UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

GOVERNMENT EMPLOYEES INSURANCE CO.,      :
GEICO INDEMNITY CO., GEICO GENERAL        :
INSURANCE COMPANY, and GEICO CASUALTY     :        REPORT &
CO.,                                      :        RECOMMENDATION
                                          :        19-CV-5570 (ENV) (SMG)
                          Plaintiffs,     :
                                          :
         -against-                        :
                                          :
AXIAL CHIROPRACTIC, P.C.,                 :
AXIAL CHIROPRACTIC, P.C.,                 :
ACTION CHIROPRACTIC, P.C.,                :
ACTION CHIROPRACTIC, P.C.,                :
BRUCE BROMBERG, D.C.,                     :
LEFCORT MUA CHIROPRACTIC, P.C.,           :
LAWRENCE LEFCORT, D.C,                    :
GLENN ROSENBERG, D.C., P.C, doing business as  :
SOUTH SHORE SPINAL CARE,                  :
GLENN ROSENBERG, D.C.,                    :
DAVID MARCUS COTY, D.C.,                  :
ROBERT LUCA, D.C.,                        :
and ARCHER IRBY, D.C.,                    :
                                          :
                          Defendants.     :

------------------------------------------------------------------- x

GOLD, STEVEN M., U.S. Magistrate Judge:

## INTRODUCTION

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"plaintiffs") bring this action alleging that various medical entities and professionals performing

chiropractic services in New York and New Jersey have submitted thousands of fraudulent no-

fault insurance claims to GEICO.  Compl. ¶¶ 1–4, Dkt. 1.  Plaintiffs claim that defendants'

practices amount to common law fraud and violate various civil provisions of the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1962 (c)–(d), and the New

Jersey Insurance Fraud Prevention Act, N.J. Stat. Ann. 17:33A-1 *et seq*.  Pls.' Mem. of Law in Supp. of Mot. to Stay and Enjoin Defs.' Collections Proceedings ("Pls.' Mem.") at 2, Dkt, 39-1. Plaintiffs seek two forms of relief: 1) the recovery of more than $1,500,000 that defendants obtained by submitting or causing to be submitted thousands of no-fault insurance claims, Compl. ¶ 1; and 2) a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, declaring that defendants have no right to receive payment for any pending no-fault insurance claims which have been submitted to GEICO, *id.* ¶¶ 3, 309.  This litigation is in its early stages, with fact discovery set to be completed by October 8, 2020.  Min. Entry, Dkt 42.

Plaintiffs now move to 1) stay all pending no-fault insurance collection arbitrations that have been commenced against GEICO by or on behalf of defendants; 2) enjoin all defendants in this action from commencing new no-fault insurance collection arbitration or litigation proceedings against GEICO; and 3) enjoin the American Arbitration Association ("AAA") and any other arbitral forum from arbitrating claims filed on behalf of defendants against GEICO. Dkt. 39; Pls.' Mem. at 1.  Plaintiffs seek to enjoin and stay these activities until its claims in this action are resolved.  *Id*.  Only the Axial and Lefcort defendants[1] have submitted opposition to the motion.  Dkt. 43; Dkt 47.

For the reasons stated below, the Court respectfully recommends granting plaintiffs' motion to stay the pending arbitrations and enjoin defendants from commencing further no-fault insurance arbitration and litigation proceedings against GEICO, but denying plaintiffs' motion to enjoin the AAA.[2]

---

[1] The "Axial defendants" include Bruce Bromberg, the Action and Axial Chiropractic practices, Glenn Rosenberg, and South Shore Spinal Care.  The "Lefcort defendants" include Lawrence Lefcort and Lefcort MUA Chiropractic.

[2] Judge Vitaliano initially directed plaintiffs to address their motion to me.  *See* Order dated Dec. 18, 2019. However, because plaintiffs' motion is one for injunctive relief, I issue a report and recommendation rather than decide the motion in a memorandum and order.  *See* 28 U.S.C. § 636(b)(1)(A).

# BACKGROUND

## I.    No-Fault Insurance Law

### A.  New York

New York's Comprehensive Motor Vehicle Insurance Regulations Act, N.Y. Ins. Law §§ 5101, *et seq.*, and the corresponding regulations, N.Y. Comp. Codes R. & Regs. tit. 11, §§ 65, *et seq.*, "are designed to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts, and to provide substantial premium savings to New York motorists," *Gov't Emps. Ins. Co. v. Mayzenberg*, 2018 WL 6031156, at *1 (E.D.N.Y. Nov. 16, 2018); *see* N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.2 (instructing insurers to prioritize "the prompt and fair payment to all automobile accident victims" and "not demand verifications of facts unless there are good reasons to do so"). Accordingly, automobile insurers like GEICO are required to provide up to $50,000 per insured for necessary health care expenses and services arising from motor vehicle accidents without proof of the other driver's fault.  N.Y. Ins. Law §§ 5102(a)–(b), 5103.  In addition, insurers must process all claims within 30 days after proof of the claim is submitted.  N.Y. Ins. Law § 5106(a). Failure to do so may prevent an insurer from asserting certain defenses to coverage, including fraud-based defenses.  *Fair Price Med. Supply Corp. v. Travelers Indem. Co.*, 10 N.Y.3d 556, 562 (N.Y. 2008).  All overdue no-fault payments bear interest at the rate of two percent per month.  N.Y. Ins. Law § 5106(a); N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.9(a).

Insurers are also obligated under New York law to give claimants "the option of submitting any dispute involving the insurer's liability" to arbitration.  N.Y. Ins. Law § 5106(b). "Those arbitrations are 'special expedited' proceedings, where no oral arguments are heard, virtually no defenses are permitted, and discovery is limited or non-existent."  *Mayzenberg*, 2018

WL 6031156, at *2 (citing N.Y. Comp. Codes R. & Regs. tit. 11, § 65-4.5).  Multiple arbitration

disputes may be consolidated "if the claims involved arose out of the same accident and involve

common issues of fact."  N.Y. Comp. Codes R. & Regs. tit. 11, § 65-4.5(c).

Insureds may assign their rights to collect no-fault insurance benefits, sometimes called

"Personal Injury Protection Benefits," to their health care providers.  Those healthcare providers

may then submit an insured's claim to the insurance carrier directly and receive payment for

having provided medically necessary services to the insured.  N.Y. Comp. Codes R. & Regs. tit.

11, § 65-3.11.  A health care provider is not eligible to receive no-fault reimbursements, though,

"if the provider fails to meet any applicable New York state or local licensing necessary to

perform such service in New York or meet any applicable licensing requirement necessary to

perform such service in any other state in which such service is performed."  N.Y. Comp. Codes

R. & Regs. tit. 11, § 65-3.16(a)(12).  One such requirement, relevant here, is that health care

providers "may not bill for services provided by physicians who are not employees of the

corporation, such as independent contractors."  *Mayzenberg*, 2018 WL 6031156, at *2; *see

Guidance from N.Y. Office of Gen. Counsel on No-fault Fees; Independent Contractor/Prof.

Corp.* (Mar. 11, 2002) (on file with N.Y. Dep't of Fin. Servs),

https://www.dfs.ny.gov/insurance/ogco2002/rg203111.htm.

Providers who submit fraudulent claims for reimbursement are subject to criminal

prosecution.  Each claim submitted by health care providers includes the following warning:

> Any person who knowingly and with intent to defraud any insurance company or
> other person files an application for insurance or statement of claim containing any
> materially false information, or conceals for the purpose of misleading, information
> concerning any fact material thereto, commits a fraudulent insurance act, which is
> a crime...

N.Y. Ins. Law § 403(d).

4

### B.  New Jersey

New Jersey's statutory scheme is similarly designed to ensure that victims of motor vehicle accidents receive prompt compensation for their injuries.  *See* Compulsory Automobile Liability Ins., N.J. Stat. Ann. § 39:6A-1, *et seq.*; Automobile Reparation Reform Act, N.J. Admin. Code § 11:3-7.1, *et seq.*  As in New York, health care providers may submit assigned claims for payment for medically necessary procedures directly to insurers.  *See* N.J. Admin. Code § 11:3-4.9(a).  To be eligible to receive such benefits in New Jersey, health care providers must comply with all applicable laws and regulations, including that a foreign professional corporation may not offer chiropractic professional services in the state without being properly incorporated under New Jersey law.  *See Liberty Mut. Ins. Co. v. Healthcare Integrated Servs.*, 2008 WL 2595922, *2 (N.J. Super. Ct. App. Div. July 2, 2008); N.J. Stat. Ann. § 14A:17-5.  Disputes "regarding the recovery of medical expense benefits or other benefits provided under personal injury protection coverage" may be submitted to arbitration.  N.J. Stat. Ann. § 39:6A-5.1(a).  Discovery is limited in those proceedings, though the parties may seek court intervention to resolve certain discovery disputes relating to the injured person.  *See* N.J. Stat. Ann. § 39:6A-13(g); *New Jersey Mfrs. Ins. Co. v. Bergen Ambulatory Surgery Ctr.*, 982 A.2d 1, 4 (N.J. App. Div. 2009).

### C.  Fraudulent Claims

In New York, "[a]n insurer who pays No-Fault benefits and subsequently discovers fraud may bring an action for damages."  *Gov't Emps. Ins. Co. v. Wellmart RX, Inc.*, 2020 WL 249020, at *2 (E.D.N.Y. Jan. 16, 2020) (citing *State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*, 589 F. Supp. 2d 221, 229–35 (E.D.N.Y. 2008)); *see also Fair Price Med. Supply Corp. v. Travelers Indem. Co.*, 9 Misc. 3d 76, 79 (N.Y. App. Term 2005) ("We note in passing that an

insurer precluded from defending a claim based on provider fraud is not without remedy; after paying such a claim, the insurer, for example, may have an action to recover benefits paid under a theory of fraud or unjust enrichment"), *aff'd*, 10 N.Y.3d 556 (N.Y. 2008).  In such circumstances, an insurer may also, pursuant to 28 U.S.C. § 2201, seek a declaratory judgment that it is not obligated to reimburse a defendant provider's no-fault claims.  *Gov't Emps. Ins. Co. v. Jacques*, 2017 WL 9487191, at *9 (E.D.N.Y. Feb. 13, 2017), *report and recommendation adopted*, 2017 WL 1214460 (E.D.N.Y. Mar. 31, 2017).

New Jersey provides similar relief to insurers under the New Jersey Insurance Fraud Prevention Act, N.J. Stat. Ann. §§ 17:33A-1 *et seq.*, a statute designed "to confront aggressively the problem of insurance fraud," N.J. Stat. Ann. § 17:33A-2; N.J. Stat. Ann. § 17:33A-7 (providing a cause of action by insurance companies against violators).  A medical provider violates the Act if the provider makes a statement in support of a claim for payment "knowing that the statement contains any false or misleading information … material to the claim."  N.J. Stat. Ann. § 17:33A-4(a)(1)–(2).  The statute also holds practitioners liable for conspiring with others, N.J. Stat. Ann. § 17:33A-4(a)(6)(c), and provides for awards of treble damages against those who exhibit a "pattern" of fraudulent behavior, defined as five or more related violations, N.J. Stat. Ann. §§ 17:33A-3, 17:33A-7(b).

## II.    Factual Background

### A.  The Parties

Plaintiffs, GEICO and its subsidiaries, issue automobile insurance policies in New Jersey and New York.  Compl. ¶ 46.  The defendants are health care providers and their related entities.

Defendant Bruce Bromberg, D.C., has been licensed to practice chiropractic medicine in New York since 1987 and New Jersey since 2014.  *Id.* ¶ 19.  Bromberg owns and performs

chiropractic services on behalf of the defendant entities Axial Chiropractic, P.C. ("Axial Chiro NY"), Axial Chiropractic, P.C. ("Axial Chiro NJ"), Action Chiropractic, P.C. ("Action Chiro NY"), and Action Chiropractic, P.C. ("Action Chiro NJ"). *Id.*

Defendant Glenn Rosenberg, D.C., has been licensed to practice chiropractic medicine in New York since 1996 and New Jersey since 2004. *Id.* ¶ 29. Rosenberg owns Glenn Rosenberg D.C., P.C. d/b/a South Shore Spinal Care ("South Shore Spinal") and has performed chiropractic services on its behalf. *Id.* Rosenberg has also performed services on behalf of Axial Chiro NJ, Action Chiro NJ, and Lefcort MUA. *Id.* Collectively, Bromberg, Bromberg's practices, Rosenberg, and South Shore Spinal are the "Axial defendants."

Defendant Lawrence Lefcort, D.C., has been licensed to practice chiropractic medicine in New York since 1980 and New Jersey since 2014. *Id.* ¶ 31. Lefcort owns Lefcort MUA Chiropractic P.C. ("Lefcort MUA") and performs chiropractic services on its behalf. *Id.* Collectively, Lefcort and his practice are the "Lefcort defendants."

Defendants David Marcus Coty, D.C., Robert Luca, D.C., and Archer Irby, D.C. are individual chiropractors. *Id.* ¶¶ 32–34. Coty has been licensed to practice chiropractic medicine in New York since 1980 and performed services on behalf of Axial Chiro NY. *Id.* ¶ 32. Luca has been licensed to practice chiropractic medicine in New York since 1987 and New Jersey since 2009 and performed services on behalf of South Shore Spinal. *Id.* ¶ 33. Irby has been licensed to practice chiropractic medicine in New York since 2001 and New Jersey since 2006 and performed services on behalf of South Shore Spinal. *Id.* ¶ 34.

Defendants Bromberg and Irby have apparently been accused of misconduct in the past. Bromberg has twice been sued for participating in no-fault insurance fraud schemes, and Irby has been criminally charged with groping female patients. *Id.* ¶¶ 20–26, 35–37. This history,

plaintiffs allege, "made it virtually impossible for [either] to obtain legitimate employment as a chiropractor, and contributed to [their] motive to participate in the [alleged] fraudulent scheme." *Id.* ¶¶ 27, 41.

### B. Plaintiffs' Fraud Allegations

Plaintiffs' Complaint describes two general categories of fraudulent activity. The first relates to defendants' failure to comply with New York and New Jersey licensing requirements. Specifically, plaintiffs allege that defendants offered chiropractic services in New Jersey prior to being lawfully incorporated under New Jersey law and are therefore ineligible to claim or receive no-fault benefits for those services. Compl. ¶¶ 82–108. Plaintiffs further allege that defendants are ineligible to receive no-fault benefits for services performed by defendant Irby because he worked as an independent contractor and not as an employee. *Id.* ¶¶ 109–21.

The second category of fraudulent activity, to which the majority of plaintiffs' Complaint is addressed, details material misrepresentations in defendants' claims for no-fault benefits. Most of the alleged misrepresentations involve the use of "current procedural terminology," or "CPT" codes, which are set forth in New York and New Jersey fee schedules and represent various medical services. *Id.* ¶¶ 57, 69. For example, plaintiffs allege that defendants used CPT codes for treatments not ordinarily required for the minor injuries typically sustained in "low-speed, low-impact collisions" such as those experienced by their insureds. *Id.* ¶¶ 122–27, 138–56. Plaintiffs allege that the vehicles involved in these collisions were capable of being driven away and that defendants' insureds, who rarely sought treatment at a hospital after their motor vehicle accidents, were not too injured to drive them. *Id.* Plaintiffs further allege that defendants used CPT codes that overstate the time they spent conducting initial examinations, *id.* ¶¶ 157–67, the extent of the examinations they conducted in response to patient's complaints, which were

"limited to musculoskeletal complaints," *id.* ¶¶ 168–90, and the complexity of the medical decision-making required to respond to their insureds' "minor soft-tissue injury complaints," *id.* ¶¶ 191–221.  Defendants' misrepresentations created further opportunities for fraud by providing "a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide…including follow-up examinations, chiropractic services and MUA [manipulation under anesthesia] services."  *Id*. ¶ 156.

With respect to MUA services, a treatment involving a "series of mobilization, stretching and traction procedures performed on a patient's musculoskeletal system, while the patient is under sedation," plaintiffs claim that defendants routinely prescribed MUA before attempting more conservative treatment options.  *See id.* ¶¶ 222–44.  In addition, defendants performed more than one MUA per patient even though repeat MUAs "are medically necessary only under limited circumstances."  *Id.* ¶¶ 247–77.

Plaintiffs further allege that the virtually uniform treatment of defendants' numerous insured patients is indicative of fraud.  For example, plaintiffs point out that defendants recorded numerous MUA patients' rate of recovery at identical rates even though "it is simply impossible that" so many insureds presented "identical symptomology and subjective complaints," "recover[ed] from the treatment in identical fashion," and "report[ed] identical subjective improvements following the first and second days of putative MUA services."  *Id.* ¶¶ 269–71.  Plaintiffs also list a representative group of patients about whom Rosenberg and Lefcort made identical notes—down to the same grammatical error—prior to their patients' first MUA, after the first MUA, and after the second MUA.  *Id.* ¶¶ 272–77.

Plaintiffs seek to recover more than $1,500,000 that GEICO paid in reliance on defendants' material misrepresentations and omissions.  Compl. ¶¶ 300–01; Pls.' Reply Mem. to

Axial Defs.' Mem. ("Pls.' Reply to Axial") at 6, Dkt. 48. Plaintiffs further request a declaratory

judgment stating that they are not liable to pay any of defendants' outstanding claims for no-fault

benefits. Pls.' Mem. at 2. Defendants are collectively pursuing those claims in at least 220

separate arbitration proceedings through which they seek to collect approximately $570,000 in

benefits. Pls.' Mem. at 6; Aff. of Robert Weir ¶ 18, Dkt. 39-2.

DISCUSSION

## I.    Motion to Stay Pending Arbitrations and to Enjoin Defendants from Commencing Future Arbitration and Litigation Proceedings

Plaintiffs' requests to stay pending arbitrations and enjoin new proceedings "are

considered in tandem." *Gov't Emps. Ins. Co. v. Cean*, 2019 WL 6253804, at *4 (E.D.N.Y. Nov.

22, 2019).[3] "Courts look to the preliminary injunction standard under such circumstances."

*Wellmart*, 2020 WL 249020, at *4.

> In order to justify a preliminary injunction, a movant must demonstrate (1) irreparable harm absent injunctive relief; and (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor.

*Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 217 (E.D.N.Y. 2013) (internal quotation

marks omitted) (quoting *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d

Cir. 2010)).

---

[3] In contrast to recent motions for injunctions submitted by GEICO and other insurers, *see, e.g., Mayzenberg*, 2018 WL 6031156, at *1, GEICO's present motion does not ask the Court to enjoin any ongoing state proceedings initiated by defendants; instead, GEICO asks the Court to enjoin *future* state proceedings. While a district court is generally prohibited under the Anti-Injunction Act from enjoining ongoing state proceedings, *id.* at *7, "[t]he Anti–Injunction Act does not prevent a federal court from restraining a party from instituting future state proceedings," *Pathways, Inc. v. Dunne*, 329 F.3d 108, 114 (2d Cir. 2003). Accordingly, the Anti-Injunction Act does not present a bar to GEICO's motion in the present case.

### A.  Irreparable Harm

"The showing of irreparable harm is [p]erhaps the single most important prerequisite for the issuance of a preliminary injunction."  *Elzanaty*, 929 F. Supp. 2d at 221 (quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)).  The movant must show that "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation."  *Kamerling*, 295 F.3d at 214 (internal quotation marks omitted) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)).  Importantly, "mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."  *Mayzenberg*, 2018 WL 6031156, at *5.

Here, however, plaintiffs face an additional risk that the hundreds of arbitrations pending with defendants will result in awards inconsistent with any final judgment in this case.  Courts have repeatedly held that this risk, which requires an insurer "to waste time defending numerous no-fault actions when those same proceedings could be resolved globally in a single, pending declaratory judgment action," constitutes irreparable harm.  *State Farm Mut. Auto. Ins. Co. v. Parisien*, 352 F. Supp. 3d 215, 233 (E.D.N.Y. 2018); *see also Cean*, 2019 WL 6253804, at *5 (same); *Elzanaty*, 929 F. Supp. 2d. at 222  ("[T]here is a concern here with wasting time and resources in an arbitration with awards that might eventually be, at best, inconsistent with this Court's ruling, and at worst, essentially ineffective."); *Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243, 264 (E.D.N.Y. 2012) ("Permitting these individual claims to proceed to arbitration while [plaintiff insurer's] claim for a declaratory judgment remains pending in this court puts the plaintiffs at significant risk of multiple judgments that may be inconsistent with the ultimate decision in this case.").

The expedited procedures in no-fault arbitration proceedings further increase the risk of inconsistent judgments.  As Judge Glasser observed in *Mayzenberg*, "New York's arbitration process for No-fault coverage is a 'special expedited,' simple affair designed to work as quickly as possible…discovery is limited or non-existent and the insurance companies are essentially defenseless."  2018 WL 6031156, at *6 (internal citation omitted).  Thus, "[c]omplex fraud and RICO claims, maturing years after the initial claimants were fully reimbursed, cannot be shoehorned into this system."  *Allstate Ins. Co. v. Mun*, 751 F.3d 94, 99 (2d Cir. 2014). Relatedly, arbitration claims may be consolidated only when they arise out of the same incident. This restriction limits plaintiffs' ability in arbitration proceedings to demonstrate a pattern of diagnoses and treatments indicative of fraud, which is a significant aspect of the showing plaintiffs make in their Complaint here.  As noted by the court in *Parisien*, "alleged violations may not be apparent if the claims and their supporting documentation are examined in isolation on a case-by-case basis."  352 F. Supp. 3d at 229.

The Axial defendants cite *Allstate Ins. Co. v. Harvey Family Chiropractic*, 677 F. App'x 716, 718 (2d Cir. 2017), in support of their argument that an injunction is unnecessary because plaintiffs can be "fully compensated through money damages for the alleged harm suffered from the defendants' fraudulent claims."  Axial Defs.' Mem. of Law in Opp. to Pls.' Mot. to Stay and Enjoin Defs.' ("Axial Mem.") at 4, Dkt. 43.  However, courts in this district have repeatedly held that the decision in *Harvey* does not preclude granting injunctive relief similar to that sought by plaintiffs here.  Judge Matsumoto noted in *Wellmart* that "*Harvey's* limited discussion of the underlying facts deprives the court of the ability to meaningfully compare *Harvey* to the present circumstances."  2020 WL 249020, at *6.  Judge Glasser further observed in *Mayzenberg* that while the *Harvey* opinion reiterates the principle that "mere injuries…in terms of money, time

and energy necessarily expended" do not amount to irreparable harm, it does not discuss the harm associated with inconsistent judgments, or "the inconsistency to which hundreds arbitrations will inevitably give rise." 2018 WL 6031156, at *5. The *Harvey* opinion is also a summary order and therefore of limited precedential effect. *Wellmart*, 2020 WL 249020, at *5– *6; *Mayzenberg*, 2018 WL 6031156, at *5; *see also* 2d Cir. Local R. 32.1.1(a) ("Rulings by summary order do not have precedential effect.").

The present case is also distinguishable from *Allstate Ins. Co. v. Avetisyan*, 2018 WL 6344249 (E.D.N.Y. Oct. 30, 2018). In that case, which involved similar allegations of fraud, the Court distinguished some of the cases cited above and denied plaintiff's motion for an injunction after concluding that the insurer's claims in the federal action were not identical to the defenses asserted in the arbitral forums. *Id.* at *4. More specifically, in *Avetisyan*, plaintiff revealed at oral argument that it had asserted defenses in the parallel proceedings only on the grounds of medical necessity and not fraud. *Id.* The risk of inconsistent judgments noted in those cases granting injunctive relief did not, according to the Court, arise in *Avetisyan*. In contrast, in *Elzanaty* "the issues before the federal court were identical to the issues in the arbitral proceedings the plaintiffs sought to enjoin" and, as a result, posed a risk of inconsistent judgments. *Avetisyan*, 2018 WL 634429 at *3; *see also Elzanaty*, 929 F. Supp. 2d at 221 (explaining that "if this Court were to grant a declaratory judgment finding [defendants] ineligible for reimbursement, it may be that an award won by the Defendants in arbitration would conflict with this Court's ruling").

The present case poses the same risk recognized in *Elzanaty*. Though plaintiffs have not disclosed which defenses they are asserting in the parallel proceedings, a declaratory judgment that GEICO is not obligated to reimburse defendants would directly conflict with an arbitration

panel's finding that defendants' claims for payment are valid.  Plaintiffs here also challenge

defendants' no-fault claims as medically unnecessary.  Compl. ¶ 3.  Thus, a finding in the

parallel proceedings that defendants submitted claims for treatments that were medically

necessary would conflict with any ruling this Court might ultimately make in favor of GEICO.

*See Wellmart*, 2020 WL 249020, at *6 (distinguishing *Avetisyan* on the same basis).

In conclusion, and particularly given the recent authority in this district, the Court

respectfully recommends finding that plaintiffs have shown that they will face irreparable harm

absent the requested injunction.

### B.  *Serious Question Going to the Merits*

The Court next evaluates whether there is "either a likelihood of success on the merits, or

a serious question going to the merits to make them a fair ground for trial, with a balance of

hardships tipping decidedly in the plaintiff's favor."  *Elzanaty*, 929 F. Supp. 2d at 217.  At this

early stage in the case, "any likelihood of success inquiry would be premature."  *Parisien*, 352 F.

Supp. 3d at 234.  The "serious question" alternative "permits a district court to grant a

preliminary injunction in situations where it cannot determine with certainty that the moving

party is more likely than not to prevail on the merits of the underlying claims, but where the

costs outweigh the benefits of not granting the injunction."  *Citigroup Glob. Markets, Inc. v.

VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

Here, plaintiffs seek an injunction pending the disposition of their claims in this action,

which include claims for damages based on common law fraud and RICO and for a declaratory

judgment that plaintiffs are not obligated to reimburse defendants for pending no-fault claims.

Pls.' Mem. at 1–2.  To raise sufficiently serious questions going to the merits of those claims,

plaintiffs must "adequately detail[] a complicated scheme of alleged fraudulent activity." *Elzanaty*, 929 F. Supp. 2d at 222.

Plaintiffs have done so here, in large part by pointing out the striking similarities among so many of defendants' no-fault claims. Plaintiffs list more than 5000 claims they allege are fraudulent in the exhibits attached to their Complaint. Compl. ¶¶ 7–12; Dkt. 1-1; Dkt. 1-2; Dkt. 1-3; Dkt. 1-4; Dkt. 1-5; Dkt. 1-6. In their Complaint, plaintiffs describe in great detail 89 representative examples of defendants using CPT codes that, plaintiffs contend, exaggerate or fabricate the severity of the insured's injuries and the extent of the treatment defendants administered or the insureds required. *See* Compl. ¶¶ 153, 176, 188, 207, 288.

Plaintiffs' contention that defendants exaggerated or conjured the injuries sustained and medical treatment required by their insureds is supported by details of the insureds' accidents and medical records that are inconsistent with the nature of the injuries and treatments claimed by defendants. For example, plaintiffs point out that defendants submitted claims with CPT codes reflecting injuries of moderate or high severity, *see* Compl. ¶¶ 132–147, but the police reports of the underlying motor vehicle accidents indicate that the accidents were typically low-impact and that the insureds generally had no complaints of pain or injury at the accident scene, *see, e.g.*, Compl. ¶¶ 153(i), (ii) and (v).[4] Plaintiffs also point to several instances in which defendants submitted claims with CPT codes indicating "detailed" or "comprehensive" physical examinations, but the underlying medical records do not reflect the sort of thorough examinations that would be consistent with the use of those codes. *See* Compl. ¶¶ 168–90. Plaintiffs contend further that, although defendants submitted claims indicating they treated many insureds for pelvic ring injuries, these same insureds made no complaints of pain

---

[4] The cited subparagraphs are just a small sampling of several similar allegations in subsequent paragraphs of the Complaint.

consistent with having sustained injuries of that type at the time of their underlying motor vehicle accidents.  *See* Compl. ¶¶ 278–290.

The Complaint also describes 90 representative examples of insureds—including those of varying ages and physical conditions—who were given identical diagnoses and courses of treatment by defendants, and who were reported by defendants as improving at identical rates. *See* Compl. ¶¶ 215, 246, 266, 276.  The sheer number of no-fault claims with virtually identical characteristics is sufficiently indicative of fraud to establish, at a minimum, serious questions going to the merits of plaintiffs' allegations.  While discrete examples of defendants' no-fault claims would not necessarily indicate fraudulent activity, the claims viewed as a whole— reporting the same CPT codes and rates of recovery—lead to the "irresistible inference [] that the treatments are not being provided on the basis of medical necessity."  *Parisien*, 352 F. Supp. 3d at 229.  Rather, as plaintiffs persuasively allege, logic dictates that the identical diagnoses among defendants' patients of all ages and physical conditions, are "simply impossible." *See, e.g.,* Compl. ¶¶ 269–72; *see also State Farm Automobile Insurance Company v. Physicians Injury Care Center, Inc.*, 2010 WL 11475709, at *6–*7, *14 (M.D. Fla. May 24, 2010) (holding that plaintiffs proved fraud based on evidence of 957 "virtually identical" patient charts and testimony that "every [] patient received the exact same treatment, regardless of the patient's age, the severity of the injury or whether the patient was improving or worsening").

In their opposition brief, the Lefcort defendants rely on *Mayzenberg*, *Parisien*, and *Wellmart*, to argue that courts have found serious questions going to the merits of the movants' claims only as a "consequence of [a] fact-laden discovery process."  Lefcort Defs.' Mem. of Law in Opp. to Pls.' Mot. for Injunctive Relief ("Lefcort Mem.") at 5–8, Dkt. 47.  Indeed, in each of those cases the Court was presented with a more extensive record than a Complaint and its

exhibits, as plaintiffs have provided here.  *Wellmart*, 2020 WL 249020, at *8 (reviewing

declarations from two doctors, one of whom was a defendant);  *Mayzenberg,* 2018 WL 6031156,

at *6–*7 (reviewing defendant's testimony and exhibits submitted with motion); *Parisien*, 352 F.

Supp. 3d at 235 (reviewing "detailed grids purporting to show the initial evaluation made of

patients…and how those services were billed" in addition to "copies of documents allegedly

containing false statements by some of the Defendants").  Judge Matsumoto observed in

*Wellmart*, however, that the movant's showing "would likely satisfy the heightened 'likelihood

of success' standard" and therefore "easily raise[d] a serious question going to the merits of

whether defendants were prescribing medically necessary treatments."  2020 WL 249020, at *8.

Thus, while a "fact-laden discovery process" may help demonstrate a likelihood of success, it is

not essential to a showing that a case presents a serious question going to the merits.  *See Excel*

*Imaging*, 879 F. Supp. 2d at 254, 264 (staying arbitration "in the interest of judicial economy"

based upon facts drawn primarily from plaintiffs' complaint); *R.R. P.B.A. of State of New York,*

*Inc. v. Metro-N. Commuter R.R.*, 699 F. Supp. 40, 43–44 (S.D.N.Y. 1988) (concluding that

plaintiff failed to establish "probable success on the merits" due to "the obvious conflict [in

facts] as to the case's dispositive issue," but nevertheless inquiring into the balance of hardships

because "the obvious conflict" also presented serious questions going to the merits).

Moreover, tying the serious question element to the extent of discovery conducted

ignores its utility as an alternative to the likelihood of success standard.  The Second Circuit has

stressed that "[t]he value of this circuit's approach to assessing the merits of a claim at the

preliminary injunction stage lies in its flexibility in the face of…the greater uncertainties inherent

at the outset of particularly complex litigation."  *Citigroup Glob. Markets*, 598 F.3d at 35.

Finally, plaintiffs' Complaint is hardly conclusory; to the contrary, in their Complaint, plaintiffs extensively set forth specific facts that "adequately detail[] a complicated scheme of fraudulent activity." *Elzanaty*, 929 F. Supp. 2d at 222. Having done so, plaintiffs have raised serious questions going to the merits of their claims.

### C. Balance of Hardships

"Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Citigroup Glob. Markets*, 598 F.3d at 35 (internal citation omitted). Here, the balance of hardships favors granting the injunction. Absent a stay, plaintiffs will face "a multitude of individual arbitrations." Pls.' Mem. at 15; *see Parisien*, 352 F. Supp. 3d at 233 ("[E]ven if State Farm prevails on the merits in this case, it will go uncompensated for the time and expense wasted in the state proceedings and arbitrations."); *Gov't Emps. Ins. Co. v. Sheepshead Bay Med. Supply, Inc. et al*, 18-CV-4039, Dkt. 31, slip op. at 11 (E.D.N.Y. Aug. 23, 2019) (concluding in analogous circumstances that failure to issue a stay "would result in premature resolution of defendants' unpaid insurance claims and might require plaintiffs to return to federal court in the future in order to recoup benefits paid only because of fraudulent representations"). These arbitrations will be simple proceedings with little or no opportunity to conduct discovery. *See Mayzenberg*, 2018 WL 6031156, at *6. Accordingly, plaintiffs would undoubtedly not have the opportunity to present the pattern of identical treatment of patients discussed above, and would therefore face the same dilemma described by the court in *Parisien*, which noted that, "[b]ecause it is only through this tapestry of facts that the alleged fraud comes into focus, [plaintiff] may not as a practical matter have a fair opportunity to present its claims

unless it is permitted to direct the trier of fact to *all* of the claims at issue." 352 F. Supp. 3d at 229 (citation omitted).

Defendants, on the other hand, will be compensated for any delay in obtaining no-fault reimbursements because they are entitled to statutory interest on unpaid claims. *See Elzanaty*, 929 F. Supp. 2d at 222 (concluding that practitioner defendant will in fact "benefit from the stay if it ultimately prevails in this matter, because it will be entitled to the collection of interest at a rate of two percent every month that the No-Fault payments are overdue").

For all the reasons stated above, the Court respectfully recommends granting plaintiffs' motion for preliminary injunctive relief.

### D.  Security Requirement under Rule 65(c)

The Lefcort defendants argue that, if any injunction is issued, plaintiffs should be required to post a substantial bond or undertaking. Lefcort Mem. at 10. Under Rule 65(c) of the Federal Rules of Civil Procedure, a court "may issue a preliminary injunction only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Courts nevertheless have "wide discretion to dispense with the bond requirement of Fed.R.Civ.P. 65(c) 'where there has been no proof of likelihood of harm'" resulting from the injunction. *Donohue v. Mangano*, 886 F. Supp. 2d 126, 163 (E.D.N.Y. 2012) (quoting *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997)); *see also Wellmart*, 2020 WL 249020, at *9.

This is such a case. Though the Lefcort defendants insist that the delay in adjudicating their claims "exposes them to the risk that plaintiffs will be relieved of their duty to pay because of the exhaustion of benefits," they cite no authority to this effect and fail to explain the risk

further.  Lefcort Mem. at 10.  To the contrary, defendants will be entitled substantial statutory interest on their claims—2% per month under New York regulations, N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.9—if they prevail.  Moreover, there is no reason to doubt GEICO's ability to pay defendants for the services they provided if required to do so.  *See Yong Ki Hong v. KBS Am., Inc.*, 2005 WL 1712236, at *4 (E.D.N.Y. July 22, 2005) (waiving the bond requirement in light of "the absence of evidence of any direct harm to defendants").  The Court therefore recommends that the bond requirement be waived. [5]

## II.    Motion to Enjoin the American Arbitration Association

In addition to moving to stay all pending arbitrations and enjoin future arbitration and litigation proceedings filed by defendants, plaintiffs ask the court to enjoin the AAA and any other arbitral forum from arbitrating claims filed on behalf of defendants against GEICO.  Pls.' Mem. at 1.  A review of recent cases brought by GEICO, including *Wellmart*, *Cean*, and *Mayzenberg*, suggests that this is the first time GEICO has sought an injunction against the AAA itself.  This request is, however, easily disposed of; not only is it an unnecessary measure given the Court's recommendation that defendants be enjoined from instituting any further arbitration or litigation proceedings, but plaintiffs have neither named the AAA as a party in this action nor served it with the present motion.  The Court therefore recommends denying plaintiffs' motion for an injunction directed at the AAA or any other arbitral forum.

---

[5] Courts have also recognized an exception to the Rule 65(c) bond requirement in "cases involving the enforcement of public interests arising out of comprehensive federal health and welfare statutes."  *Pharm. Soc'y v. N.Y. State Dep't of Soc. Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995) (internal quotation marks omitted).  Though there are no federal health and welfare statutes presently at issue, courts in this district have applied this exception to cases similar to this one because "preventing fraud on our health care system is also in the public's interest."  *Mayzenberg*, 2018 WL 6031156, at *10; *see also Wellmart*, 2020 WL 249020, at *9.

CONCLUSION

For the reasons set forth above, the Court respectfully recommends that plaintiffs' motion be granted in part, and that a preliminary injunction issue 1) staying all pending arbitrations that have been commenced against GEICO by or on behalf of defendants; and 2) enjoining all defendants in this action from commencing new no-fault arbitrations or lawsuits against GEICO. The Court further recommends that the injunction remain in place through the disposition of plaintiffs' claims in this action.  Finally, the Court recommends that plaintiffs' motion to enjoin the AAA be denied.

Any objections to the recommendations made in this Report must be made within fourteen days after the filing of this Report and Recommendation and, in any event, on or before May 11, 2020.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file timely objections may waive the right to appeal the District Court's order.  *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (discussing waiver under the former ten-day limit).

                                                /s/
                                    STEVEN M. GOLD
                                    United States Magistrate Judge

Brooklyn, New York
April 27, 2020

*U:\#ECC 2019-2020\19-cv-5570 GEICO v. Axial et al\19-cv-5570 GEICO Motion to Stay FINAL 042420.docx*