Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
Steven T. Henesy (SH 6357)
Yonatan Bernstein (YB 6425)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance*
*Co., GEICO Indemnity Co., GEICO General Insurance*
*Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO., | Docket No.:<br>1:19-cv-05570-ENV-VMS |
| Plaintiffs, | **AMENDED COMPLAINT** |
| –against– | **Plaintiff Demands a Trial by Jury** |
| AXIAL CHIROPRACTIC, P.C.,<br>ACTION CHIROPRACTIC, P.C.,<br>BRUCE BROMBERG, D.C.,<br>LEFCORT MUA CHIROPRACTIC, P.C.,<br>BAYSIDE PHYSICAL THERAPY, CHIROPRACTIC, &<br>ACUPUNCTURE, P.L.L.C.,<br>LAWRENCE LEFCORT, D.C.,<br>KYUNG HEE YOO, P.T., L.Ac.,<br>GLENN ROSENBERG, D.C., P.C. d/b/a SOUTH SHORE<br>SPINAL CARE,<br>GLENN ROSENBERG, D.C.,<br>DAVID MARCUS COTY, D.C.,<br>ROBERT LUCA, D.C., and<br>ARCHER IRBY, D.C., | |
| Defendants. | |

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

1

"Plaintiffs"), as and for their Amended Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.     This action seeks to recover more than $1,900,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted:

(i)      hundreds of fraudulent no-fault insurance charges through Axial Chiropractic, P.C. with a tax identification number ending -0085 ("Axial Chiro"), Action Chiropractic, P.C. with a tax identification number ending in -4605 ("Action Chiro"), Glenn Rosenberg, D.C., P.C. d/b/a South Shore Spinal Care with a tax identification number ending in -2439 ("South Shore"), and Lefcort MUA Chiropractic, P.C. with a tax identification number ending in -4620("Lefcort MUA"), for purported patient examinations and manipulation under anesthesia ("MUA") services; and

(ii)     thousands of fraudulent no-fault insurance changes through Bayside Physical Therapy, Chiropractic, & Acupuncture, P.L.L.C. with a tax identification number ending in -5273 ("Bayside") for purported patient examinations, pain fiber nerve conduction study ("pf-NCS") testing, chiropractic services, physical therapy services, acupuncture services, and computerized range of motion and muscle strength testing ("ROM/MT") services.

(the  purported patient examinations, MUA services, pf-NCS testing, chiropractic services, physical therapy services, acupuncture services, and ROM/MT services collectively are referred to herein as the "Fraudulent Services").

2.     The Fraudulent Services purportedly were provided, to the extent they were provided at all, to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.     In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,800,000.00 in pending no-fault insurance claims submitted by or on behalf of the Defendants, because:

(i)      the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent

protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the levels and types of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)    Lefcort MUA and Bayside were engaged in an illegal referral scheme;

(iv)    many of the Fraudulent Services purportedly provided by South Shore were performed – to the extent that they were performed at all – by independent contractors, rather than by South Shore or its employees, which rendered South Shore ineligible to receive no-fault insurance reimbursement in connection with the Fraudulent Services;

(v)     Axial Chiro, Action Chiro, Lefcort MUA, and South Shore unlawfully operated in New Jersey as foreign professional corporations in violation of New Jersey law, which rendered them ineligible to receive no-fault insurance reimbursement;

(vi)    Axial Chiro, Action Chiro, Lefcort MUA, South Shore, and Bayside were not in compliance with all relevant laws and regulations governing healthcare practice and, as a result, were not eligible to receive no-fault reimbursement in the first instance; and

(vii)   the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice and, therefore, were not eligible for no-fault reimbursement in the first instance.

4.      As set forth herein, the Defendants at all relevant times have known that:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the levels and types of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)   Lefcort MUA and Bayside were engaged in an illegal referral scheme;

(iv)    many of the Fraudulent Services purportedly provided by South Shore were performed – to the extent that they were performed at all – by independent contractors, rather than by South Shore or its employees, which rendered South Shore ineligible to receive no-fault insurance reimbursement in connection with the Fraudulent Services;

(v)    Axial Chiro, Action Chiro, Lefcort MUA, and South Shore unlawfully operated in New Jersey as foreign professional corporations in violation of New Jersey law, which rendered them ineligible to receive no-fault insurance reimbursement;

(vi)   Axial Chiro, Action Chiro, Lefcort MUA, South Shore, and Bayside were not in compliance with all relevant laws and regulations governing healthcare practice and, as a result, were not eligible to receive no-fault reimbursement in the first instance; and

(vii)  the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice and, therefore, were not eligible for no-fault reimbursement in the first instance.

5.    Each and every charge submitted through Axial Chiro, Action Chiro, Lefcort MUA, South Shore, and Bayside since at least 2014 has been fraudulent and unlawful for the reasons set forth herein. The charts annexed hereto as Exhibits "1" – "5" set forth a large and representative sample of the fraudulent and unlawful claims that have been identified to date that have been submitted by mail through Axial Chiro, Action Chiro, Lefcort MUA, South Shore, and Bayside to GEICO. Defendants' interrelated fraudulent schemes began no later than 2014, and have continued uninterrupted since that time.

## THE PARTIES

### I.    Plaintiffs

6.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New Jersey.

### II.   Defendants

7.    Defendant Axial Chiro is a New York and New Jersey chiropractic professional corporation, operating as a single entity under a single tax identification number ending in -0085, with its principal place of business in New York. Axial Chiro was incorporated in New York on

or about February 14, 2011 and in New Jersey on or about June 11, 2015, was owned by Bromberg, and was used by Bromberg as a vehicle to submit fraudulent billing to GEICO and other insurers.

8.      Defendant Action Chiro is a New York and New Jersey chiropractic professional corporation, operating as a single entity under a single tax identification number ending in -4605, with its principal place of business in New York. Action Chiro was incorporated in New York on or about February 14, 2011 and in New Jersey on or about June 11, 2015, was owned by Bromberg, and was used by Bromberg as a vehicle to submit fraudulent billing to GEICO and other insurers.

9.      Although they were ostensibly different businesses – with different names and tax identification numbers – Axial Chiro and Action Chiro operated in virtually identical fashion, and the differences between these entities was purely nominal. Indeed, Bromberg's testimony during a deposition in this action indicated that the only difference between Axial Chiro and Action was their names, the dates of their incorporation, and the colors of their checkbooks.

10.     Defendant Bromberg resides in and is a citizen of New York. Bromberg was licensed to practice chiropractic in New York in 1987, was licensed to practice chiropractic in New Jersey in 2014, owned Axial Chiro and Action Chiro, and purported to perform many of the Fraudulent Services on behalf of Axial Chiro and Action Chiro.

11.     Defendant South Shore is a New York chiropractic professional corporation with its principal place of business in New York. South Shore was incorporated in New York on or about April 9, 1998, was owned by Rosenberg, and was used by Rosenberg as a vehicle to submit fraudulent billing to GEICO.

12.     Defendant Rosenberg resides in and is a citizen of New York. Rosenberg was licensed to practice chiropractic in New York in 1996 and in New Jersey in 2004, owned South

Shore, and purported to perform many of the Fraudulent Services on behalf of South Shore, Axial Chiro, Action Chiro, and Lefcort MUA.

13.     Defendant Lefcort MUA is a New York chiropractic professional corporation with its principal place of business in New York. Lefcort MUA was incorporated in New York on or about December 30, 2011, was owned by Lefcort, and was used by Lefcort as a vehicle to submit fraudulent billing to GEICO.

14.     Defendant Bayside is a New York chiropractic, physical therapy, and acupuncture professional limited liability company with its principal place of business in New York. Bayside was incorporated in New York on or about October 29, 2009, had Lefcort and Yoo as its owners and members, and was used by Lefcort and Yoo as a vehicle to submit fraudulent billing to GEICO.

15.     Defendant Lefcort resides in and is a citizen of New York. Lefcort was licensed to practice chiropractic in New York in 1980, was licensed to practice chiropractic in New Jersey in 2014, purported to be the sole owner of Lefcort MUA, was an owner and member of Bayside, and purported to perform many of the Fraudulent Services on behalf of Lefcort MUA and Bayside.

16.     Defendant Yoo resides in and is a citizen of New York. Yoo was licensed to practice acupuncture in New York in 2007, was licensed to practice physical therapy in New York in 2000, was an owner and member of Bayside, and purported to perform many of the Fraudulent Services on behalf of Bayside.

17.     Defendant Coty resides in and is a citizen of New York. Coty was licensed to practice chiropractic in New York in 1980, and purported to perform many of the Fraudulent Services on behalf of Axial Chiro.

18. Defendant Luca resides in and is a citizen of New York. Luca was licensed to practice chiropractic in New York in 1987, was licensed to practice chiropractic in New Jersey in 2009, and purported to perform many of the Fraudulent Services on behalf of South Shore.

19. Defendant Irby resides in and is a citizen of New Jersey. Irby was licensed to practice chiropractic in New York in 2001 and in New Jersey in 2006, and purported to perform many of the Fraudulent Services on behalf of South Shore.

## III.   The Independent Contractors

20. Although they have not been named as Defendants, Brett Saal, D.C. ("Saal"), Henry Estrada, D.C. ("Estrada"), Russell Neresov, D.C. ("Neresov"), and Matthew Leffel, D.C. ("Leffel") are relevant to understanding the allegations in this Complaint.

21. Along with Irby and Luca, Saal, Estrada, Neresov, and Leffel purported to perform many of the Fraudulent Services on behalf of South Shore.

22. However, neither Irby, Luca, Saal, Estrada, Neresov, nor Leffel was ever an employee of South Shore.

23. Instead, at all relevant times, Irby, Luca, Saal, Estrada, Neresov, and Leffel were independent contractors when they purported to perform the Fraudulent Services on South Shore's behalf.

24. Even so, all of South Shore's billing submitted to GEICO for the Fraudulent Services performed by Irby, Luca, Saal, Estrada, Neresov, and Leffel falsely represented that Irby, Luca, Saal, Estrada, Neresov, and Leffel were South Shore's employees, when in fact they were independent contractors.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.  This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

26.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

27.     GEICO underwrites automobile insurance in New York and New Jersey.

### A.     Pertinent New York Law Governing No-Fault Insurance Reimbursement

28.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

29.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" or "PIP Benefits") to Insureds.

30.     In New York, an Insured can assign his/her right to PIP Benefits to healthcare goods and services providers in exchange for those services.

31.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3") or using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form").

32.     Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

33.     For instance, the implementing regulation adopted by the New York  Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

34.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule")

35.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and

the attendant fee were not excessive.

36.     New York law prohibits chiropractors from referring patients to healthcare practices in which they have an ownership interest unless: (i) the ownership interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative healthcare provider if any such alternative is reasonably available". See N.Y. Public Health Law § 238-d.

37.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**B.     Pertinent New Jersey Law Governing No-Fault Insurance Reimbursement**

38.     Like New York, New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B-1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A-1 et seq.), which require automobile insurers to provide PIP Benefits to Insureds.

39.     As in New York, under the New Jersey no-fault insurance laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the HCFA-1500 form.

40.     In order for a healthcare services provider to be eligible to receive PIP Benefits in New Jersey, it must comply with all relevant laws and regulations governing healthcare practice.

41.     Thus, a healthcare services provider in New Jersey is not entitled to receive PIP Benefits where it has failed to comply with all applicable statutory and regulatory requirements governing healthcare practice, whether or not the underlying services were medically necessary or actually provided.

42.     Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement in New Jersey, the service itself must be provided in compliance with all relevant laws and regulations governing healthcare practice.

43.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that are not in compliance with all relevant statutory and regulatory requirements governing healthcare practice in New Jersey.

44.     Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits for healthcare services that are not rendered in compliance with all relevant statutory and regulatory requirements governing healthcare practice in New Jersey.

45.     A foreign professional corporation cannot offer chiropractic professional services in the State of New Jersey without being properly incorporated under New Jersey law. See N.J.S.A. § 14A:17-5; N.J.A.C. 13:44E-2.15(b)(3), and (d).

46.     Therefore, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that are unlawfully operating in New Jersey as foreign professional corporations.

47.     Like New York, New Jersey has established a medical fee schedule (the "NJ Fee Schedule") that is applicable to claims for PIP Benefits.

48.     When a healthcare services provider submits a claim for PIP Benefits using the CPT codes set forth in the NJ Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

49.     The New Jersey no-fault insurance laws specifically prohibit healthcare service providers from charging for services in amounts exceeding the amounts set forth in the NJ Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29:6.

50.     New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the New Jersey Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A-1 et seq. A healthcare services provider violates the IFPA if, among other things, it:

> Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A-4.

51.     A healthcare services provider also violates the IFPA if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of the provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation

of this act." Id.

## II.      The Defendants' Interrelated Fraudulent Schemes

### A.      Axial Chiro, Action Chiro, Lefcort MUA, and South Shore's Unlawful Operations in New Jersey

52.     As set forth above, a foreign professional corporation cannot provide professional services in the State of New Jersey without being properly incorporated under New Jersey law.

53.     Insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that are unlawfully operating in New Jersey as foreign professional corporations.

### 1.      Axial Chiro's Unlawful Operations in New Jersey

54.     As set forth above, Bromberg caused Axial Chiro to be incorporated as a professional corporation in New York on or about February 4, 2011.

55.     Bromberg did not cause Axial Chiro to be incorporated in New Jersey as a New Jersey professional corporation until June 11, 2015.

56.     However, between at least November 18, 2014 and June 11, 2015, Bromberg unlawfully caused Axial Chiro to provide and bill for chiropractic services in New Jersey as a foreign professional corporation.

57.     Between at least November 18, 2014 and June 11, 2015, Bromberg and Axial Chiro submitted more than 1,500 charges to GEICO for Fraudulent Services purportedly provided in New Jersey by Axial Chiro, despite the fact that – during this period – Axial Chiro was unlawfully operating in New Jersey as a foreign professional corporation.

58.     All of the billing identified in Exhibit "1" that Bromberg and Axial Chiro submitted through Axial Chiro between at least November 18, 2014 and June 11, 2015 for Fraudulent Services purportedly provided in New Jersey falsely represented that Axial Chiro and the

underlying Fraudulent Services were in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and were eligible to receive PIP reimbursement.

59.    In fact, neither Axial Chiro, nor the Fraudulent Services purportedly provided by Axial Chiro in New Jersey between at least November 18, 2014 and June 11, 2015, were in compliance with all applicable statuary and regulatory requirements governing healthcare practice in New Jersey, nor were they eligible for PIP reimbursement, because – during this period – Axial Chiro was unlawfully operating in New Jersey as a foreign professional corporation.

**2.    Action Chiro's Unlawful Operations in New Jersey**

60.    As set forth above, Bromberg caused Action Chiro to be incorporated as a professional corporation in New York on or about June 8, 2011.

61.    Bromberg did not cause Action Chiro to be incorporated in New Jersey as a New Jersey professional corporation until June 11, 2015.

62.    However, between at least December 4, 2014 and June 11, 2015, Bromberg unlawfully caused Action Chiro to provide and bill for chiropractic services in New Jersey as a foreign professional corporation.

63.    Between at least December 4, 2014 and June 11, 2015, Bromberg and Action Chiro submitted more than 1,400 charges to GEICO for Fraudulent Services purportedly provided in New Jersey by Action Chiro, despite the fact that – during this period – Action Chiro was unlawfully operating in New Jersey as a foreign professional corporation.

64.    All of the billing identified in Exhibit "3" that Bromberg and Action Chiro submitted through Action Chiro between at least December 4, 2014 and June 11, 2015 for Fraudulent Services purportedly provided in New Jersey falsely represented that Axial Chiro and

the underlying Fraudulent Services were in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and were eligible to receive PIP reimbursement.

65.     In fact, neither Action Chiro, nor the Fraudulent Services purportedly provided by Action Chiro in New Jersey between at least December 4, 2014 and June 11, 2015, were in compliance with all applicable statuary and regulatory requirements governing healthcare practice in New Jersey, nor were they eligible for PIP reimbursement, because – during this period – Action Chiro was unlawfully operating in New Jersey as a foreign professional corporation.

**3.     Lefcort MUA's Unlawful Operations in New Jersey**

66.     As set forth above, Lefcort caused Lefcort MUA to be incorporated as a professional corporation in New York on or about December 6, 2011.

67.     However, Lefcort never caused Lefcort MUA to be incorporated in New Jersey as a New Jersey professional corporation.

68.     Even so, between at least July 22, 2015 and the present, Lefcort unlawfully caused Lefcort MUA to provide and bill for chiropractic services in New Jersey as a foreign professional corporation.

69.     Between at least July 22, 2015 and the present, Lefcort and Lefcort MUA submitted more than 200 charges to GEICO for Fraudulent Services purportedly provided in New Jersey by Lefcort MUA, despite the fact that – during this period – Lefcort MUA was unlawfully operating in New Jersey as a foreign professional corporation.

70.     All of the billing identified in Exhibit "5" that Lefcort and Lefcort MUA submitted through Lefcort MUA between at least July 22, 2015 and the present for Fraudulent Services purportedly provided in New Jersey falsely represented that Lefcort MUA and the underlying

Fraudulent Services were in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and were eligible to receive PIP reimbursement.

71.     In fact, neither Lefcort MUA, nor the Fraudulent Services purportedly provided by Lefcort MUA in New Jersey between at least July 22, 2015 and the present, were in compliance with all applicable statuary and regulatory requirements governing healthcare practice in New Jersey, nor were they eligible for PIP reimbursement, because – during this period – Lefcort MUA was unlawfully operating in New Jersey as a foreign professional corporation.

**4.     South Shore's Unlawful Operations in New Jersey**

72.     As set forth above, Rosenberg caused South Shore to be incorporated as a professional corporation in New York on or about March 12, 1998.

73.     However, Rosenberg never caused South Shore to be incorporated in New Jersey as a New Jersey professional corporation.

74.     Even so, between at least May 7, 2016 and the present, Rosenberg unlawfully caused South Shore to provide and bill for chiropractic services in New Jersey as a foreign professional corporation.

75.     Between at least May 7, 2016 and the present, Rosenberg and South Shore submitted more than 400 charges to GEICO for Fraudulent Services purportedly provided in New Jersey by South Shore, despite the fact that – during this period – South Shore was unlawfully operating in New Jersey as a foreign professional corporation.

76.     All of the billing identified in Exhibit "4" that Rosenberg and South Shore submitted through South Shore between at least May 7, 2016 and the present for Fraudulent Services purportedly provided in New Jersey falsely represented that South Shore and the underlying Fraudulent Services were in compliance with all applicable statutory and regulatory

requirements governing healthcare practice in New Jersey, and were eligible to receive PIP reimbursement.

77.     In fact, neither South Shore, nor the Fraudulent Services purportedly provided by South Shore in New Jersey between at least May 7, 2016 and the present, were in compliance with all applicable statuary and regulatory requirements governing healthcare practice in New Jersey, nor were they eligible for PIP reimbursement, because – during this period – South Shore was unlawfully operating in New Jersey as a foreign professional corporation.

**B.     The Fraudulent Charges for Services Performed by Independent Contractors on Behalf of South Shore**

78.     Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

79.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of

the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); <u>DOI Opinion Letter</u>, October 29, 2003 (extending the independent contractor rule to hospitals); <u>See DOI Opinion Letter</u>, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

80.     Even so, South Shore and Rosenberg routinely billed GEICO for services performed by Irby, Luca, Saal, Estrada, Neresov, and Leffel who, at all relevant times, were independent contractors rather than employees of South Shore.

81.     In keeping with the fact that Irby, Luca, Saal, Estrada, Neresov, and Leffel were independent contractors, rather than employees of South Shore, during a November 2, 2020 deposition, Rosenberg and South Shore testified that Irby, Luca, Saal, Estrada, Neresov, and Leffel were independent contractors, rather than employees of South Shore.

82.     Even so, Rosenberg and South Shore routinely submitted charges through South Shore to GEICO for Fraudulent Services that purportedly were provided by Irby, Luca, Saal, Estrada, Neresov, or Leffel, who, at all relevant times, were independent contractors.

83.     By electing to treat Irby, Luca, Saal, Estrada, Neresov, and Leffel as independent contractors, Rosenberg and South Shore realized significant economic benefits, including the ability to avoid certain tax and insurance obligations.

84.     In the claims for the Fraudulent Services performed by Irby, Luca, Saal, Estrada, Neresov, or Leffel that are identified in Exhibit "4", Rosenberg and South Shore falsely represented that Irby, Luca, Saal, Estrada, Neresov, and Leffel were employees of South Shore.

85.     In  keeping with the fact that all of the claims for Fraudulent Services performed by Irby, Luca, Saal, Estrada, Neresov, or Leffel falsely represented that Irby, Luca, Saal, Estrada, Neresov, and Leffel were employees of South Shore when in fact they were not, Rosenberg's

November 2, 2020 deposition testimony indicated that, to the extent Rosenberg and South Shore's billing represented that Irby, Luca, Saal, Estrada, Neresov, and Leffel were employees of South Shore, that representation was false.

86.     In fact, Irby, Luca, Saal, Estrada, Neresov, and Leffel were, at all relevant times, independent contractors, and not employees, and Rosenberg and South Shore therefore never had any right to bill for or to collect no-fault benefits in connection with the services purportedly performed by Irby, Luca, Saal, Estrada, Neresov, or Leffel.

**C.     Lefcort, Lefcort MUA, and Bayside's Illegal and Unnecessary Self-Referrals**

87.     As set forth above, New York law prohibits chiropractors from referring patients to healthcare practices in which the chiropractor has an ownership interest unless: (i) the ownership interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative healthcare provider if any such alternative is reasonably available".

88.     Even so, as part of their fraudulent scheme, Lefcort, Lefcort MUA, and Bayside engaged in a pattern of illegal self-referrals in violation of New York law.

89.     At all relevant times, Lefcort was the sole owner and operator of Lefcort MUA, and was an owner and member of Bayside.

90.     Lefcort, Lefcort MUA, and Bayside's unlawful self-referral scheme was executed in the following manner:

(i)     Lefcort and Bayside routinely would refer Insureds – or cause them to be referred – from Bayside to Lefcort MUA for a purported "MUA evaluation", but would not disclose to Insureds Lefcort's ownership interest in Lefcort MUA, and would not inform the Insureds of their right to utilize an alternative healthcare provider; and then

(ii)    at the conclusion of the "MUA evaluation", Lefcort and Lefcort MUA referred the Insureds – or cause them to be referred – back to Bayside for the continued provision

of chiropractic, physical therapy, and acupuncture services, but would not disclose to the Insureds Lefcort's ownership interest in Bayside, and would not inform the Insureds of their right to utilize an alternative healthcare provider.

91.     For example:

(i)     On or about July 18, 2015, Lefcort and Bayside caused an Insured named CB to be referred from Bayside to Lefcort MUA for a purported MUA evaluation, but did not: (a) disclose Lefcort's ownership interest in Lefcort MUA; or (b) inform the patient of their right to utilize an alternative healthcare provider. Then, at the conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA caused CB to be referred back to Bayside for the continued provision of the Fraudulent Services, but did not: (a) disclose Lefcort's ownership interest in Bayside; or (b) inform the patient of their right to utilize an alternative healthcare provider.

(ii)    On or about July 18, 2015, Lefcort and Bayside caused an Insured named SB to be referred from Bayside to Lefcort MUA for a purported MUA evaluation, but did not: (a) disclose Lefcort's ownership interest in Lefcort MUA; or (b) inform the patient of their right to utilize an alternative healthcare provider. Then, at the conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA caused SB to be referred back to Bayside for the continued provision of the Fraudulent Services, but did not: (a) disclose Lefcort's ownership interest in Bayside; or (b) inform the patient of their right to utilize an alternative healthcare provider.

(iii)   On or about July 23, 2016, Lefcort and Bayside caused an Insured named CH to be referred from Bayside to Lefcort MUA for a purported MUA evaluation, but did not: (a) disclose Lefcort's ownership interest in Lefcort MUA; or (b) inform the patient of their right to utilize an alternative healthcare provider. Then, at the conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA caused CH to be referred back to Bayside for the continued provision of the Fraudulent Services, but did not: (a) disclose Lefcort's ownership interest in Bayside; or (b) inform the patient of their right to utilize an alternative healthcare provider.

(iv)    On or about January 14, 2017, Lefcort and Bayside caused an Insured named SC to be referred from Bayside to Lefcort MUA for a purported MUA evaluation, but did not: (a) disclose Lefcort's ownership interest in Lefcort MUA; or (b) inform the patient of their right to utilize an alternative healthcare provider. Then, at the conclusion of the purported MUA evaluation, Lefcort referred SC back to Bayside for the continued provision of the Fraudulent Services, but did not: (a) disclose Lefcort's ownership interest in Bayside; or (b) inform the patient of their right to utilize an alternative healthcare provider.

(v)     On or about January 23, 2017, Lefcort and Bayside caused an Insured named MH to be referred from Bayside to Lefcort MUA for a purported MUA evaluation, but did not: (a) disclose Lefcort's ownership interest in Lefcort MUA; or (b) inform the patient of their right to utilize an alternative healthcare provider. Then, at the

conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA caused MH to be referred back to Bayside for the continued provision of the Fraudulent Services, but did not: (a) disclose Lefcort's ownership interest in Bayside; or (b) inform the patient of their right to utilize an alternative healthcare provider.

(vi)     On or about May 19, 2017, Lefcort and Bayside caused an Insured named SA to be referred from Bayside to Lefcort MUA for a purported MUA evaluation, but did not: (a) disclose Lefcort's ownership interest in Lefcort MUA; or (b) inform the patient of their right to utilize an alternative healthcare provider. Then, at the conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA caused SA to be referred back to Bayside for the continued provision of the Fraudulent Services, but did not: (a) disclose Lefcort's ownership interest in Bayside; or (b) inform the patient of their right to utilize an alternative healthcare provider.

(vii)    On or about May 17, 2018, Lefcort and Bayside caused an Insured named RC to be referred from Bayside to Lefcort MUA for a purported MUA evaluation, but did not: (a) disclose Lefcort's ownership interest in Lefcort MUA; or (b) inform the patient of their right to utilize an alternative healthcare provider. Then, at the conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA caused RC to be referred back to Bayside for the continued provision of the Fraudulent Services, but did not: (a) disclose Lefcort's ownership interest in Bayside; or (b) inform the patient of their right to utilize an alternative healthcare provider.

(viii)   On or about May 18, 2018, Lefcort and Bayside caused an Insured named JG to be referred from Bayside to Lefcort MUA for a purported MUA evaluation, but did not: (a) disclose Lefcort's ownership interest in Lefcort MUA; or (b) inform the patient of their right to utilize an alternative healthcare provider. Then, at the conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA caused JG to be referred back to Bayside for the continued provision of the Fraudulent Services, but did not: (a) disclose Lefcort's ownership interest in Bayside; or (b) inform the patient of their right to utilize an alternative healthcare provider.

(ix)     On or about November 5, 2018, Lefcort and Bayside caused an Insured named MD to be referred from Bayside to Lefcort MUA for a purported MUA evaluation, but did not: (a) disclose Lefcort's ownership interest in Lefcort MUA; or (b) inform the patient of their right to utilize an alternative healthcare provider. Then, at the conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA caused MD to be referred back to Bayside for the continued provision of the Fraudulent Services, but did not: (a) disclose Lefcort's ownership interest in Bayside; or (b) inform the patient of their right to utilize an alternative healthcare provider.

(x)      On or about December 11, 2018, Lefcort and Bayside caused an Insured named JC to be referred from Bayside to Lefcort MUA for a purported MUA evaluation, but did not: (a) disclose Lefcort's ownership interest in Lefcort MUA; or (b) inform the patient of their right to utilize an alternative healthcare provider. Then, at the conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA caused JC

to be referred back to Bayside for the continued provision of the Fraudulent Services, but did not: (a) disclose Lefcort's ownership interest in Bayside; or (b) inform the patient of their right to utilize an alternative healthcare provider.

92.     These are only representative examples. In the claims identified in Exhibits "3" and "5", Lefcort, Lefcort MUA, and Bayside routinely caused Insureds to be referred to and from Lefcort MUA and Bayside without: (i) disclosing Lefcort's ownership interest in Lefcort MUA or Bayside; or (ii) informing the Insureds of their right to utilize a different healthcare provider.

93.     Each and every one of these referrals constituted a separate violation of Public Health Law § 238-d.

94.     Lefcort, Lefcort MUA, and Bayside caused Insureds to be unlawfully self-referred between Lefcort MUA and Bayside in order to maximize the amount of fraudulent or otherwise noncompensable billing Lefcort, Lefcort MUA, and Bayside could submit to GEICO and other insurers, rather than to treat or otherwise benefit the Insureds they were causing to be referred.

95.     In keeping with the fact that the unlawful self-referrals were not predicated on medical necessity, but instead were designed to maximize the amount of fraudulent or otherwise noncompensable billing Lefcort, Lefcort MUA, and Bayside could submit to GEICO and other insurers, the purported MUA evaluations at Lefcort MUA were almost entirely duplicative of the initial and follow-up examinations that Lefcort, Yoo, and Bayside purported to provide Insureds in advance of the self-referrals to Lefcort MUA.

96.     The parameters of the purported MUA evaluations provided and billed through Lefcort MUA were, in large part, substantially the same as the parameters of the initial and follow-up examinations purportedly provided to Insureds through Bayside in advance of the self-referrals to Lefcort MUA.

97.     In fact, in many instances, the reports generated by Lefcort and Lefcort MUA at the conclusion of the purported MUA evaluations included language that was duplicative of the language appearing in the reports generated at the conclusion of the purported initial and follow-up examinations provided by Bayside, Yoo, and Lefcort.

98.     For instance, the reports of the initial examinations provided by Lefcort and Bayside typically purported to report each Insured's: (i) past medical history; (ii) work status; (iii) social history; and (iv) details regarding the Insured's automobile accident.

99.     Even so, the MUA evaluation reports generated by Lefcort MUA and Lefcort also typically reported information concerning each Insured's: (i) past medical history; (ii) work status; (iii) social history; and (iv) details regarding the Insured's automobile accident.

100.    Similarly, the reports of the follow-up examinations provided by Lefcort and Bayside typically purported to report the results of a physical examination of each Insured, including the results of the following orthopedic testing: (i) Valsalva Maneuver; (ii) Kemp's test; (iii) heel to toe walking; (iv) straight leg raises; (v) Ely testing; (vi) Yeoman's testing; and (vii) an examination of each Insured's range of motion.

101.    Despite the fact that this testing and physical examination had been purportedly performed by Lefcort on Bayside's behalf, the MUA evaluation reports generated by Lefcort MUA and Lefcort also typically reported the results of a physical examination of each Insured, including the results of the following orthopedic testing: (i) Valsalva Maneuver; (ii) Kemp's test; (iii) heel to toe walking; (iv) straight leg raises; (v) Ely testing; (vi) Yeoman's testing; and (vii) an examination of each Insured's range of motion.

102.    Moreover, in many instances, Lefcort and Bayside caused Insureds to be self-referred to Lefcort MUA for purported MUA evaluations despite the fact that Lefcort, Yoo, and

Bayside had purportedly provided those Insureds with follow-up examinations just days before –
and, in some instances, <u>on the same day</u> – as the self-referrals to Lefcort MUA for MUA
evaluations.

103.  For example:

(i)  On February 17, 2016, Lefcort and Bayside caused an Insured named KB to be self-
referred to Lefcort MUA for a purported MUA evaluation, despite the fact that, <u>just
two days earlier</u>, Lefcort had purported to perform a follow-up examination of KB
on behalf of Bayside. The information supposedly gathered during the putative MUA
evaluation was, in large part, substantially identical to the information supposedly
gathered during the putative follow-up examination just two days earlier.

(ii)  On February 15, 2017, Lefcort and Bayside caused an Insured named MJ to be self-
referred to Lefcort MUA for a purported MUA evaluation, despite the fact that, <u>just
two days earlier</u>, Lefcort had purported to perform a follow-up examination of MJ on
behalf of Bayside. The information supposedly gathered during the putative MUA
evaluation was, in large part, substantially identical to the information supposedly
gathered during the putative follow-up examination just two days earlier.

(iii)  On March 22, 2017, Lefcort and Bayside caused an Insured named CA to be self-
referred to Lefcort MUA for a purported MUA evaluation, despite the fact that, <u>that
same day</u>, Lefcort purported to perform a follow-up examination of CA on behalf of
Bayside. All told, GEICO received two separate bills for two separate examinations,
supposedly provided through two separate entities, for examinations performed by
Lefcort on behalf of both Lefcort MUA and Bayside on the same patient on the same
day. The information supposedly gathered during the putative MUA evaluation was,
in large part, substantially identical to the information supposedly gathered during
the putative follow-up examination that same day.

(iv)  On November 18, 2017, Lefcort and Bayside caused an Insured named BB to be self-
referred to Lefcort MUA for a purported MUA evaluation, despite the fact that, <u>just
four days earlier</u>, Lefcort had purported to perform a follow-up examination of KB
on behalf of Bayside. The information supposedly gathered during the putative MUA
evaluation was, in large part, substantially identical to the information supposedly
gathered during the putative follow-up examination just four days earlier.

(v)  On September 18, 2018, Lefcort and Bayside caused an Insured named DM to be
self-referred to Lefcort MUA for a purported MUA evaluation, despite the fact that,
<u>that same day</u>, Lefcort purported to perform a follow-up examination of DM on
behalf of Bayside. All told, GEICO received two separate bills for two separate
examinations, supposedly provided through two separate entities, for examinations
performed by Lefcort on behalf of both Lefcort MUA and Bayside on the same
patient on the same day. The information supposedly gathered during the putative

MUA evaluation was, in large part, substantially identical to the information supposedly gathered during the putative follow-up examination just that same day.

104. These are only representative examples. In the claims identified in Exhibits "3" and "5", Lefcort and Bayside routinely caused Insureds to be self-referred to Lefcort MUA for purported MUA evaluations despite the fact that the Insureds had purportedly been examined by Lefcort on behalf of Bayside just days earlier – or even that same day.

105. What is more, and in keeping with the fact that Lefcort, Lefcort MUA, and Bayside's self-referrals were not predicated on medical necessity, at the conclusion of the purported MUA evaluations at Lefcort MUA, Lefcort and Lefcort MUA virtually always caused the Insureds to be referred back to Bayside for the continued provision of the Fraudulent Services.

106. In keeping with the fact that the self-referrals from Lefcort MUA back to Bayside were not predicated on medical necessity, Bayside and Lefcort MUA's own records indicated that the services the Insureds supposedly had received at Bayside had not been effective in resolving the Insureds' supposed complaints.

107. In fact, virtually all of Lefcort and Lefcort MUA's purported MUA evaluations contained the following identical language concerning each Insured's supposed symptoms and response to the services provided through Bayside:

> [Insured] is being examined to determine if a more intensive manual therapy in the form of Manipulation Under Anesthesia (MUA) is indicated. [He/she] has responded sub-optimally to conservative chiropractic treatments and medical co-management and continues to have intractable pain and/or biomechanical dysfunction. … Finally per the guidelines cited, this patient's level of reproduced pain interferes with [his/her] activities of daily living and/or causes disability.

108. Even so, Lefcort and Lefcort MUA virtually always caused Insureds to be referred back to Bayside for the continued provision of the Fraudulent Services.

109. For example:

(i)    On September 23, 2016, an Insured named JM was involved in an automobile accident. Thereafter, JM sought treatment from Lefcort, Yoo, and Bayside, who provided JM with chiropractic, physical therapy, and acupuncture services between September 2016 and June 2017. In June 2017, Lefcort and Bayside caused JM to be self-referred to Lefcort MUA for a purported MUA evaluation. In a June 25, 2017 examination report, Lefcort and Lefcort MUA contended that JM had "responded sub-optimally to conservative chiropractic treatments and medical co-management and continues to have intractable pain and/or biomechanical dysfunction", despite the fact that – by that point – JM had received more than seven months of chiropractic, physical therapy, and acupuncture services at Bayside. Though the purported chiropractic, physical therapy, and acupuncture services had apparently been ineffective in resolving JM's symptoms, at the conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA nonetheless caused JM to be self-referred back to Bayside for the continued provision of the Fraudulent Services.

(ii)    On October 16, 2016, an Insured named CH was involved in an automobile accident. Thereafter, CH sought treatment from Lefcort, Yoo, and Bayside, who provided CH with chiropractic, physical therapy, and acupuncture services between December 2016 and May 2017. In May 2017, Lefcort and Bayside caused CH to be self-referred to Lefcort MUA for a purported MUA evaluation. In a May 19, 2017 examination report, Lefcort and Lefcort MUA contended that CH had "responded sub-optimally to conservative chiropractic treatments and medical co-management and continues to have intractable pain and/or biomechanical dysfunction", despite the fact that – by that point – CH had received approximately six months of chiropractic, physical therapy, and acupuncture services at Bayside. Though the purported chiropractic, physical therapy, and acupuncture services had apparently been ineffective in resolving CH's symptoms, at the conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA nonetheless caused CH to be self-referred back to Bayside for the continued provision of the Fraudulent Services.

(iii)    On April 3, 2017, an Insured named EZ was involved in an automobile accident. Thereafter, EZ sought treatment from Lefcort, Yoo, and Bayside, who provided CH with chiropractic, physical therapy, and acupuncture services between April 2017 and February 2018. In February 2018, Lefcort and Bayside caused EZ to be self-referred to Lefcort MUA for a purported MUA evaluation. In a February 18, 2018 examination report, Lefcort and Lefcort MUA contended that EZ had "responded sub-optimally to conservative chiropractic treatments and medical co-management and continues to have intractable pain and/or biomechanical dysfunction", despite the fact that – by that point – EZ had received approximately 10 months of chiropractic, physical therapy, and acupuncture services at Bayside. Though the purported chiropractic, physical therapy, and acupuncture services had apparently been ineffective in resolving EZ's symptoms, at the conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA nonetheless caused EZ to be self-referred back to Bayside for the continued provision of the Fraudulent Services.

(iv)   On May 7, 2017, an Insured named MM was involved in an automobile accident. Thereafter, MM sought treatment from Lefcort, Yoo, and Bayside, who provided MM with chiropractic, physical therapy, and acupuncture services between May 2017 and November 2017. In November 2017, Lefcort and Bayside caused MM to be self-referred to Lefcort MUA for a purported MUA evaluation. In a November 28, 2017 examination report, Lefcort and Lefcort MUA contended that MM had "responded sub-optimally to conservative chiropractic treatments and medical co-management and continues to have intractable pain and/or biomechanical dysfunction", despite the fact that – by that point – MM had received approximately six months of chiropractic, physical therapy, and acupuncture services at Bayside. Though the purported chiropractic, physical therapy, and acupuncture services had apparently been ineffective in resolving MM's symptoms, at the conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA nonetheless caused MM to be self-referred back to Bayside for the continued provision of the Fraudulent Services.

(v)   On August 27, 2018, an Insured named PR was involved in an automobile accident. Thereafter, PR sought treatment from Lefcort, Yoo, and Bayside, who provided PR with chiropractic, physical therapy, and acupuncture services between September 2018 and March 2019. In March 2019, Lefcort and Bayside caused PR to be self-referred to Lefcort MUA for a purported MUA evaluation. In a March 15, 2019 examination report, Lefcort and Lefcort MUA contended that PR had "responded sub-optimally to conservative chiropractic treatments and medical co-management and continues to have intractable pain and/or biomechanical dysfunction", despite the fact that – by that point – PR had received approximately six months of chiropractic, physical therapy, and acupuncture services at Bayside. Though the purported chiropractic, physical therapy, and acupuncture services had apparently been ineffective in resolving PR's symptoms, at the conclusion of the purported MUA evaluation, Lefcort and Lefcort MUA nonetheless caused PR to be self-referred back to Bayside for the continued provision of the Fraudulent Services.

110.   These are only representative examples. In the claims identified in Exhibits "3" and "5", Lefcort and Lefcort MUA routinely caused Insureds to be self-referred back to Bayside for the continued provision of the Fraudulent Services, despite the fact that Lefcort MUA and Bayside's own records indicated that those services had been ineffective in resolving the Insureds' supposed symptoms.

**D.   The Defendants' Fraudulent Treatment and Billing Protocol**

111.    In the claims identified in Exhibits "1"-"5", the vast majority of the Insureds whom the Defendants purported to treat did not suffer from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

112.    Even so, the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

113.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from their fraudulent scheme.

**1.      The Fraudulent Charges for Initial Examinations**

114.    As an initial step in the Defendants' fraudulent treatment and billing protocols, each of the Insureds in the claims identified in Exhibits "1" – "5" purportedly received an initial examination at Axial Chiro, Action Chiro, Lefcort MUA, South Shore, and Bayside, with:

(i)     Bromberg and Coty purporting to personally perform virtually all of the putative initial examinations at Axial Chiro, which were then typically billed to GEICO under CPT codes 99203 and 99204, resulting in charges of between $54.73 and $78.20 for each purported initial examination identified in Exhibit 1;

(ii)    Bromberg purporting to perform virtually all of the putative initial examinations at Action Chiro, which were then typically billed to GEICO under CPT code 99204, resulting in a charge of $78.20 for each purported initial examination identified in Exhibit 3;

(iii)   Lefcort purporting to perform virtually all of the putative initial examinations at Lefcort MUA, which were then billed to GEICO under CPT code 99243, typically resulting in a charge between $148.69 and $181.22 for each purported initial examination identified in Exhibit 5;

(iv)    Rosenberg, Irby, and Luca purporting to perform virtually all of the putative initial examinations at South Shore, which were then billed to GEICO under CPT code 99203, typically resulting in a charge of $54.79 for each purported initial examination identified in Exhibit 6; and

(v)     Lefcort purporting to perform the substantial majority of the putative initial examinations at Bayside, many of which were then billed to GEICO under CPT code 99204, resulting in a charge of $148.69 for each purported initial examination identified in Exhibit "5".

115.    Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the NY Fee Schedule and NJ Fee Schedule:

(i)     the use of CPT codes 99203 and 99243 to bill for an initial patient examination represents – among other things – that: (a) the patient presented with problems of moderate severity; (b) the physician who conducted the examination spent at least 30 or 40 minutes of face-to-face time with the patient or the patient's family during the examination; (c) the physician who performed the examination conducted a "detailed" physical examination; and (d) the physician who performed the examination engaged in "low complexity" medical decision-making; and

(ii)    the use of CPT code 99204 to bill for an initial patient examination represents – among other things – that: (a) the patient presented with problems of moderate to high severity; (b) the physician who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family during the examination; (c) the physician who performed the examination conducted a "comprehensive" physical examination; and (d) the physician who performed the examination engaged in "moderate complexity" medical decision-making.

116.    As set forth below, the charges for the initial examinations identified in Exhibits "1" – "5", were fraudulent in that they misrepresented the nature, extent, and results of the purported initial examinations.

a.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

117.    In the claims for initial examinations under CPT code 99203, 99204, and 99243 identified in Exhibits "1" – "5", Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby routinely misrepresented the severity of the Insureds' presenting problems.

118.    Indeed, to the extent that the Insureds in the claims identified in Exhibits "1" – "5", had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

29

119.    Even so, in the claims for initial examinations identified in Exhibits "1" – "5", Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby routinely billed for their putative initial examinations using CPT codes 99203, 99204, and 99243, thereby falsely represented that the Insureds presented with problems of moderate severity, or moderate to high severity.

120.    For example:

(i)     On April 13, 2015, an Insured named TM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that TM's vehicle was drivable following the accident. The police report further indicated that TM was not injured and did not complain of any pain at the scene. In keeping with the fact that TM was not seriously injured, she did not visit any hospital emergency room following the minor accident. To the extent that TM experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination by Bromberg on May 29, 2015, Bromberg and Action Chiro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(ii)    On September 23, 2016, an Insured named JM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that JM's vehicle was drivable following the accident. The police report further indicated that JM was not injured and did not complain of any pain at the scene. In keeping with the fact the JM was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that JM experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of JM by Lefcort on June 25, 2017, Lefcort and Lefcort MUA billed GEICO for the initial examination using CPT code 99243, and thereby falsely represented that JM presented with problems of moderate severity.

(iii)   On November 18, 2016, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that SA's vehicle was drivable following the accident. The police report further indicated that SA was not injured and did not complain of any pain at the scene. In keeping with the fact that SA was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that SA experienced any health issues at all as the result of his accident, they were of low severity. Even so, following a purported initial examination by Lefcort on May 19, 2017, Lefcort and Lefcort MUA billed GEICO for the initial examination using CPT code 99243, and thereby falsely represented that SA presented with problems of moderate severity.

(iv)     On January 7, 2017, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured and did not complain of any pain at the scene. In keeping with the fact that MA was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MA experienced any health issues at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of MA by Luca on June 21, 2017, Luca, Rosenberg, and South Shore billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JM presented with problems of moderate severity.

(v)      On September 13, 2017, an Insured named PH was involved in an automobile accident. The contemporaneous police report indicated that PH's vehicle was drivable following the accident. The police report further indicated that PH was not injured and did not complain of any pain at the scene. In keeping with the fact that PH was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that PH experienced any health issues at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of PH by Lefcort on September 7, 2018, Lefcort, Yoo, and Bayside billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that PH presented with problems of moderate to high severity.

(vi)     On October 2, 2017, an Insured named DM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision, and that DM's vehicle was drivable following the accident. The contemporaneous police report indicated that DM was not injured and did not complain of any pain. In keeping with the fact that DM was not seriously injured in the accident, she did not visit any hospital emergency room following the accident. To the extent that DM experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of DM by Lefcort  on September 18, 2018, Lefcort and Lefcort MUA billed GEICO for the initial examination using CPT code 99243, and thereby falsely represented that DM presented with problems of moderate severity.

(vii)    On October 12, 2017, an Insured named BB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision, and that BB's vehicle was drivable following the accident. The police report further indicated that BB  was not injured and did not complain of any pain at the scene. In keeping with the fact that BB was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that BB experienced any health issues at all as the result of his accident, they were of low severity. Even so, following a purported initial examination by

Lefcort on April 23, 2018, Lefcort and Lefcort MUA billed GEICO for the initial examination using CPT code 99243, and thereby falsely represented that BB presented with problems of moderate severity.

(viii)   On March 1, 2018, an Insured named KK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KK's vehicle was drivable following the accident. The police report further indicated that KK was not injured and did not complain of any pain at the scene. In keeping with the fact that KK was not seriously injured, he did not visit any hospital emergency room following the minor accident. To the extent that KK experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination by Bromberg on August 23, 2018, Bromberg and Axial Chiro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(ix)    On March 13, 2018, an Insured named AL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AL's vehicle was drivable following the accident. The police report further indicated that AL was not injured and did not complain of any pain at the scene. In keeping with the fact that AL was not seriously injured, she did not visit any hospital emergency room following the minor accident. To the extent that AL experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination by Bromberg on May 25, 2018, Bromberg and Axial Chiro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that AL presented with problems of moderate severity.

(x)     On March 22, 2018, an Insured named PM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PM's vehicle was drivable following the accident. The police report further indicated that PM was not injured and did not complain of any pain at the scene. In keeping with the fact that PM was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that PM experienced any health issues at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination by Bromberg on August 16, 2018, Bromberg and Axial Chiro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(xi)    On June 19, 2018, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision, and that JC's vehicle was drivable following the accident. Later that same day, JC traveled on his own to North Shore LIJ Hospital where JC was briefly observed on an outpatient basis and then discharged that same day with

a neck contusion. To the extent that JC experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of JC by Lefcort on June 20, 2018, Lefcort, Yoo, and Bayside billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JC presented with problems of moderate to high severity.

(xii)   On August 26, 2018, an Insured named DP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DP's vehicle was drivable following the accident. The police report further indicated that DP was not injured and did not complain of any pain at the scene. In keeping with the fact that DP was not seriously injured, he did not visit any hospital emergency room following the minor accident. To the extent that DP experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of DP on August 30, 2018 by Irby, Irby, Rosenberg, and South Shore billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that DP presented with problems of moderate severity.

(xiii)   On August 26, 2018, an Insured named RL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RL's vehicle was drivable following the accident. The police report further indicated that RL was not injured and did not complain of any pain at the scene. In keeping with the fact that RL was not seriously injured, he did not visit any hospital emergency room following the minor accident. To the extent that RL experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of RL on August 30, 2018 by Irby, Irby, Rosenberg, and South Shore billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that RL presented with problems of moderate severity.

(xiv)   On May 10, 2019, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that SH experienced any health issues at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of SH by Lefcort on May 17, 2019, Lefcort, Yoo, and Bayside billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that SH presented with problems of moderate to high severity.

121.   These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibits "1" – "5", Axial Chiro, Action Chiro, Lefcort MUA, South

Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby falsely represented that

the Insureds presented with problems of moderate severity or moderate to high severity when in

fact the Insureds' problems were low severity soft tissue injuries such as sprains and strains, to the

extent that they had any presenting problems at all in order to: (i) create a false basis for their

charges for the examinations under CPT codes 99203, 99204, and 99243, because examinations

billable under CPT code 99203, 99204, and 99243, are reimbursable at higher rates than

examinations involving presenting problems of low severity, or no severity; and (ii) create a false

basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to

the Insureds, including follow-up examinations, chiropractic services, and MUA services.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

122.     In addition, as set forth above, when Axial Chiro, Action Chiro, Lefcort MUA,

South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby submitted their

billing for initial examinations under CPT codes 99203, 99204, or 99243, they thereby represented

that the chiropractor who purported to perform the initial examinations spent either 30, 40, or 45

minutes of face-to-face time with the Insureds or the Insureds' families during the putative

examinations.

123.     In fact, in the claims for initial examinations identified in Exhibits "1" – "5", neither

Bromberg, Coty, Lefcort, Rosenberg, Luca, Irby, nor any other chiropractor, ever spent even 30

of face-to-face time with the Insureds or their families when conducting the examinations, much

less 40 or 45 minutes, as these initial examinations did not entail more than 15 minutes of face-to-

face time between the examining chiropractors and the Insureds or their families, to the extent that

the examinations actually were performed in the first instance.

124.     In keeping with the fact that the initial examinations in the claims identified in

Exhibits "1" – "5", did not entail more than 15 minutes, to the extent that they were provided at all, Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby used template forms in conducting the examinations which set forth a very limited range of examination parameters.

125.    The only face-to-face time between the examining chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews, limited examinations of the Insureds' musculoskeletal systems, and a perfunctory check of a few of the Insureds' other systems.

126.    These brief interviews and limited examinations did not require Bromberg, Coty, Lefcort, Rosenberg, Luca, Irby, or any other chiropractor associated with Axial Chiro, Action Chiro, Lefcort MUA, or South Shore to spend more than 15 minutes of face-to-face time with the Insureds or their families.

127.    In the claims for initial examinations identified in Exhibits "1" – "5", Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby falsely represented that the examinations involved at least 30, 40, or  45 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT codes 99203, 99204 and 99243, because examinations billable under CPT codes 99203, 99204, and 99243 are reimbursable at a higher rate than examinations that require less time to perform.

c.    **Misrepresentations Regarding the Performance of "Detailed" and "Comprehensive" Physical Examinations**

128.    Moreover, in every claim identified in Exhibits "1" – "5", for initial examinations under CPT codes 99203, 99243, or 99204, Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby falsely represented the extent

of the underlying physical examinations.

129.     Pursuant to the Fee Schedule, the use of CPT code 99203 or 99243 to bill for a patient examination represents that the chiropractor who performed the examination conducted a "detailed" physical examination.

130.     Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the chiropractor conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

131.     To the extent that the Insureds in the claims identified in Exhibits "1" – "5" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to musculoskeletal complaints.

132.     In the claims for initial examinations identified in Exhibits "1", "3", 4", and "5", when Axial Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby billed for the initial examinations under CPT code 99203 or 99243, they falsely represented that they performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

133.     In fact, with respect to the claims for initial examinations under CPT code 99203 and 99243 that are identified in Exhibits "1", "3", and "4", neither Bromberg, Coty, Lefcort, Rosenberg, Luca, Irby, nor any other chiropractor associated with Axial Chiro, Lefcort MUA, or South Shore ever conducted an extended examination of the Insureds' musculoskeletal systems.

134.     For example:

(i)     On August 18, 2017, Luca, Rosenberg, and South Shore billed GEICO under CPT code 99203 for an initial examination that Luca purported to perform on an Insured named UG, and thereby represented that they had provided a "detailed" physical examination to UG. However, Luca did not document an extended examination of UG's musculoskeletal system, despite the fact that – to the extent UG had any complaints at all as the result of the automobile accident – they were limited to

musculoskeletal complaints.

(ii)    On December 12, 2017, Luca, Rosenberg, and South Shore billed GEICO under CPT code 99203 for an initial examination that Luca purported to perform on an Insured named NT, and thereby represented that they had provided a "detailed" physical examination to NT. However, Luca did not document an extended examination of NT's musculoskeletal system, despite the fact that – to the extent NT had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)   On December 21, 2017, Bromberg, Coty, and Axial Chiro billed GEICO under CPT code 99203 for an initial examination that Coty purported to perform on an Insured named FN, and thereby represented that they had provided a "detailed" physical examination to FN. However, Coty did not document an extended examination of FN's musculoskeletal system, despite the fact that – to the extent FN had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)    On January 3, 2018, Lefcort and Lefcort MUA billed GEICO under CPT code 99243 for an initial examination that Lefcort purported to perform on an Insured named FT, and thereby represented that they had provided a "detailed" physical examination to FT. However, Lefcort did not document an extended examination of FT's musculoskeletal system, despite the fact that – to the extent FT had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)     On August 15, 2018, Rosenberg, Irby, and South Shore billed GEICO under CPT code 99203 for an initial examination that Irby purported to perform on an Insured named AL, and thereby represented that they had provided a "detailed" physical examination to AL. However, Irby did not document an extended examination of AL's musculoskeletal system, despite the fact that – to the extent AL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)    On September 13, 2018, Rosenberg, Irby, and South Shore billed GEICO under CPT code 99203 for an initial examination that Irby purported to perform on an Insured named GH, and thereby represented that they had provided a "detailed" physical examination to GH. However, Irby did not document an extended examination of GH's musculoskeletal system, despite the fact that – to the extent GH had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)   On September 18, 2018, Lefcort and Lefcort MUA billed GEICO under CPT code 99243 for an initial examination that Lefcort and Lefcort MUA purported to perform on an Insured named DM, and thereby represented that they had provided a "detailed" physical examination to DM. However, Lefcort did not document an

extended examination of DM's musculoskeletal system, despite the fact that – to the extent DM had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

135.    These are only representative examples. In all of the claims for initial examinations under CPT codes 99243 and 99203 that are identified in Exhibits "1", "3", and "4", Axial Chiro, Lefcort MUA, South Shore, Bromberg, Coty, Lefcort, Rosenberg, Luca, and Irby falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because they had not conducted an extended examination of the affected body areas and other symptomatic or related organ systems.

136.    In the claims for initial examinations under CPT codes 99243 and 99203 that are identified in Exhibits "1", "3", and "4" Axial Chiro, Lefcort MUA, South Shore, Bromberg, Coty, Lefcort, Rosenberg, Luca, and Irby falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99243 and 99203, because examinations billable under CPT codes 99243 and 99203 are reimbursable at higher rates than examinations that do not require the examining chiropractor to provide "detailed" physical examinations.

137.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the chiropractor who performed the examination conducted a "comprehensive" physical examination.

138.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining chiropractor either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

139.    In the claims for initial examinations identified in Exhibits "1", "2", and "5" when Axial Chiro, Action Chiro, Bromberg, Lefcort, Yoo, and Bayside billed for the initial examinations under CPT code 99204, they falsely represented that they provided "comprehensive" patient examinations to the Insureds they purported to treat during the initial examinations.

140.    In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibits "1", "2", and "5", Bromberg or Lefcort neither conducted a general examination of multiple patient organ systems, nor conducted a complete examination of a single patient organ system.

141.    For example:

(i)     On May 1, 2015, Bromberg and Axial Chiro billed GEICO under CPT code 99204 for an initial examination that Bromberg purported to perform on an Insured named HF, and thereby represented that they had provided a "comprehensive" physical examination to HF. However, Bromberg did not document findings with respect to at least eight of HF's organ systems, nor did he document a "complete" examination of HF's musculoskeletal system or any of HF's other organ systems.

(ii)    On August 10, 2015, Bromberg and Action Chiro billed GEICO under CPT code 99204 for an initial examination that Bromberg purported to perform on an Insured named MA, and thereby represented that they had provided a "comprehensive" physical examination to MA. However, However, Bromberg did not document findings with respect to at least eight of MA's organ systems, nor did he document a "complete" examination of MA's musculoskeletal system or any of MA's other organ systems.

(iii)   On December 7, 2015, Bromberg and Action Chiro billed GEICO under CPT code 99204 for an initial examination that Bromberg purported to perform on an Insured named CF, and thereby represented that they had provided a "comprehensive" physical examination to CF. However, However, Bromberg did not document findings with respect to at least eight of CF's organ systems, nor did he document a "complete" examination of CF's  musculoskeletal system or any of CF's other organ systems.

(iv)    On September 7, 2017, Bromberg and Axial Chiro billed GEICO under CPT code 99204 for an initial examination that Bromberg purported to perform on an Insured named SD, and thereby represented that they had provided a "comprehensive" physical examination to SD. However, Bromberg did not document findings with respect to at least eight of SD's organ systems, nor did he document a "complete"

examination of SD's musculoskeletal system or any of SD's other organ systems.

(v)     On September 7, 2018, Lefcort, Yoo, and Bayside billed GEICO under CPT code 99204 for an initial examination that Lefcort purported to perform on an Insured named PH, and thereby represented that they had provided a "comprehensive" physical examination to PH. However, Lefcort did not document findings with respect to at least eight of PH's organ systems, nor did he document a "complete" examination of PH's musculoskeletal system or any of SD's other organ systems.

(vi)    On September 26, 2018, Bromberg and Axial Chiro billed GEICO under CPT code 99204 for an initial examination that Bromberg purported to perform on an Insured named MR, and thereby represented that they had provided a "comprehensive" physical examination to MR. However, Bromberg did not document findings with respect to at least eight of MR's organ systems, nor did he document a "complete" examination of MR's musculoskeletal system or any of MR's other organ systems.

142.    These are only representative examples. In virtually all of the claims for initial examinations under CPT codes 99203, 99204, and 99243 that are identified in Exhibits "1" – "5", Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby falsely represented that they had provided "detailed" or "comprehensive" physical examinations, when in fact they had not in order to create a false basis for their charges for the examinations under CPT codes 99203, 99204, and 99243 because examinations billable under CPT codes 99203, 99204, and 99243 are reimbursable at higher rates than examinations that do not require the examining chiropractor to perform "detailed" or "comprehensive" physical examinations.

d.      **Misrepresentations Regarding the Extent of Medical Decision-Making**

143.    Pursuant to the Fee Schedule, the use of CPT code 99203 and 99243 to bill for a patient examination represents that the chiropractor who performed the examination engaged in medical decision-making of "low complexity".

144.    Furthermore, pursuant to the Fee Schedule, the use of CPT code 99204 to bill for a patient examination represents that the chiropractor who performed the examination engaged in medical decision-making of "moderate complexity".

145.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

146.    Though Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby routinely billed for their putative initial examinations using CPT codes 99203, 99204, and 99243, and thereby falsely represented that the initial examinations involved medical decision-making of "low" or "moderate" complexity, in actuality the initial examinations did not involve any medical decision-making at all.

147.    First, in virtually every case, the initial examinations performed by Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information.

148.    When the Insureds in the claims identified in Exhibits "1" – "5", presented Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby for "treatment", they did not arrive with any significant amount of medical records.

149.     Furthermore, prior to the initial examinations, Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby neither requested any medical records from any other healthcare providers, nor conducted any diagnostic tests.

150.     Second, in the claims for initial examinations identified in Exhibits "1" – "5", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

151.     Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the procedures or treatment options provided by Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby – to the extent that Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby provided any such procedures or treatment options in the first instance.

152.     In almost every instance, any diagnostic procedures and "treatments" that Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby actually provided were limited to a series of medically unnecessary MUA services, none of which was health- or life-threatening if properly administered.

153.     Third, in virtually every case, Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby did not consider any significant number of diagnoses or treatment options for the Insureds during the purported initial examinations.

154.    Rather, to the extent that the initial examinations were conducted in the first instance, Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby provided a nearly identical, pre-determined laundry-list of objectively-unverifiable, phony "diagnoses" for every Insured, and prescribed a virtually identical course of treatment for virtually every Insured.

155.    Specifically, in most of the instances in the claims identified in Exhibits "1" – "5", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

156.    Even so, Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby prepared initial examination reports in which they provided substantially similar, phony, objectively unverifiable soft tissue injury "diagnoses" to virtually every Insured.

157.    Then, based upon these phony "diagnoses", Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby directed virtually every Insured to continue to present to Axial Chiro, Action Chiro, South Shore, and Lefcort MUA for further chiropractic treatment and MUA services regardless of the Insureds' true circumstances or presentation.

158.    In keeping with the fact that Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby's purported initial examinations and consultations did not involve any medical decision-making at all, the putative "results" of the initial examinations and consultations were fabricated, as shown by the fact that the pre-determined boilerplate "results" of the initial examinations and consultations frequently were contravened by contemporaneous police reports and/or hospital records, which indicated that

the Insureds did not suffer and could not have suffered from the phony symptomatology reported

by Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort,

Yoo, Rosenberg, Luca, and Irby.

159.   For example:

(i)   On August 28, 2015, an Insured named JE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that JE was not injured and did not complain of any pain at the scene. In keeping with the fact that JE was not seriously injured, he did not visit any hospital emergency room following the minor accident. To the extent that JE experienced any health problems at all as the result of the minor accident, they were of low severity. On December 3, 2015, Bromberg purported to conduct an initial examination of JE at Action Chiro. Bromberg did not retrieve, review, or analyze any significant amount of chiropractic records, diagnostic tests, or other information in connection with the examination. Moreover, Bromberg did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Bromberg provided JE with substantially the same, phony, objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JE's presenting problems, nor the treatment plan provided to JE by Bromberg and Action Chiro, presented any risk of significant complications, morbidity, or mortality. To the contrary, JE did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Bromberg and Action Chiro consisted of medically unnecessary MUA services, none of which posed the least bit of risk to JE. Even so, Bromberg and Action Chiro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Bromberg engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)   On September 23, 2016 an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JM's vehicle was drivable following the accident. The police report further indicated that JM was not injured and did not complain of any pain at the scene. In keeping with the fact that JM was not seriously injured, she did not visit any hospital emergency room following the minor accident. To the extent that JM experienced any health issues at all as the result of her minor accident, they were of low severity at the outset, and would have completely resolved within two to three months of the minor accident.. On June 25, 2017 – nine months after the accident – Lefcort purported to conduct an initial examination of JM at Lefcort MUA. Lefcort did not retrieve, review, or analyze any significant amount of chiropractic records, diagnostic tests, or other information in connection with the examination. Moreover, Lefcort did not consider any significant number of diagnoses or management options in connection

with the examination. Instead, Lefcort provided JM with substantially the same, phony, objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JM's presenting problems, nor the treatment plan provided to JM by Lefcort and Lefcort MUA, presented any risk of significant complications, morbidity, or mortality. To the contrary, JM did not need any extensive treatment at all as the result of her minor accident, and the treatment plan provided by Lefcort and Lefcort MUA consisted of medically unnecessary MUA services, none of which posed the least bit of risk to JM. Even so, Lefcort and Lefcort MUA billed GEICO for the initial examination using CPT code 99243, and thereby falsely represented that Lefcort engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)     On January 7, 2017, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured and did not complain of any pain at the scene. In keeping with the fact that MA was not seriously injured, he did not visit any hospital emergency room following the minor accident. To the extent that MA experienced any health issues at all as the result of his minor accident, they were of low severity at the outset, and would have completely resolved within two to three months of the minor accident. On June 21, 2017 – more than five months after the accident – Luca purported to conduct an initial examination of MA at South Shore. Luca did not retrieve, review, or analyze any significant amount of chiropractic records, diagnostic tests, or other information in connection with the examination. Moreover, Luca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Luca provided MA with substantially the same, phony, objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MA's presenting problems, nor the treatment plan provided to MA by Luca, Rosenberg, and South Shore, presented any risk of significant complications, morbidity, or mortality. To the contrary, MA did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Luca, Rosenberg, and South Shore consisted of medically unnecessary MUA services, none of which posed the least bit of risk to MA. Even so, Luca, Rosenberg, and South Shore billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Luca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)     On March 25, 2017, an Insured named BM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that BM was not injured and did not complain of any pain at the scene. In keeping with the fact that BM was not seriously injured, she did not visit any hospital emergency room following the minor accident. To the extent that BM experienced any health issues at all as the

result of her minor accident, they were of low severity. On June 14, 2017, Luca purported to conduct an initial examination of BM at South Shore. Luca did not retrieve, review, or analyze any significant amount of chiropractic records, diagnostic tests, or other information in connection with the examination. Moreover, Luca did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Luca provided BM with substantially the same, phony, objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither BM's presenting problems, nor the treatment plan provided to BM by Luca, Rosenberg, and South Shore, presented any risk of significant complications, morbidity, or mortality. To the contrary, BM did not need any extensive treatment at all as the result of her minor accident, and the treatment plan provided by Luca, Rosenberg, and South Shore consisted of medically unnecessary MUA services, none of which posed the least bit of risk to BM. Even so, Luca, Rosenberg, and South Shore billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Luca engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On April 3, 2017, an Insured named EZ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that EZ was not injured and did not complain of any pain at the scene. In keeping with the fact that EZ was not seriously injured, she did not visit any hospital emergency room following the minor accident. To the extent that EZ experienced any health issues at all as the result of her minor accident, they were of low severity at the outset, and would have completely resolved within two to three months of the minor accident.. On February 13, 2018 – ten months after the accident – Lefcort purported to conduct an initial examination of EZ at Lefcort MUA. Lefcort did not retrieve, review, or analyze any significant amount of chiropractic records, diagnostic tests, or other information in connection with the examination. Moreover, Lefcort did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lefcort provided EZ with substantially the same, phony, objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither EZ's presenting problems, nor the treatment plan provided to EZ by Lefcort and Lefcort MUA, presented any risk of significant complications, morbidity, or mortality. To the contrary, EZ did not need any extensive treatment at all as the result of her minor accident, and the treatment plan provided by Lefcort and Lefcort MUA consisted of medically unnecessary MUA services, none of which posed the least bit of risk to EZ. Even so, Lefcort and Lefcort MUA billed GEICO for the initial examination using CPT code 99243, and thereby falsely represented that Lefcort engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)    On May 28, 2017 an Insured named SD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed,

low-impact collision, and that SD's vehicle was drivable following the accident. The police report further indicated that SD was not injured and did not complain of any pain at the scene. In keeping with the fact that SD was not seriously injured, he did not visit any hospital emergency room following the minor accident. To the extent that SD experienced any health issues at all as the result of his minor accident, they were of low severity at the outset, and would have completely resolved within two to three months of the minor accident. On September 7, 2017, Bromberg purported to conduct an initial examination of SD at Axial Chiro. Bromberg did not retrieve, review, or analyze any significant amount of chiropractic records, diagnostic tests, or other information in connection with the examination. Moreover, Bromberg did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Bromberg provided SD with substantially the same, phony, objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SD's presenting problems, nor the treatment plan provided to SD by Bromberg and Axial Chiro, presented any risk of significant complications, morbidity, or mortality. To the contrary, SD did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Bromberg and Axial Chiro consisted of medically unnecessary chiropractic treatment, none of which posed the least bit of risk to SD. Even so, Bromberg, and Axial Chiro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Bromberg engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)   On February 6, 2018, an Insured named EC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EC's vehicle was drivable following the accident. The police report further indicated that EC was not injured and did not complain of any pain at the scene. In keeping with the fact that EC was not seriously injured, he did not visit any hospital emergency room following the minor accident. To the extent that EC experienced any health issues at all as the result of his minor accident, they were of low severity at the outset, and would have completely resolved within two to three months of the minor accident. On May 23, 2018, Bromberg purported to conduct an initial examination of EC at Axial Chiro. Bromberg did not retrieve, review, or analyze any significant amount of chiropractic records, diagnostic tests, or other information in connection with the examination. Moreover, Bromberg did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Bromberg provided EC with substantially the same, phony, objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither EC's presenting problems, nor the treatment plan provided to EC by Bromberg and Axial Chiro, presented any risk of significant complications, morbidity, or mortality. To the contrary, EC did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Bromberg and Axial Chiro consisted of medically unnecessary MUA services, none of which posed the least bit of risk to EC Even so, Bromberg and Axial Chiro

billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Bromberg engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)  On June 19, 2018, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision, and that JC's vehicle was drivable following the accident. Later that same day, JC traveled on his own to North Shore LIJ Hospital where JC was briefly observed on an outpatient basis and then discharged that same day with a neck contusion. To the extent that JC experienced any health problems at all as a result of the accident, they were of low severity. On June 20, 2018 , Lefcort purported to conduct an initial examination of JC at Bayside. Lefcort did not retrieve, review, or analyze any significant amount of chiropractic records, diagnostic tests, or other information in connection with the examination. Moreover, Lefcort did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lefcort provided JC with substantially the same, phony, objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JC's presenting problems, nor the treatment plan provided to JC by Lefcort, Yoo, and Bayside, presented any risk of significant complications, morbidity, or mortality. To the contrary, JC did not need any extensive treatment at all as the result of his minor accident, and the treatment plan provided by Lefcort, Yoo, and Bayside consisted of medically unnecessary chiropractic treatment and acupuncture, none of which posed the least bit of risk to JC. Even so, Lefcort, Yoo, and Bayside billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lefcort engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)  On March 7, 2019, an Insured named CH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that CH's vehicle was drivable following the accident. The police report further indicated that CH was not injured and did not complain of any pain at the scene. In keeping with the fact that CH was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that CH experienced any health issues at all as the result of his accident, they were of low severity. On March 13, 2019, Lefcort purported to conduct an initial examination of CH at Bayside. Lefcort did not retrieve, review, or analyze any significant amount of chiropractic records, diagnostic tests, or other information in connection with the examination. Moreover, Lefcort did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lefcort provided CH with substantially the same, phony, objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CH's presenting problems, nor the treatment plan provided to CH by Lefcort, Yoo, and Bayside, presented any risk of significant complications, morbidity, or mortality. To the contrary, CH did not need any extensive treatment at all as the result of his minor accident, and the treatment

48

plan provided by Lefcort, Yoo, and Bayside consisted of medically unnecessary chiropractic treatment, range of motion testing, and muscle strength testing,  none of which posed the least bit of risk to CH. Even so, Lefcort, Yoo, and Bayside billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lefcort engaged in some legitimate, low complexity medical decision-making during the purported examination.

160.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "5", Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby routinely falsely purported to diagnose continuing back, neck, and/or extremity pain in the Insureds long after the minor underlying automobile accidents occurred, so as to create a false basis: (i) to bill for "low" or "moderate" complexity medical decision-making under CPT Code 99203, 99243 or 99204; and  (ii) for the other, medically unnecessary Fraudulent Services.

161.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

162.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

163.    It is extremely improbable that any two or more Insureds involved in any one of the automobile accidents in the claims identified in Exhibits "1" – "5", would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

164.    It likewise is improbable that any two or more Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibits "1" – "5", would present for an initial examination with <u>substantially identical symptoms,</u> and receive <u>substantially identical</u>

diagnoses, on or about the <u>exact same date</u> several days, weeks, or even months after their underlying automobile accident.

165.    It is even more improbable – to the point of impossibility – that this would occur over and over again.

166.    Even so, in keeping with the fact that Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby frequently issued or caused to be issued substantially identical, phony "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

167.    For example:

(i)    On September 11, 2014, two Insureds – JC and SH – were involved in the same automobile accident. Incredibly, JC and SH both presented to Axial Chiro on the exact same date, November 12, 2014, for initial examinations by Bromberg. JC and SH were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Bromberg and Axial Chiro provided JC and SH with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(ii)    On September 16, 2014, two Insureds – NM and SS – were involved in the same automobile accident. Incredibly, NM and SS both presented to Axial Chiro on the exact same date, November 21, 2014, for initial examinations by Bromberg. NM and SS were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Bromberg and Axial Chiro provided NM and SS with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(iii) On September 24, 2014, two Insureds – LJ and RR – were involved in the same automobile accident. Incredibly, LJ and RR both presented to Axial Chiro on the exact same date, September 26, 2014, for initial examinations by Bromberg. LJ and RR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Bromberg and Axial Chiro, provided LJ and RR with substantially identical "diagnoses" and recommended a substantially identical course of medically unnecessary treatment for both of them.

(iv) On October 29, 2014, two Insureds – CB and SB – were involved in the same automobile accident. Incredibly, CB and SB both presented to Lefcort MUA on the exact same date, July 18, 2015, for initial examinations by Lefcort. CB and SB were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Lefcort and Lefcort MUA provided CB and SB with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(v) On January 5, 2015, two Insureds – JC and KM – were involved in the same automobile accident. On February 28, 2015, KM presented to Action Chiro for an initial examination by Bromberg. A week later, on March 4, 2015, JC too presented to Action Chiro for an initial examination by Bromberg. JC and KM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Bromberg and Action Chiro provided JC and KM with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(vi) On March 6, 2015, two Insureds – MB and EJ – were involved in the same automobile accident. On October 7, 2015, MB presented to Action Chiro for an initial examination by Bromberg. Just one day later, on October 8, 2015, EJ too presented to Action Chiro for an initial examination by Bromberg. MB and EJ were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Bromberg and Action Chiro provided MB and EJ with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(vii) On April 13, 2015, two Insureds – TM and SR – were involved in the same automobile accident. On May 29, 2015, TM presented to Action Chiro for an initial examination by Bromberg. On July 31, 2015, SR too presented to Action Chiro for an initial examination by Bromberg. TM and SR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the

putative initial examinations, Bromberg and Action Chiro provided TM and SR with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(viii)   On May 24, 2015, two Insureds – MJ and RN – were involved in the same automobile accident. Incredibly, MJ and RN both presented to Axial Chiro on the exact same date, August 5, 2015, for initial examinations by Bromberg. MJ and RN were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Bromberg and Axial Chiro provided MJ and RN with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(ix)   On September 8, 2016, two Insureds – EB and TP – were involved in the same automobile accident. Incredibly, four days later, on September 12, 2016, EB and TP both presented to Bayside for initial examinations by Lefcort. EB and TP were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Lefcort, Yoo, and Bayside provided EB and TP with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(x)   On March 24, 2017, two Insureds – YB and KH – were involved in the same automobile accident. On April 4, 2017, YB presented to Axial Chiro for an initial examination by Coty. Just one day later, on April 5, 2017, KH too presented to Axial Chiro for an initial examination by Coty. YB and KH were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Bromberg and Axial Chiro, provided YB and KH with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xi)   On April 1, 2017, two Insureds – LC and RD – were involved in the same automobile accident. Incredibly, LC and RD both presented to Axial Chiro on the exact same date, June 15, 2017, for initial examinations by Bromberg. LC and RD were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Bromberg and Axial Chiro, provided LC and RD with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xii)   On April 12, 2017, three Insureds – JP, DR, and YR – were involved in the same automobile accident. Incredibly, the next day, June 15, 2017, JP and YR presented to Axial Chiro for initial examinations by Bromberg. On June 29, 2017, DR also

presented to Axial Chiro for an initial examination by Bromberg. JP, YR, and DR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Bromberg and Axial Chiro provided JP, YR, and DR with substantially identical "diagnoses", and recommended a substantially identical course of treatment for all of them.

(xiii)   On April 18, 2017, four Insureds – MC, AO, DR, and DR– were involved in the same automobile accident. Incredibly, DR, and DR both presented to Axial Chiro on the exact same date, October 4, 2017, for initial examinations by Bromberg. AO presented to Axial Chiro for an initial examination on October 17, 2017, and MC presented to Axial Chiro on January 8, 2018 for an initial examination. MC, AO, DR, and DR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Bromberg and Axial Chiro provided MC, AO, DR, and DR with substantially identical "diagnoses" and recommended a substantially identical course of medically unnecessary treatment for all of them.

(xiv)   On May 28, 2017, three Insureds – YB, SD and JR – were involved in the same automobile accident. Incredibly, YB, SD and JR all presented to Axial Chiro on the exact same date, September 7, 2017, for initial examinations by Bromberg. JR presented to Axial Chiro the next day, September 8, 2018. YB, SD, and JR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations Bromberg and Axial Chiro provided YB, SD, and JR with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for all of them.

(xv)   On June 21, 2017, three Insureds – BJ, JR, and PT – were involved in the same automobile accident. Incredibly, BJ, JR, and PT all presented to Axial Chiro on the exact same date, June 27, 2017, for initial examinations by Bromberg.  BJ, JR, and PT were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Bromberg and Axial Chiro provided BJ, JR, and PT with substantially identical "diagnoses" and recommended a substantially identical course of medically unnecessary treatment for all of them.

(xvi)   On July 10, 2017, two Insureds – YM and MR  – were involved in the same automobile accident. YM presented to Axial Chiro on October 23, 2017, for an initial examination by Bromberg. Just two days later, on October 25, 2017, MR presented to Axial Chiro for an initial examination by Bromberg. YM and MR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even

so, at the conclusion of the putative initial examinations, Bromberg and Axial Chiro provided YM and MR with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xvii)   On September 13, 2017, two Insureds – PH and ZC – were involved in the same automobile accident. Incredibly, more than eleven months later, on September 7, 2018, PH and ZC both presented to Bayside for initial examinations by Lefcort. PH and ZC were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Lefcort, Yoo, and Bayside provided PH and ZC with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xviii)   On October 9, 2017, two Insureds – NF and SP – were involved in the same automobile accident. Incredibly, NF and SP both presented to Axial Chiro on the exact same date, October 19, 2017, for initial examinations by Coty. NF and SP were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Coty, Bromberg and Axial Chiro provided NF and SP with substantially identical "diagnoses" and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xix)   On January 10, 2018, three Insureds – YH, IH, and IH – were involved in the same automobile accident. Incredibly, five days later, on January 15, 2018, YH, IH, and IH all presented to Bayside for initial examinations by Lefcort. YH, IH, and IH were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Lefcort, Yoo, and Bayside provided YH, IH, and IH with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for all of them.

(xx)   On November 1, 2018, two Insureds – EA and JA – were involved in the same automobile accident. Incredibly, twelve later, on November 13, 2018, EA and JA both presented to Bayside for initial examinations by Lefcort. EA and JA were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Even so, at the conclusion of the putative initial examinations, Lefcort, Yoo, and Bayside provided EA and JA with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

168.   These are only representative examples. In the claims for initial examinations that

are identified in Exhibits "1" – "5", Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

169.    Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the laundry list of other medically unnecessary Fraudulent Services that the Defendants purported to provide to the Insureds, including chiropractic services and MUA services.

170.    To the extent that the Insureds in the claims identified in Exhibits "1" – "5", ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back and/or neck and other, similarly minor soft tissue injuries.

171.    The diagnosis and treatment of these ordinary sprains and strains and soft tissue injuries did not require any "low complexity" or "moderate complexity" medical decision-making on the part of Bromberg, Coty, Lefcort, Rosenberg, Luca, Irby, or any other chiropractors associated with Axial Chiro, Action Chiro, Lefcort MUA, South Shore.

172.    To the contrary, and as set forth above, Bromberg, Coty, Lefcort, Rosenberg, Luca, and Irby did not engage in any legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibits "1" – "5".

173.    In the claims for initial examinations identified in Exhibits "1" – "5", Axial Chiro,

Action Chiro, Lefcort MUA, South Shore, Bayside, Bromberg, Coty, Lefcort, Yoo, Rosenberg, Luca, and Irby routinely falsely represented that the initial examinations involved medical decision-making of low complexity or moderate complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99203, 99204 and 99243 because CPT codes 99203, 99204 and 99243 are reimbursable at a higher rate than examinations that do not require low or moderate complexity medical decision-making.

**e.      The Fraudulent Charges for "Consultations" at Lefcort MUA**

174.    As set forth above, Lefcort and Lefcort MUA billed many of their purported initial examinations under CPT code 99243.

175.    CPT code 99243 is a "consultation" code, the use of which typically requires, among other things, that the "consultation" be performed at the request of another healthcare provider, and a copy of the "consultation" report be sent to that provider at the conclusion of the "consultation".

176.    However, in virtually all of Lefcort and Lefcort MUA's claims for "consultations" under CPT code 99243, Lefcort and Bayside had caused Insureds to be self-referred to Lefcort MUA, and therefore the resulting examinations did not qualify as "consultations" at the request of another healthcare provider.

177.    In keeping with the fact that the supposed "consultations" billed through Lefcort MUA falsely represented that each Insured had been referred by a separate healthcare provider, in virtually all of the reports generated in connection with the supposed "consultations", Lefcort and Lefcort MUA falsely indicated that he would forward additional information to an apparent third party referral source, despite the fact that no such referral source existed.

178.    In particular, in many of the reported generated by Lefcort and Lefcort MUA in

connection with their putative "consultations", Lefcort stated that "I will forward you an operative report following the procedure", despite the fact that it was Lefcort and Bayside who had caused the Insureds to be self-referred to Lefcort MUA in the first instance.

179.    Virtually all of Lefcort and Lefcort MUA's charges under CPT code 99243 falsely represented that the billed-for services legitimately qualified as "consultations", when in fact they did not.

180.    In keeping with the fact that Lefcort and Lefcort MUA's charges under CPT code 99243 falsely represented that the billed-for services legitimately qualified as "consultations" when in fact they did not, Lefcort's testimony during a November 12, 2020 deposition indicated that Lefcort and Lefcort MUA's charges under CPT code 99243 falsely represented that the billed-for services legitimately qualified as "consultations" when in fact they did not.

**2.    The Fraudulent Charges for pf-NCS Testing at Bayside**

181.    Based on the fraudulent, pre-determined "diagnoses" that Lefcort, Yoo, and Bayside provided during the initial examinations, Lefcort, Yoo, and Bayside purported to subject many Insureds to medically useless pf-NCS testing.

182.    Lefcort purported to perform virtually all of the pf-NCS tests that were billed to GEICO through Bayside, which were billed to GEICO under CPT code 95999, typically resulting in a total charge of $2,330.56 for each putative pf-NCS test.

183.    Like the charges for the other Fraudulent Services, the charges for the pf-NCS testing were fraudulent in that the pf-NCS testing services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined treatment protocol in order to maximize the potential charges they could submit, rather than to treat or otherwise benefit the Insureds.

a.      **Legitimate Tools for Neuropathy Diagnosis**

184.    Lefcort, Yoo, and Bayside supposedly provided the pf-NCS tests to Insureds in order to diagnose radiculopathies, which are a type of neuropathy.

185.    There are three primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent, and specific location of abnormalities (i.e., neuropathies) in the peripheral nerves and (radiculopathies) in the nerve roots.  These diagnostic tests are NCV tests, EMG tests, and magnetic resonance imaging tests ("MRIs").

186.    Except in very limited circumstances, for diagnostic purposes NCV tests and EMG tests are performed together if: (i) nerve damage is suspected following an auto accident; (ii) the damage cannot be fully evaluated through a physical examination or other generally accepted diagnostic technique; and (iii) the tests are necessary to determine an appropriate treatment plan.

187.    If NCV tests and EMG tests are necessary to diagnose nerve damage, they should be performed no fewer than 14-21 days following an auto accident because it typically takes at least that long for nerve damage to appear following a trauma.

188.    MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue and nerves inside the human body. MRIs often are used following auto accidents to diagnose abnormalities in the nerve roots through images of the nerves, nerve roots and surrounding areas.

b.      **The Medically Useless pf-NCS Tests**

189.    The pf-NCS test is a supposed non-invasive sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots. It does not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

190.    Pf-NCS tests are performed by administering electricity through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet and/or face. The voltage amplitude is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage. Supposed "findings" then are made by comparing the minimum voltage stimulus required for the patient to announce that he or she perceives some sensation from it with purported normal ranges.

191.    In actuality, however, there are no reliable, peer-reviewed data that establish normal response ranges in pf-NCS testing.

192.    If the patient's sensation threshold is greater than the purported normal range of amplitude required to evoke a sensation, it supposedly indicates that the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves have decreased function). If the amplitude required for the patient to announce that he perceives a sensation is less than the supposed normal range of intensity to evoke a sensation, it supposedly indicates that the patient has a hyperesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

193.    The sensory nerves are comprised of three different kinds of nerve fibers, the A-beta fibers, the A-delta fibers and the C fibers. The pf-NCS tests allegedly can diagnose the existence, nature, extent and location of any abnormal condition in each of these specific nerve fibers by using three different frequencies of electrical current. Specifically, the use of electrical currents with frequencies of 5 Hz, 250 Hz and 2000 Hz allegedly stimulate and thereby test the C fibers, the A-delta fibers and the A-beta fibers, respectively.

194.    Though Lefcort, Yoo, and Bayside purported to subject many Insureds to pf-NCS tests, supposedly to diagnose radiculopathies, the pf-NCS tests were medically useless because virtually every Insured who purportedly was subjected to the pf-NCS tests by Lefcort, Yoo, and

Bayside also received, shortly before and/or shortly thereafter, NCVs, EMGs, and/or MRIs.

195.    Even if the pf-NCS tests purportedly provided by Lefcort, Yoo, and Bayside had any legitimate value in the diagnosis of neuropathies, they were duplicative of the NCV tests, EMG tests, and/or MRIs that the Insureds received, and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the pf-NCS tests that Lefcort, Yoo, and Bayside purported to provide.

196.    For example:

(i)      On January 30, 2015, Lefcort, Yoo, and Bayside purported to provide pf-NCS tests to an Insured named SC, despite the fact that SC, already had received an MRI just one day earlier, and EMG testing and NCV testing that same day.

(ii)     On November 20, 2015, Lefcort, Yoo, and Bayside purported to provide pf-NCS tests to an Insured named CA, despite the fact that CA already had received an MRI just four days earlier.

(iii)    On September 27, 2016, Lefcort, Yoo, and Bayside purported to provide pf-NCS tests to an Insured named CS, despite the fact that CS already had received an MRI less than 3 weeks earlier, and EMG testing and NCV testing just three days earlier.

(iv)     On April 28, 2017, Lefcort, Yoo, and Bayside purported to provide pf-NCS tests to an Insured named SD, despite the fact that SD already had received MRIs less than three weeks earlier, and EMG testing and NCV testing just three days earlier.

(v)      On September 15, 2017, Lefcort, Yoo, and Bayside purported to provide pf-NCS tests to an Insured named WH, despite the fact that WH, already had received and MRI just four days earlier.

(vi)     On October 30, 2017, Lefcort, Yoo, and Bayside purported to provide pf-NCS tests to an Insured named DD, despite the fact that DD already had received an MRI less than one month earlier, and EMG testing and NCV testing just six days earlier.

(vii)    On June 29, 2018, Lefcort, Yoo, and Bayside purported to provide pf-NCS tests to an Insured named DM, despite the fact that DM, already had received an MRI just one day earlier, and EMG testing and NCV testing just two days earlier.

(viii)   On August 17, 2018, Lefcort, Yoo, and Bayside purported to provide pf-NCS tests to an Insured named LL, despite the fact that LL, already had received an MRI just six days earlier, and EMG testing and NCV testing just five days earlier.

(ix)    On November 12, 2018, Lefcort, Yoo, and Bayside purported to provide pf-NCS tests to an Insured named SC despite the fact that SC, already had received MRIs <u>just six nine earlier</u>.

(x)     On October 28, 2019, Lefcort, Yoo, and Bayside purported to provide pf-NCS tests to an Insured named LB, despite the fact that LB already had received an MRI just <u>twelve days earlier</u>, and EMG testing and NCV testing <u>just thirteen days earlier</u>.

197.    These are only representative examples. In the claims for putative pf-NCS testing services identified in Exhibit "5", Lefcort, Yoo, and Bayside purported to provide the pf-NCS tests to Insureds who had already received – or would soon thereafter receive – far more specific, sensitive, and reliable NCV tests, EMG tests, and/or MRIs.

198.    Even assuming that there was some diagnostic value for pf-NCS tests, the pf-NCS tests in these circumstances could not possibly have provided any diagnostic information of any value beyond that which was produced through NCVs, EMGs and/or MRIs.

199.    In any case, there are no legitimate data to support the use of pf-NCS tests to diagnose neuropathies in general or radiculopathies in particular.

200.    Furthermore, even if pf-NCS tests could produce any valid diagnostic information regarding the sensory nerve fibers:

(i)     there is no reliable evidence to prove that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient;

(ii)    there is no reliable evidence to prove that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots;

(iii)   there is no reliable evidence to prove that any such information would indicate the specific location of the abnormality along the sensory nerve pathways;

(iv)    pf-NCS do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident; and

(v)     there would be no legitimate diagnostic advantage to using pf-NCS tests to obtain information regarding the sensory nerve fibers where, as here, the pf-NCS tests were duplicative of contemporaneously-provided MRIs and/or NCV/EMG tests.

201.    Moreover, in keeping with the fact that the pf-NCS tests were medically useless, the putative results of the pf-NCS testing were never incorporated into the treatment "plan" Lefcort, Yoo, and Bayside provided to Insureds at Bayside.

202.    In keeping with the fact that the putative "results" of the pf-NCS testing were never incorporated into the treatment "plan" Lefcort, Yoo, and Bayside provided to Insureds at Bayside, following the purported pf-NCS testing, Lefcort, Yoo, and Bayside routinely directed the Insureds identified in Exhibit "5" to receive a virtually identical course of treatment as had been recommended for that Insured prior to the supposed pf-NCS testing.

203.    For example:

(i)     On August 20, 2016, an Insured named CS was involved in an automobile accident. Thereafter, on August 22, 2016, CS presented to Bayside for an initial examination by Lefcort. At the conclusion of the putative examination, Lefcort, Yoo, and Bayside provided CS with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that CS begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on September 9, 2016, Lefcort, Yoo, and Bayside purported to provide CS with putative pf-NCS testing at Bayside. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into CS's supposed treatment "plan", and CS thereafter received substantially the same treatment as had been recommended to her prior to the pf-NCS testing being provided.

(ii)    On April 3, 2017, an Insured named EZ was involved in an automobile accident. Thereafter, on April 7, 2017, EZ presented to Bayside for an initial examination by Lefcort. At the conclusion of the putative examination, Lefcort, Yoo, and Bayside provided EZ with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that EZ begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on April 28, 2017, Lefcort, Yoo, and Bayside purported to provide EZ with putative pf-NCS testing at Bayside. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into EZ's supposed

treatment "plan", and EZ thereafter received substantially the same treatment as had been recommended to her prior to the pf-NCS testing being provided.

(iii)    On November 24, 2017, an Insured named MD was involved in an automobile accident. Thereafter, on November 29, 2017, MD presented to Bayside for an initial examination by Lefcort. At the conclusion of the putative examination, Lefcort, Yoo, and Bayside provided MD with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that MD begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on January 30, 2018, Lefcort, Yoo, and Bayside purported to provide MD with putative pf-NCS testing at Bayside. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into MD's supposed treatment "plan", and MD thereafter received substantially the same treatment as had been recommended to her prior to the pf-NCS testing being provided.

(iv)    On June 19, 2018, an Insured named JC was involved in an automobile accident. Thereafter, on June 20, 2018, JC presented to Bayside for an initial examination by Lefcort. At the conclusion of the putative examination, Lefcort, Yoo, and Bayside provided JC with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that JC begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on August 17, 2018, Lefcort, Yoo, and Bayside purported to provide JC with putative pf-NCS testing at Bayside. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into JC's supposed treatment "plan", and JC thereafter received substantially the same treatment as had been recommended to her prior to the pf-NCS testing being provided.

(v)    On July 16, 2019, an Insured named BD was involved in an automobile accident. Thereafter, on July 19, 2019, BD presented to Bayside for an initial examination by Lefcort. At the conclusion of the putative examination, Lefcort, Yoo, and Bayside provided BD with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured, and recommended that BD begin substantially the same course of putative "treatment" they recommended to virtually every other Insured. Thereafter, on September 23, 2019, Lefcort, Yoo, and Bayside purported to provide BD with putative pf-NCS testing at Bayside. However – and in keeping with the fact that the putative pf-NCS testing was medically unnecessary – the "results" of the pf-NCS testing were never incorporated into BD's supposed treatment "plan", and BD thereafter received substantially the same treatment as had been recommended to her prior to the pf-NCS testing being provided.

204.    These are only representative examples. In the claims identified in Exhibit "5",

following the purported pf-NCS testing, Lefcort, Yoo, and Bayside routinely directed Insureds to

receive a virtually identical course of treatment as had been recommended for that Insured prior to the supposed pf-NCS testing.

205.    In further keeping with the fact that Lefcort, Yoo, and Bayside's purported pf-NCS tests were medically useless, CMS has issued a National Coverage Determination that pf-NCS tests are not medically reasonable and necessary for diagnosing sensory neuropathies and radiculopathies, and are therefore not compensable.

206.  In keeping with the fact that Lefcort, Yoo, and Bayside's putative pf-NCS were medically unnecessary, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for pf-NCS tests.

207.    In keeping with the fact that Lefcort, Yoo, and Bayside's purported pf-NCS tests were medically useless, the putative "results" of the Defendants' pf-NCS tests were not incorporated into any Insured's treatment plan, and the pf-NCS tests played no genuine role in the treatment or care of the Insureds.

**c.    Each of the Two Main pf-NCS Test Device Manufacturers Claims the Other is a Fraud**

208.    Until 2004, about the same time that CMS was considering the medical benefits of pf-NCS testing before ultimately issuing its National Coverage Determination that denied Medicare coverage of pf-NCS tests, the two primary manufacturers of sensory nerve conduction threshold devices were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

209.    Neurotron, Inc. manufactured a device called the "Neurometer". Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000". While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purported to provide quantitative data on sensory nerve conduction threshold.

210.    In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and re-branded its Medi-Dx 7000 device as the "Axon-II".

211.    Neuro Diagnostic Associates, Inc.'s last known business address and telephone number are identical to those used by PainDx, Inc. Moreover, the technical specifications of the Medi-Dx 7000 are virtually identical to the Axon-II.

212.    To the extent that Lefcort, Yoo, and Bayside actually provided any pf-NCS tests to Insureds in the first instance, they were provided using an Axon-II or re-branded Medi-Dx 7000 device.

213.    Notwithstanding the Medi-Dx 7000's cosmetic re-branding as the Axon-II, Neurotron, Inc. claims that neither device produces valid data or results, and that both the Medi-Dx 7000 and Axon-II have been fraudulently marketed. For its part, Neuro Diagnostic Associates, Inc. had asserted the same claims regarding Neurotron, Inc.'s Neurometer device.

214.    Among the charges made by Neurotron, Inc. against the Medi-Dx 7000 are that: (i) there is no reliable evidence that the type of electrical wave forms (asymmetrical wave forms) used by the Medi DX 7000 stimulate or provide any useful diagnostic information regarding any specific kind of sensory nerve fiber; (ii) the alternating output of electrical current used by the Medi-Dx 7000 is "severely distorted by skin impedance" (e.g., texture, thickness, temperature of the skin etc.) making it "impossible" to determine the true intensity levels of the electrical current being delivered by the Medi-Dx 7000; (iii) the Medi-Dx 7000 protocols are "incapable of measuring the thresholds in the sensory nerves"; and (iv) there are no peer-reviewed studies that validate the tests performed using the Medi-Dx 7000.

215.    Because the Axon-II is virtually identical to the Medi-Dx 7000, any and all of Neurotron, Inc.'s criticisms of the Medi-Dx 7000 also apply to the Axon-II/Medi-DX 7000 that was used by Lefcort, Yoo, and Bayside.

**d.    The Fraudulent pf-NCS "Reports"**

216.    In support of their fraudulent charges for the pf-NCS tests, Bayside, Lefcort, and Yoo submitted phony pf-NCS test "reports" which falsely represented that an actual chiropractor – either Lefcort or Yoo – had some role in performing and interpreting the tests.

217.    Bayside, Lefcort, and Yoo's bills for the pf-NCS tests likewise falsely represented that an actual chiropractor – either Lefcort or Yoo – had some role in performing and interpreting the tests.

218.    In actuality, to the extent that the pf-NCS tests were performed in the first instance, they were performed by unlicensed technicians, and neither Lefcort, Yoo, nor any other licensed healthcare provider associated with Bayside had any role whatsoever in interpreting the test results.

219.    In keeping with the fact that the pf-NCS tests were performed by unlicensed technicians, rather than by a licensed chiropractor associated with Bayside, and in keeping with the fact that the purported tests played no genuine role in the treatment or care of the Insureds who purportedly were subjected to them, the putative test "reports" did not contain any genuine interpretation of the test data.

220.    Instead, aside from reporting the putative pf-NCS data that supposedly were derived from the respective Insureds' tests, virtually all of the boilerplate pf-NCS test "reports" contained an identical, boilerplate "Diagnostic Summary" section that did not vary from patient-to-patient and was included solely to foster the illusion that a licensed healthcare professional had some role in performing or interpreting the tests.

221.    For instance, virtually all of Bayside, Lefcort, and Yoo's purported pf-NCS test reports in the pf-NCS test claims identified in Exhibit "5" contained the following, substantively identical "Diagnostic Discussion" section, with no other interpretation of the supposed "data" derived from the tests provided at all:

> On the graph, the nerve with the highest amplitude is the injured nerve that the source of the patient's dysfunction. As a result of spinal cord interconnectivity, sensory pathology influences conduction in adjacent nerves so adjacent nerves will also show higher amplitudes. However, the highest amplitude is the injured nerve.
>
> Below normal amplitudes correlate with irritation and may suggest possible adjacent inflammatory activity, which may warrant investigation to rule in/rule out concomitant pathology. However, it is not uncommon to find irritation adjacent to the injured nerve.
>
> The uninjured side will mirror the injured side very closely in an acute injury. However, in the case of chronic pain, the uninjured side will no longer mirror and will be closer to the normal range due to disinhibition of nerve signals over time.
>
> Normal findings do not rule out non-neurogenic etiologies. For example, if the results do not indicate any neurological involvement then the doctor can be confident that the source of the patient's pain can be narrowed to the other structures that are commonly injured following cervical trauma. This would most commonly include the muscles and ligamentous structures.

222.    Likewise, virtually all of Bayside, Lefcort, and Yoo's purported pf-NCS test reports contained the following, substantively identical "Diagnostic Summary" section:

> These findings are seen in and are suggestive of small sensory pain fiber radiculopathy. Dysfunction in these fibers is causing proprioceptive dyskinesia and segmental biomechanical dysfunction specifically causing pathomechanical vertebral segmental coupled motion. It is these levels of abnormal coupled motion that is at the root of the patient's pain and dysfunction and where chiropractic high velocity low amplitude manipulative techniques should be performed.

223.    Other than the boilerplate "Diagnostic Discussion" and "Diagnostic Summary" sections of the purported pf-NCS test reports, which did not vary in any way from Insured to Insured, the "reports" did not contain any interpretation of the supposed data that Bayside, Lefcort, and Yoo purported to obtain from the tests.

224.    In keeping with the fact that Lefcort, Yoo, and Bayside's purported pf-NCS tests were medically useless, the putative "results" of the pf-NCS tests were not incorporated into any Insured's treatment plan, and the pf-NCS tests played no genuine role in the treatment or care of the Insureds – virtually every Insured received the same pre-determined chiropractic and physical therapy services before and after the pf-NCS tests purportedly were administered by Bayside, Lefcort, and Yoo.

225.    The pf-NCS tests that Lefcort, Yoo, and Bayside purported to provide were medically unnecessary, because those tests had no effect on the treatment that the Insureds received, and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, not to treat or otherwise benefit the Insureds.

**e.    The Fraudulent Radiculopathy "Diagnoses"**

226.    Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the American Association of Neuromuscular and Electrodiagnostic Medicine.

227.    Very few of the Insureds whom Lefcort, Yoo, and Bayside purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathy.

228.    Even so, Lefcort, Yoo, and Bayside falsely purported to use their pf-NCS tests to diagnose radiculopathies in the substantial majority of the Insureds that purportedly received pf-NCS testing at Bayside.

229. Lefcort, Yoo, and Bayside purported to arrive at their pre-determined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the medically unnecessary Fraudulent Services provided through the Defendants.

230. In fact, pf-NCS tests cannot legitimately be used to diagnose radiculopathies in the first instance.

**3.  The Fraudulent Charges for Range of Motion/Muscle Strength Testing at Bayside**

231. In an attempt to maximize the fraudulent billing that they submit or cause to be submitted for each Insured, after purporting to provide initial examinations at Bayside, Lefcort, and Yoo directed many Insureds to return for one or more rounds of medically useless computerized range of motion and muscle strength tests.

232. As set forth in Exhibit "5", Bayside, Lefcort, and Yoo then purported to provide, and billed, the computerized range of motion and muscle strength tests to GEICO under CPT codes 95831, 95851, and 97750, typically resulting in a combined charge of between $83.13 and $365.68 for each round of computerized range of motion and muscle strength tests.

233. As set forth below, Bayside, Lefcort, and Yoo's charges for the computerized range of motion and muscle strength tests identified in Exhibit "5" were fraudulent in that they misrepresented the medical necessity of the putative computerized range of motion and muscle strength tests.

234. Like the charges for the other Fraudulent Services, the charges for the computerized range of motion and muscle strength tests identified in Exhibit "5" were fraudulent in that they were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined treatment protocol in order to maximize the potential charges they could submit, rather than to treat or otherwise benefit the Insureds.

235.     Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treated with Bayside – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning.  Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

236.     Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial consultations and follow-up examinations.

237.     In other words, health care providers cannot conduct and bill for an initial consultation or follow-up examination, then bill separately for contemporaneously-provided computerized range of motion and muscle strength tests.

238.     To the extent that Bayside, Lefcort, and Yoo actually provided initial examinations and follow-up examinations in the first instance, practitioners associated with Bayside – typically Lefcort or Yoo – purported to conduct manual range of motion and manual muscle tests on virtually every Insured during each initial and/or follow-up examination.

239.     The charges for these manual range of motion and manual muscle tests were part and parcel of the charges that Bayside, Lefcort, and Yoo routinely submitted for the initial examinations under CPT codes 99203 and 99204 and for the follow-up examinations under CPT codes 99212 and 99213.

240.     Despite the fact that virtually every Insured already purportedly had undergone manual range of motion and muscle testing during their initial examinations and/or follow-up examinations, and despite the fact that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the initial examinations and/or follow-up examinations, Bayside, Lefcort, and Yoo systemically billed for, and purported to provide, a series of computerized range of motion and muscle strength tests to most Insureds.

241.     Bayside, Lefcort, and Yoo purported to provide the computerized range of motion and muscle strength tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements.  The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each initial examination and follow-up examination.

242.     The information gained through the use of the computerized range of motion and muscle strength tests was not significantly different from the information obtained through the manual testing that was part and parcel of virtually every Insured's initial examination and follow-up examinations.

243.     In the relatively minor soft-tissue injuries allegedly sustained by the Insureds – to the extent that any of the Insureds suffered any injuries at all as the result of the automobile accidents they purported to experience – the difference of a few percentage points in the Insureds' range of motion reading or pounds of resistance in the Insureds' muscle strength testing was meaningless. This is evidenced by the fact that neither Lefcort, Yoo, nor any other health care provider associated with Bayside, ever incorporated the results of computerized range of motion

and muscle strength tests into the rehabilitation programs of any of the Insureds whom they purported to treat.

**4.     The Fraudulent Charges for Chiropractic, Physical Therapy, and Acupuncture Services at Bayside**

244.    Bayside, Lefcort, and Yoo's fraudulent scheme was aimed at, among other things, at providing as many chiropractic, physical therapy, and acupuncture services as possible, without regard for medical necessity.

245.    Based on the phony "diagnoses" that Bayside, Lefcort, and Yoo provided during their initial examinations and at the conclusion of their fraudulent pf-NCS and range of motion and muscle testing services, Bayside, Lefcort, and Yoo purported to subject many Insureds to many months of medically unnecessary chiropractic, physical therapy, and acupuncture services.

246.    As set forth in Exhibit "5", Lefcort purported to perform most of the chiropractic services that were billed to GEICO through Bayside to GEICO, which were typically billed to GEICO through Bayside under CPT codes 98940 and 98941.

247.    As set forth in Exhibit "5", Yoo purported to perform most of the acupuncture and physical therapy services that were billed through Bayside to GEICO, which were typically billed to GEICO through Bayside under: (i) CPT codes 97810 and 98711 for the purported acupuncture services; and (ii) CPT codes 97010, 97014, 97110, 97124, 97139, and 97140 for the purported physical therapy services.

248.    Like the charges for the other Fraudulent Services, the charges for the chiropractic services, physical therapy services, and acupuncture services were fraudulent in that the services were medically unnecessary and were performed – to the extent that they were performed at all – solely to financially enrich Bayside, Lefcort, and Yoo, not to treat or otherwise benefit the Insureds who were subjected to them.

249.    Bayside, Lefcort, and Yoo used the phony "diagnoses" provided during the fraudulent initial examinations, and at the conclusion of the fraudulent pf-NCS, range of motion, and muscle strength testing, as a false basis to bill for many months of medically unnecessary chiropractic, physical therapy, and acupuncture services.

250.    For example:

(i)    On July 17, 2015, an Insured named KB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision, and that KB's vehicle was drivable following the accident. Later that same day, KB traveled on his own to North Shore LIJ Hospital where KB was briefly observed on an outpatient basis and then discharged with a low back pain diagnosis. To the extent that KB experienced any health problems at all as a result of the accident, they were of low severity, would have resolved within two to three months, and did not require more than sixteen months of chiropractic, acupuncture, and physical therapy services. Even so, based on the phony "results" of Lefcort, Yoo, and Bayside's putative patient examinations, and at the conclusion of the purported pf-NCS testing, Lefcort, Yoo, and Bayside purported to provide KB with over sixteen months of medically unnecessary chiropractic, acupuncture, and physical therapy services.

(ii)    On April 7, 2016, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that, although MP complained of neck pain, MP refused medical attention at the scene. In keeping with the fact that MP was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems as a result of the accident, they were of low severity, would have resolved within two to three months, and did not require more than nineteen months of chiropractic, acupuncture, and physical therapy services. Even so, based on the phony "results" of Lefcort, Yoo, and Bayside's putative patient examinations, and at the conclusion of the purported pf-NCS testing, Lefcort, Yoo, and Bayside purported to provide MP with over nineteen months of medically unnecessary chiropractic, acupuncture, and physical therapy services.

(iii)    On November 18, 2016, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SA's vehicle was drivable following the accident. The police report further indicated that SA was not injured and did not complain of any pain at the scene. In keeping with the fact that SA was not seriously injured, he did not visit any hospital emergency room following the minor accident. To the extent that SA experienced any health issues at all as the result of his minor accident, they were of low severity, would have resolved within two to three

months, and did not require nearly three of chiropractic, acupuncture, and physical therapy services. Even so, based on the phony "results" of Lefcort, Yoo, and Bayside's putative patient examinations, and at the conclusion of the purported pf-NCS, range of motion, and muscle strength testing, Lefcort, Yoo, and Bayside purported to provide SA with <u>nearly three years</u> of medically unnecessary chiropractic, acupuncture, and physical therapy services.

(iv)    On April 3, 2017, an Insured named EZ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that EZ was not injured and did not complain of any pain at the scene. In keeping with the fact that EZ was not seriously injured, she did not visit any hospital emergency room following the minor accident. To the extent that EZ experienced any health issues at all as the result of her minor accident, they were of low severity, would have resolved within two to three months, and did not require nearly two years of chiropractic, acupuncture, and physical therapy services. Even so, based on the phony "results" of Lefcort, Yoo, and Bayside's putative patient examinations, and at the conclusion of the purported pf-NCS testing, Lefcort, Yoo, and Bayside purported to provide EZ with <u>nearly two years</u> of medically unnecessary chiropractic, acupuncture, and physical therapy services.

(v)    On April 7, 2017, an Insured named TW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TW's vehicle was drivable following the accident. The police report further indicated that TW was not injured and did not complain of any pain at the scene. In keeping with the fact that TW was not seriously injured, she did not visit any hospital emergency room following the minor accident. To the extent that TW experienced any health issues at all as the result of her minor accident, they were of low severity, would have resolved within two to three months, and did not require more than one year of chiropractic, acupuncture, and physical therapy services. Even so, based on the phony "results" of Lefcort, Yoo, and Bayside's putative patient examinations, and at the conclusion of the purported pf-NCS testing, Lefcort, Yoo, and Bayside purported to provide TW with <u>over one year</u> of medically unnecessary chiropractic, acupuncture, and physical therapy services.

(vi)    On September 13, 2017, an Insured named PH was involved in an automobile accident. The contemporaneous police report indicated that PH's vehicle was drivable following the accident. The police report further indicated that PH was not injured and did not complain of any pain at the scene. In keeping with the fact that PH was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that PH experienced any health issues at all as the result of his accident, they were of low severity, would have resolved within two to three months, and did not require more than one year of chiropractic, acupuncture, and physical therapy services. Even so, based on the phony "results" of Lefcort, Yoo, and Bayside's putative patient examinations, and at the conclusion

of the purported pf-NCS, range of motion, and muscle strength testing, Lefcort, Yoo, and Bayside purported to provide PH with <u>more than one year</u> of medically unnecessary chiropractic, acupuncture, and physical therapy services.

(vii)   On October 2, 2017, an Insured named DM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision, and that DM's vehicle was drivable following the accident. The contemporaneous police report indicated that DM was not injured and did not complain of any pain. In keeping with the fact that DM was not seriously injured in the accident, she did not visit any hospital emergency room following the accident. To the extent that DM experienced any health problems at all as the result of her minor accident, they were of low severity, would have resolved within two to three months, and did not require more than twenty-one months of chiropractic, acupuncture, and physical therapy services. Even so, based on the phony "results" of Lefcort, Yoo, and Bayside's putative patient examinations, and at the conclusion of the purported pf-NCS, range of motion, and muscle strength testing, Lefcort, Yoo, and Bayside purported to DM with <u>more than twenty-one months</u> of medically unnecessary chiropractic, acupuncture, and physical therapy services.

(viii)  On October 12, 2017 an Insured named BB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BB's vehicle was drivable following the accident. The police report further indicated that BB was not injured and did not complain of any pain at the scene. In keeping with the fact that BB was not seriously injured, he did not visit any hospital emergency room following the minor accident. To the extent that BB experienced any health issues at all as the result of his minor accident, they were of low severity, would have resolved within two to three months, and did not require nearly two and a half years of chiropractic, acupuncture, and physical therapy services. Even so, based on the phony "results" of Lefcort, Yoo, and Bayside's putative patient examinations – which were intended to provide a false basis to circumvent the ordinary Care Paths – Lefcort, Yoo, and Bayside purported to provide BB with <u>nearly two and a half years</u> of medically unnecessary chiropractic, acupuncture, and physical therapy services.

(ix)    On June 19, 2018, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision, and that JC's vehicle was drivable following the accident. Later that same day, JC traveled on his own to North Shore LIJ Hospital where JC was briefly observed on an outpatient basis and then discharged that same day with a neck contusion. To the extent that JC experienced any health problems at all as a result of the accident, they were of low severity, would have resolved within two to three months, and did not require more than twenty-two months of chiropractic, acupuncture, and physical therapy services. Even so, based on the phony "results" of Lefcort, Yoo, and Bayside's putative patient examinations, and at the conclusion of the purported pf-NCS testing, Lefcort, Yoo, and Bayside purported to provide

JC with <u>over twenty-two months</u> of medically unnecessary chiropractic, acupuncture, and physical therapy services.

(x)    On May 10, 2019, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that SH experienced any health issues at all as the result of his accident, they were of low severity, would have resolved within two to three months, and did not require more than fifteen months of chiropractic, acupuncture, and physical therapy services. Even so, based on the phony "results" of Lefcort, Yoo, and Bayside's putative patient examinations, and at the conclusion of the purported pf-NCS, range of motion, and muscle strength testing, Lefcort, Yoo, and Bayside purported to SH with <u>more than fifteen months</u> of medically unnecessary chiropractic, acupuncture, and physical therapy services.

251.    These are only representative examples. In the claims for physical therapy and chiropractic services that are identified in Exhibit "5", Bayside, Lefcort, and Yoo routinely used the phony "results" of their putative examinations, pf-NCS, and range of motion and muscle testing as a false basis to bill for months – and sometimes <u>years</u> – of medically unnecessary chiropractic, physical therapy, and acupuncture services.

**5.    The Fraudulent Charges for MUA Services at Axial Chiro, Action Chiro, Lefcort MUA, and South Shore**

252.    As set forth in Exhibits "1" – "4", based upon the fraudulent, pre-determined "diagnoses" they purported to provide virtually every Insured at the conclusion of their putative examinations, Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bromberg, Lefcort, Rosenberg, and Luca purported to subject many Insureds to chiropractic MUA services.

253.    Bromberg and Rosenberg purported to perform virtually all of the MUA services that were billed through Axial Chiro and Action Chiro.

254.    As set forth in Exhibits "1" – "4", Bromberg, Rosenberg, Axial Chiro and Action Chiro then billed the putative MUA services to GEICO under CPT codes 22505, 23700, 27194,

and 27275, generally resulting in combined charges of at least $2,700.00 for each date on which the MUA purportedly was provided.

255.   Lefcort and Rosenberg purported to perform virtually all of the MUA services that were billed through Lefcort MUA.

256.   As set forth in Exhibit "3", Lefcort, Rosenberg, and Lefcort MUA then billed the putative MUA services to GEICO under CPT codes 22505 and 27194, generally resulting in combined charges of at least $1,400.00 for each date on which the MUA purportedly was provided.

257.   Luca and Rosenberg purported to perform virtually all of the MUA services that were billed through South Shore.

258.   As set forth in Exhibit "4", Luca, Rosenberg, and South Shore then billed the putative MUA services to GEICO under CPT codes 22505, 23700, 27194, and 27198, generally resulting in combined charges of at least $1,700.00 for each date on which the MUA purportedly was provided.

259.   In many of the claims identified in Exhibits "1" – "4", Bromberg, Axial Chiro, Action Chiro, Lefcort MUA, and South Shore would examine Insureds in New York and refer or cause them to be referred to Axial Chiro, Action Chiro, Lefcort MUA, and South Shore for MUA services provided in New Jersey.

260.   Like the charges for the other Fraudulent Services, the charges for the MUA services were fraudulent in that the MUA services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined treatment protocol in order to maximize the potential charges they could submit, rather than to treat or otherwise benefit the Insureds.

a.   **The Medically-Unnecessary MUA Services**

261.     MUA involves a series of mobilization, stretching, and traction procedures performed on a patient's musculoskeletal system, while the patient is under sedation.

262.     Anesthesia is purportedly used to reduce pain, spasms, and muscle guarding that otherwise might occur in a non-sedated patient.

263.     MUA is a moderately accepted treatment for a limited set of isolated joint conditions, such as arthrofibrosis of the knee and adhesive capsulitis, as well as to reduce displaced fractures.

264.     By contrast, there is a dearth of quality supportive scientific evidence for the use of MUA on most other areas of the body, including the spine, hip, and pelvis. There are no randomized controlled trials or published cohort studies on management of specific diagnoses of the spine, hip, or pelvis via MUA.

265.     Virtually no reliable evidence exists showing the long-term benefits of MUA.

266.     As set forth in Exhibits "1" – "4", virtually every Insured who purportedly received MUA services from Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bromberg, Lefcort, Rosenberg, and Luca supposedly had their cervical spine, lumbar spine, thoracic spine, shoulder, hip, and/or pelvis manipulated.

267.     Given the lack of quality scientific evidence supporting the use of MUA on the spine, hip, shoulder, and pelvis, the MUA services purportedly provided by Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bromberg, Lefcort, Rosenberg, and Luca to GEICO Insureds plainly were not medically necessary.

268.     Moreover, even if MUA was a recognized form of treatment for soft tissue injuries to the spine, hip, shoulder, and pelvis – and it is not – the MUA purportedly provided by Axial

Chiro, Action Chiro, Lefcort MUA, South Shore, Bromberg, Lefcort, Rosenberg, and Luca was provided without regard to whether more conservative treatment had been effective.

269. Even in the limited instances in which MUA is medically necessary, MUA should not be attempted until a patient has tried and failed more conservative treatment, because of the risks attendant to anesthesia.

270. Nonetheless, Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bromberg, Lefcort, Rosenberg, and Luca routinely purported to provide MUA to the Insureds before they could have tried and failed a legitimate course of more conservative treatment.

271. For instance:

(i) On September 11, 2014, an Insured named JC was involved in an automobile accident. Though JC could not have tried and failed a course of more conservative treatment by November 18, 2014 – approximately two months after his accident – Bromberg, Rosenberg, and Axial Chiro nonetheless purported to provide JC with medically unnecessary MUA on November 18, 2014.

(ii) On April 26, 2015, an Insured named ES was involved in an automobile accident. Though ES could not have tried and failed a course of more conservative treatment by June 23, 2015 – less than two months after his accident – Bromberg, Rosenberg, and Axial Chiro nonetheless purported to provide ES with medically unnecessary MUA on June 23, 2015.

(iii) On May 16, 2015, an Insured named BP was involved in an automobile accident. Though BP could not have tried and failed a course of more conservative treatment by July 21, 2015 – approximately two months after his accident – Bromberg, and Axial Chiro nonetheless purported to provide BP with medically unnecessary MUA on July 21, 2015.

(iv) On April 30, 2016, an Insured named FA was involved in an automobile accident. Though FA could not have tried and failed a course of more conservative treatment by June 28, 2016 – less than two months after her accident – Bromberg, and Axial Chiro nonetheless purported to provide FA with medically unnecessary MUA on June 28, 2016.

(v) On April 30, 2016, an Insured named LC was involved in an automobile accident. Though LC could not have tried and failed a course of more conservative treatment by June 28, 2016 – less than two months after her accident – Bromberg, Rosenberg,

and Axial Chiro nonetheless purported to provide LC with medically unnecessary MUA on June 28, 2016.

(vi)    On May 17, 2016, an Insured named CG was involved in an automobile accident. Though CG could not have tried and failed a course of more conservative treatment by July 14, 2016 – less than two months after her accident – Rosenberg, Luca, and South Shore nonetheless purported to provide CG with medically unnecessary MUA on July 14, 2016.

(vii)    On December 17, 2016, an Insured named JS was involved in an automobile accident. Though JS could not have tried and failed a course of more conservative treatment by February 14, 2017 – less than two months after his accident – Bromberg, Rosenberg, and Axial Chiro nonetheless purported to provide JS with medically unnecessary MUA on February 14, 2017.

(viii)    On January 5, 2017 an Insured named ND was involved in an automobile accident. Though ND could not have tried and failed a course of more conservative treatment by March 2, 2017 – less than two months after her accident – Bromberg, Rosenberg, and Axial Chiro nonetheless purported to provide ND with medically unnecessary MUA on March 2, 2017.

(ix)    On April 20, 2017, an Insured named CM was involved in an automobile accident. Though CM could not have tried and failed a course of more conservative treatment by June 1, 2017 – less than two months after his accident – Rosenberg, Luca, and South Shore nonetheless purported to provide CM with medically unnecessary MUA on June 1, 2017.

(x)    On June 10, 2017, an Insured named TG was involved in an automobile accident. Though TG could not have tried and failed a course of more conservative treatment by July 27, 2017 – less than two months after her accident – Rosenberg, and South Shore nonetheless purported to provide TG with medically unnecessary MUA on July 27, 2017.

(xi)    On June 11, 2017, an Insured named TA was involved in an automobile accident. Though TA could not have tried and failed a course of more conservative treatment by July 15, 2017 – less than two months after her accident – Rosenberg, Luca, and South Shore nonetheless purported to provide TA with medically unnecessary MUA on July 15, 2017.

(xii)    On July 8, 2017, an Insured named JB was involved in an automobile accident. Though JB could not have tried and failed a course of more conservative treatment by August 31, 2017 – less than two months after his accident – Rosenberg, Luca, and South Shore nonetheless purported to provide JB with medically unnecessary MUA on August 31, 2017.

(xiii)   On July 13, 2017, an Insured named UG was involved in an automobile accident. Though UG could not have tried and failed a course of more conservative treatment by September 2, 2017 – less than two months after her accident – Rosenberg, Luca, and South Shore nonetheless purported to provide UG with medically unnecessary MUA on September 2, 2017.

(xiv)   On May 31, 2018, an Insured named SD was involved in an automobile accident. Though SD could not have tried and failed a course of more conservative treatment by July 28, 2018 – less than two months after her accident – Rosenberg and South Shore nonetheless purported to provide SD with medically unnecessary MUA on July 28, 2018.

(xv)   On May 31, 2018, an Insured named EP was involved in an automobile accident. Though ED could not have tried and failed a course of more conservative treatment by July 28, 2018 – less than two months after his accident – Rosenberg, and South Shore nonetheless purported to provide EP with medically unnecessary MUA on July 28, 2018.

272.   These are only representative examples. In virtually all of the claims for MUA identified in Exhibits "1" – "4", the Insureds had not legitimately failed any course of conservative treatment before the Defendants purported to subject them to MUA.

273.   In keeping with the fact that Axial Chiro, Action Chiro, Lefcort MUA, Bromberg, Lefcort, and Rosenberg, provided their purported MUA pursuant to a pre-determined, fraudulent treatment and billing protocol designed to maximize their billing, rather than to treat or otherwise benefit the Insureds who were subjected to it, Axial Chiro, Action Chiro, Lefcort MUA, Bromberg, Lefcort, and Rosenberg frequently purported to provide a substantially identical course of MUA services to two or more Insureds who were involved in the same underlying accident, often on the exact same date.

274.   For example:

(i)   On September 19, 2014, two Insureds – CC and MV – were involved in the same minor automobile accident. CC and MV were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Moreover, to the extent that CC and MV experienced any health issues at all as the result of the accident, they would have resolved at different rates and in different manners over the course of the months

81

following the accident. They did not require substantially identical MUA services on or about the exact same dates. Even so, Rosenberg, Lefcort, and Lefcort MUA purported to provide substantially identical serial MUA services to <u>both</u> CC and MV, on the <u>exact same dates</u>, October 28, 2015, October 29, 2015, and October 30, 2015 – more than one year after the accident.

(ii)     On October 29, 2014, two Insureds – CB and SB – were involved in the same minor automobile accident. CB and SB were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Moreover, to the extent that CB and SB experienced any health issues at all as the result of the accident, they would have resolved at different rates and in different manners over the course of the months following the accident. They did not require substantially identical MUA services on or about the exact same dates. Even so, Rosenberg, Lefcort, and Lefcort MUA purported to provide substantially identical serial MUA services to <u>both</u> CB and SB on the <u>exact same dates</u>, July 22, 2015, July 23, 2015, and July 24, 2015 – nine months after the accident.

(iii)    On January 5, 2015, two Insureds – JC and KM – were involved in the same minor automobile accident. JC and KM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. They did not require substantially identical MUA services on or about the exact same dates. Even so, Bromberg, Rosenberg, and Action Chiro purported to provide substantially identical serial MUA services to <u>both</u> JC and KM on the <u>exact same dates</u>, March 10, 2015, March 11, 2015, and March 12, 2015.

(iv)    On March 6, 2015, two Insureds – MB and EJ – were involved in the same minor automobile accident. MB and EJ were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Moreover, to the extent that MB and EJ experienced any health issues at all as the result of the accident, they would have resolved at different rates and in different manners over the course of the months following the accident. They did not require substantially identical MUA services on or about the exact same dates.  Even so, Bromberg, Rosenberg, and Action Chiro purported to provide substantially identical MUA services to <u>both</u> MB and EJ on the <u>exact same date</u>, October 13, 2015 – more than seven months after the accident.

(v)     On March 24, 2015, two Insureds – TR and JW – were involved in the same minor automobile accident. TR and JW were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. They did not require substantially identical MUA services on or about the exact same dates. Even so, Bromberg, Rosenberg, and Axial Chiro purported to provide substantially identical serial MUA services to <u>both</u> TR and JW on the <u>exact same dates</u>, June 23, 2015, June 24, 2015, and June 25, 2015.

(vi)     On April 3, 2015, two Insureds – MB and JJ – were involved in the same minor automobile accident. MB and JJ were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. They did not require substantially identical MUA services on or about the exact same dates.  Even so, Bromberg, Rosenberg, and Axial Chiro purported to provide substantially identical serial MUA services to both MB and JJ on the exact same dates, July 14, 2015, July 15, 2015, and July 16, 2015.

(vii)    On April 13, 2015, two Insureds – TM and SR – were involved in the same minor automobile accident. TM and SR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. They did not require substantially identical MUA services. Even so, Bromberg, Rosenberg, and Action Chiro purported to provide substantially identical serial MUA services to both TM and SR on various dates between June and August 2015.

(viii)   On May 12, 2015, two Insureds – DD and OH – were involved in the same minor automobile accident. DD and OH were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. They did not require substantially identical MUA services. Even so, Bromberg, Rosenberg, and Axial Chiro purported to provide substantially identical serial MUA to both DD and OH on various dates between July and September, 2015.

(ix)     On May 24, 2015, two Insureds – MJ and RN – were involved in the same minor automobile accident. MJ and RN were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle.  They did not require substantially identical MUA services on or about the exact same dates. Even so, Bromberg, Rosenberg, and Axial Chiro purported to provide substantially identical serial MUA services to both MJ and RN on the exact same dates, August 12, 2015 and August 25, 2015.

(x)      On June 18, 2015, two Insureds – DG and FN – were involved in the same minor automobile accident. DG and FN were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. They did not require substantially identical MUA services on or about the exact same dates. Even so, Bromberg, Rosenberg, and Action Chiro purported to provide substantially identical serial MUA services to both DG and FN on the exact same dates, August 19, 2015 and August 20, 2015.

(xi)     On June 25, 2015, two Insureds – CR and JT – were involved in the same minor automobile accident. CR and JT were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. They did not require substantially identical MUA

services. Even so, Bromberg, Rosenberg, and Axial Chiro purported to provide substantially identical serial MUA services to <u>both</u> CR and JT on various dates between September and October 2015.

(xii)  On August 4, 2016, two Insureds – JM and HP – were involved in the same minor automobile accident. JM and HP were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Moreover, to the extent that JM and HP experienced any health issues at all as the result of the accident, they would have resolved at different rates and in different manners over the course of the months following the accident. They did not require substantially identical MUA services on or about the exact same dates. Even so, Rosenberg, Lefcort, and Lefcort serial MUA services purported to provide substantially identical serial MUA services to <u>both</u> JM and HP on various dates between March and May 2017 – one year after the accident.

(xiii)  On April 12, 2017, <u>three</u> Insureds – JP, YR, and DR – were involved in the same minor automobile accident. JP, YR, and DR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. Moreover, to the extent that JP, YR, and DR experienced any health issues at all as the result of the accident, they would have resolved at different rates and in different manners over the course of the months following the accident. They did not require substantially identical MUA services. Even so, Bromberg, Rosenberg, and Axial Chiro purported to provide substantially identical serial MUA services to JP, YR, <u>and</u> DR between June and August, 2017.

(xiv)  On December 31, 2017, two Insureds – DD and JR – were involved in the same minor automobile accident. DD and JR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. They did not require substantially identical MUA services. Even so, Bromberg, Rosenberg, and Axial Chiro purported to provide substantially identical serial MUA services to <u>both</u> DD and JR on various dates in February and March 2018.

(xv)  On February 12, 2018, two Insureds – WC and WT – were involved in the same minor automobile accident. WC and WT were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. They did not require substantially identical MUA services on or about the exact same dates. Even so, Bromberg, Rosenberg, and Axial Chiro purported to provide substantially identical MUA services to <u>both</u> WC and WT on the <u>exact same date</u>, August 16, 2018 – six months after the accident.

**b.**     **The Fraudulent Charges for Serial MUA**

275. The National Academy of Manipulation Under Anesthesia Physicians ("NAMUAP") has adopted guidelines for the optimal use and provision of MUA services (the "NAMUAP Guidelines").

276. According to the NAMUAP Guidelines, serial MUA services – i.e., MUA services provided to a single patient on multiple dates of service – are medically necessary only under certain limited circumstances.

277. Specifically, according to the NAMUAP Guidelines, if a patient regains 80% or more of their biomechanical function following the first day's MUA services, further serial MUA is usually unnecessary.

278. By contrast, according to the NAMUAP Guidelines, if patient regains between 50% and 70% of their biomechanical function following a single MUA session, a second or even third day of serial MUA services could be medically indicated.

279. As practitioners regularly purporting to provide MUA services, the Defendants were well-aware of the NAMUAP Guidelines.

280. The Defendants knew that, pursuant to the NAMUAP Guidelines, they needed to create the appearance that – following their first round of MUA – the Insureds experienced between a 50% and 70% improvement of their biomechanical functionality in order to justify a second and third session of serial MUA services.

281. In order to create the false appearance the Insureds in the claims for MUA services identified in Exhibits "1" and "2" had improved biomechanical functionality, Axial Chiro, Action Chiro, Bromberg, and Rosenberg purported to test the Insureds' range of motion following their provision of the MUA services.

282.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

283.    A range of motion test consists of a measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint.  In a range of motion test, the chiropractor asks the patient to move his or her joints at various angles, or the chiropractor moves the joints. The chiropractor then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

284.    At the conclusion of their putative MUA services, Axial Chiro, Action Chiro, Bromberg, and Rosenberg purported to measure the pertinent Insured's range of motion, ostensibly to ascertain: (i) the effectiveness of the completed MUA services; and (ii) the need for additional MUA services.

285.    Each time Axial Chiro, Action Chiro, Bromberg, and Rosenberg purported to perform range of motion testing, they purported to note the progression of the Insureds' improvement. Then, Axial Chiro, Action Chiro, Bromberg, and Rosenberg used the results of their range of motion testing to justify additional MUA services.

286.    At the conclusion of Axial Chiro, Action Chiro, Bromberg, and Rosenberg's pre-printed, boilerplate MUA "reports", Axial Chiro, Action Chiro, Bromberg, and Rosenberg purported to indicate the Insured's putative "improvement" as the result of the MUA services.

287.    It is simply impossible that virtually all of the Insureds who purportedly were provided with MUA services in the claims identified in Exhibits "1" and "2" would have their range of motion improve at an identical rate.

288.    Moreover, it is simply impossible that the rate of range of motion improvement for

Insureds who supposedly received MUA services in the claims identified in Exhibits "2" and "4" would, "coincidentally", be the identical rates of improvement referenced in the NAMUAP Guidelines.

289.     Moreover, it is likewise impossible that virtually all of the Insureds whom Axial Chiro, Action Chiro, Bromberg, and Rosenberg purported to examine following the putative MUA services would all report experiencing identical improvements in flexibility.

290.     However, in keeping with the fact that the MUA services were fraudulent and medically unnecessary, Axial Chiro, Action Chiro, Bromberg, and Rosenberg simply fabricated the results of their range of motion "testing" to comport with the NAMUAP Guidelines.

291.     Specifically, in a statistically impossible number of MUA claims identified in Exhibits "1" and "2", Axial Chiro, Action Chiro, Bromberg, and Rosenberg made the following false notations to create the phony impression that the serial MUA services were medically necessary:

(i)     Following the first day of MUA services: that "the patient has experienced approximately a 50-60% improvement from the first procedure", that the patient had actually stated that he/she "feels approximately [40% or 50%] improvement in flexibility", and that "it is appropriate for this patient to have a second MUA Procedure".

(ii)     following the second day of MUA services: "the patient has experienced approximately a 60-70% improvement from the second procedure", that the patient had actually stated that he/she "feels approximately 60% improvement in flexibility", and that "it is appropriate for this patient to have a third MUA Procedure".

292.     Axial Chiro, Action Chiro, Bromberg, and Rosenberg made these identical notations at the conclusion of virtually every first and second MUA report they submitted to GEICO attendant to the bills for MUA services in order to create the false appearance that: (i) the completed MUA services had been of some medical utility; and (ii) the subsequent MUA services

were medically necessary.

293.    In keeping with the fact that the range of motion improvement measurements were simply fabricated to justify additional MUA services, the range of motion improvement measurements reported by Axial Chiro, Action Chiro, Bromberg, and Rosenberg often bore no relation at all to the measurements reported in Bromberg, Rosenberg, and Axial Chiro, Action Chiro's own records.

294.    In the claims for MUA services identified in Exhibits "1" and "2", Axial Chiro, Action Chiro, Bromberg, and Rosenberg falsely reported identical objective and subjective rates of "improvement" for virtually all of the Insureds to whom Axial Chiro, Action Chiro, Bromberg, and Rosenberg purported to provide serial MUA services.

295.    Similarly, Lefcort, Rosenberg, and Lefcort MUA generated putative MUA "reports" prior to and following each session of putative MUA services to create the false appearance that: (i) the MUA services were medically necessary in the first instance; (ii) following the second and third MUA services, that the completed MUA services had been of some medical utility; and (iii) following the first and second sessions of MUA services, that the subsequent MUA services were medically necessary.

296.    It is simply impossible that virtually all of the Insureds to whom Lefcort, Rosenberg, and Lefcort MUA purported to provide MUA services would have presented with identical symptomology and subjective complaints prior to the first day of putative MUA services.

297.    Moreover, it is simply impossible that virtually all of the Insureds to whom Lefcort, Rosenberg, and Lefcort MUA purported to provide MUA services would respond and recover from the treatment in identical fashion.

298.    Moreover, it is likewise impossible that virtually all of the Insureds to whom

Lefcort, Rosenberg, and Lefcort MUA purported to provide MUA services would report identical subjective improvements following the first and second days of putative MUA services.

299.   Even so, and in keeping with the fact that the MUA services were fraudulent and medically unnecessary, Lefcort MUA, Lefcort, and Rosenberg simply fabricated the supposed MUA "reports" preceding and following the putative MUA services to create the false appearance that the serial MUA services were medically necessary.

300.   In particular, prior to purportedly performing the first session of MUA services, Lefcort, Rosenberg, and Lefcort MUA generated phony "reports" which, <u>in virtually every instance</u>, included the following boilerplate language:

> Based upon the recent comprehensive consultation, examination and revise of the patient's history and supplied medical records, I believe a plateau has been reached in the patient's recovery, which is still considerably less than the pre-traumatic condition. Further, on today's pre-procedure examination, there remained less than optimal ranges of motion, significant biomechanical dysfunction, significant end-range pain, myofascial tenderness and pain to palpitation. In addition, the patient's VAS and pain diagram provide indications of medical necessity for the MUA being performed today. Considering this patient is not a surgical candidate, has not achieved their pre-accident condition from the other conservative treatment modalities, and no other conservative medical intervention other than MUA Is available at this point in time, it is medically reasonable and necessary as well as appropriate to commence with a series of one to three MUAs, as in-office manipulation has provided some intermittent relief to the patient. The standards of protocol being followed are set forth in the National Academy of MUA Physicians.

301.   Moreover, following the first day of MUA services, but prior to the second day, Lefcort, Rosenberg, and Lefcort MUA generated phony "reports" which, <u>in virtually every instance</u>, included the following boilerplate language, complete with an identical grammatical error:

> Based upon today's evaluation it appears that the patient has experienced approximately a 51%-79% improvement from the first procedure. While improved the patient continues to experience chronic pain, adhesions and myofascial pain syndrome. Additionally, there continues to be multilevel chronic segmental dysfunction. The patient verbally indicated subjective improvement but with continued residual pain and soreness. The patient's VAS, ADLs and our examination has been annexed to this report. Based on the guidelines of the

National Academy of MUA Physician's [*sic*], it is appropriate for this patient to have a second MUA procedure.

302.     Moreover, following the second day of MUA services, but prior to the third day, Lefcort, Rosenberg, and Lefcort MUA generated phony "reports" which, <u>in virtually every instance</u>, included the following boilerplate language:

> Based upon today's evaluation it appears that the patient has experienced approximately a 51%-79% improvement from the first two procedures. The patient continues to experience chronic pain, adhesions and myofascial pain syndrome although significantly improved from the prior procedures. The patient's VAS, ADLs and our examination has been annexed to this report. Based on the guidelines of the National Academy of MUA physicians, it is appropriate for this patient to have a third MUA procedure.

303.     This <u>identical</u> language appeared in <u>virtually all of the supposed MUA "reports"</u> generated by Lefcort, Rosenberg, and Lefcort MUA before the first, second, and third day of the putative serial MUA services.

304.     In virtually all of the claims for MUA services identified in Exhibit "3", Lefcort, Rosenberg, and Lefcort MUA generated putative MUA "reports" prior to and following each session of putative MUA services to create the false appearance that: (i) the MUA services were medically necessary in the first instance; (ii) following the second and third MUA services, that the completed MUA services had been of some medical utility; and (iii) following the first and second sessions of MUA services, that the subsequent MUA services were medically necessary.

**c.      The Fraudulent Billing for Non-Existent Pelvic Ring Injuries**

305.     In an attempt to maximize the fraudulent billing they could submit to GEICO for their medically unnecessary MUA services, Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bromberg, Lefcort, Rosenberg, and Luca routinely falsely represented that the purported MUA services involved a procedure billable under CPT codes 27194 or 27198.

306.    CPT code 27194 is the code used to bill for the treatment of "pelvic ring fracture, dislocation, diastasis or subluxation".

307.    Effective January 1, 2017, the American Medical Association replaced CPT code 27194 with CPT code 27198.

308.    Pursuant to the CPT Assistant, CPT code 27198 is the code used to bill for the treatment of "pelvic ring fracture(s), dislocation(s), diastasis or subluxation of the ilium, sacroiliac joint, and/or sacrum, with or without anterior pelvic ring factures(s) and/or dislocations(s) of the pubic symphysis and/or superior/inferior rami, unilateral or bilateral; with manipulation, requiring more than local anesthesia".

309.    None of the Insureds in the claims for MUA services identified in Exhibits "1" – "4" suffered from any pelvic ring fracture, dislocation, diastasis, or subluxation or – indeed – any other injury to their respective pelvic rings.

310.    Even so, and as set forth in Exhibits "1" – "4", Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bromberg, Lefcort, Rosenberg, and Luca routinely billed for their purported MUA services using CPT code 27194 or CPT code 27198, and thereby falsely represented that the Insureds suffered from, and they treated, some sort of pelvic ring fracture, dislocation, diastasis, or subluxation.

311.    Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bromberg, Lefcort, Rosenberg, and Luca knew that, in order to create a false justification for the Defendants' fraudulent pelvic MUA services, they needed to create the appearance that the Insureds in the claims identified in Exhibits "1"– "4" were suffering from pelvic injuries.

312.    However, Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bromberg, Lefcort, Rosenberg, and Luca knew that none of the Insureds in the claims identified in Exhibits

"1"– "4" actually experienced legitimate pelvic injuries so as to justify prospective pelvic MUA services.

313.    Moreover, Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bromberg, Lefcort, Rosenberg, and Luca also knew that, because the Insureds in the claims identified in Exhibits "1"– "4" did not actually experience legitimate pelvic injuries, the contemporaneous police reports and/or hospital records for the Insureds would not support the Defendants' provision of pelvic MUA services.

314.    Therefore, Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bromberg, Lefcort, Rosenberg, and Luca routinely provided Insureds with phony pelvic injury "diagnoses", despite the fact that these putative diagnoses were contravened by contemporaneous police reports, hospital records, and/or the Defendants' own medical records.

315.    For example:

(i)    On April 13, 2015, an Insured named TM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that TM's vehicle was drivable following the accident. The police report further indicated that TM was not injured and did not complain of any pain at the scene. In keeping with the fact that TM was not seriously injured, she did not visit any hospital emergency room following the minor accident. To the extent that TM experienced any health problems at all as the result of the minor accident, they were of low severity, and did not include any pelvic injuries. Even so, following a purported initial examination of TM by Bromberg on May 29, 2015, Bromberg and Action Chiro falsely reported that TM suffered from constant bilateral, sharp, stabbing, throbbing sacroiliac pain rated at 9 out of 10 as a result of the accident, and diagnosed TM with sacroiliac segmental dysfunction, despite the fact that TM had not suffered any injuries to her hip or pelvis. Then, pursuant to the phony pelvic injury diagnosis, Bromberg, Rosenberg, and Action Chiro purported to provide TM with medically unnecessary pelvic MUA services on June 2, 2015, June 3, 2015, and June 4, 2015.

(ii)    On April 29, 2015, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured and did not complain of any pain at the scene. In keeping with the fact that MA was not seriously injured,

he did not visit any hospital emergency room following the minor accident. To the extent that MA experienced any health problems at all as the result of the minor accident, they were of low severity, and did not include any pelvic injuries. Even so, following a purported initial examination of MA by Bromberg on August 10, 2015, Bromberg and Action Chiro falsely reported that MA suffered from bilateral, sharp, stabbing, throbbing sacroiliac pain rated at 8 out of 10 as a result of the accident, and diagnosed MA with sacroiliac segmental dysfunction, despite the fact that MA had not suffered any injuries to his hip or pelvis. Then, pursuant to the phony pelvic injury diagnosis, Bromberg, Rosenberg and Action Chiro purported to provide MA with medically unnecessary pelvic MUA services on August 18, 2015, August 19, 2015, and August 20, 2015.

(iii)   On July 17, 2015, an Insured named KB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision, and that KB's vehicle was drivable following the accident. Later that same day, KB traveled on his own to North Shore LIJ Hospital. The contemporaneous hospital records indicated that, although KB complained of pain to his back. The hospital records further indicated that KB had full range of motion, and did not indicate that KB complained of any pain to his pelvis or experienced any injury to his pelvis. The hospital records further indicated that KB was briefly observed on an outpatient basis and then discharged with a low back pain diagnosis. To the extent that KB experienced any health problems at all as a result of the accident, they were of low severity, and did not include any pelvic injuries. Even so, following a purported initial examination of KB by Lefcort on February 17, 2016, Lefcort and Lefcort MUA falsely reported that KB suffered from a "significant loss of range of motion in the pelvis", and diagnosed KB with sacral and sacro-iliac chronic segmental and somatic dysfunction despite the fact that KB had not suffered any injuries to his hip or pelvis. Then, pursuant to the phony pelvic injury diagnosis, Lefcort, Rosenberg, and Lefcort MUA purported to provide KB with medically unnecessary pelvic MUA services on February 24, 2016, February 25, 2016, and February 26, 2016.

(iv)   On April 7, 2016, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that, although MP complained of neck pain, MP refused medical attention at the scene. In keeping with the fact that MP was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems as a result of the accident, they were of low severity, and did not include any pelvic injuries. Even so, following a purported initial examination of MP by Lefcort, over one year later, on April 21, 2017, at Lefcort MUA, Lefcort and Lefcort MUA falsely reported that MP suffered from a "significant loss of range of motion in the pelvis", and diagnosed MP with sacral and sacroiliac chronic segmental and somatic dysfunction, despite the fact that MP had not suffered any injuries to his hip or pelvis. Then, pursuant to the phony pelvic injury diagnosis, Lefcort, Rosenberg, and Lefcort MUA purported to provide MP with medically unnecessary pelvic

MUA services on April 27, 2017, and May 26, 2017.

(v)     On April 3, 2017, an Insured named EZ was involved in an automobile accident. The contemporaneous police report indicated that EZ was not injured and did not complain of any pain at the scene. In keeping with the fact that EZ was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that EZ experienced any health problems as a result of the accident, they were of low severity, did not include any pelvic injuries, and had resolved within two to three months of the accident. Even so, following a purported initial examination of EZ by Lefcort on February 13, 2018 – nearly one year after the accident – a Lefcort and Lefcort MUA falsely reported that EZ suffered from a "significant loss of range of motion in the pelvis", and diagnosed EZ with sacral and sacro-iliac chronic segmental and somatic dysfunction despite the fact that EZ had not suffered any injuries to her hip or pelvis. Then, pursuant to the phony pelvic injury diagnosis, Lefcort, Rosenberg and Lefcort MUA purported to provide EZ with medically unnecessary pelvic MUA services on February 28, 2018, March 1, 2018, and March 2, 2018.

(vi)    On April 21, 2017, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. In keeping with the fact that YL was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems as a result of the accident, they were of low severity, and did not include any pelvic injuries. Even so, following a purported initial examination of YL by Bromberg on August 11, 2017, Bromberg and Axial Chiro falsely reported that YL suffered from left sacroiliac pain rated at 8/9 out of 10 as a result of the accident, and diagnosed YL with sacroiliac segmental dysfunction, despite the fact that YL had not suffered any injuries to her hip or pelvis. Then, pursuant to the phony pelvic injury diagnosis, Bromberg, Rosenberg, and Axial Chiro purported to provide YL with medically unnecessary pelvic MUA services on August 15, 2017.

(vii)   On May 3, 2017, an Insured named PG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision and that PG's vehicle was drivable following the accident. The police report further indicated that PG was not injured and did not complain of any pain at the scene. In keeping with the fact that PG was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that PG experienced any health problems as a result of the accident, they were of low severity, and did not include any pelvic injuries. Even so, following a purported initial examination of PG by Bromberg on July 19, 2017, Bromberg and Axial Chiro falsely reported that PG suffered from bilateral sacroiliac pain rated at 8 out of 10 as a result of the accident, and diagnosed PG with sacroiliac segmental dysfunction, despite the fact that PG had not suffered any injuries to his hip or

pelvis. Then, pursuant to the phony pelvic injury diagnosis, Bromberg, Rosenberg, and Axial Chiro purported to provide PG with medically unnecessary pelvic MUA services on July 25, 2017, July 27, 2017, and August 1, 2017.

(viii)  On October 10, 2017, an Insured named NT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision, and that NT's vehicle was drivable following the accident. The police report further indicated that NT was not injured and did not complain of any pain. In keeping with the fact that NT was not seriously injured, she did not visit any hospital emergency room following the minor accident. To the extent that NT experienced any health problems at all as the result of her minor accident, they were of low severity, and did not include any pelvic injuries. Even so, following a purported initial examination of NT by Luca on December 12, 2017, Luca, Rosenberg, and South Shore falsely reported that NT suffered from limited pelvic range of motion, and diagnosed NT with sacroiliac segmental dysfunction, despite the fact that NT had not suffered any injuries to her hip or pelvis. Then, pursuant to the phony diagnosis, Luca, Rosenberg, and South Shore purported to provide MA with medically unnecessary pelvic MUA services on December 16, 2017, December 21, 2017, and December 28, 2017.

(ix)  On November 22, 2017, an Insured named VN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low speed, low-impact collision, and that VN's vehicle was drivable following the accident.  The next day VN traveled on her own to White Plains Hospital Center Emergency Department. The contemporaneous hospital records indicated that VN complained of body aches. The hospital records further indicated that VN was briefly observed on an outpatient basis and then discharged with a muscle spasm. Further, the hospital records did not indicate that VN complained of any pain to her pelvis or experienced any injury to her pelvis. To the extent that VN experienced any health problems at all as a result of the accident, they were of low severity, and did not include any pelvic injuries. Even so, following a purported initial examination of VN by Lefcort, over seven months later, on June 27, 2018, at Lefcort MUA, Lefcort and Lefcort MUA falsely reported that VN suffered from a "significant loss of range of motion in the pelvis", and diagnosed VN with sacral and sacro-iliac chronic segmental and somatic dysfunction despite the fact that VN had not suffered any injuries to her hip or pelvis. Then, pursuant to the phony pelvic injury diagnosis, Lefcort, Rosenberg, and Lefcort MUA purported to provide VN with medically unnecessary pelvic MUA services on June 28, 2018, and June 29, 2018.

(x)  On June 23, 2018, an Insured named DS was involved in an automobile accident. The contemporaneous police report indicated that DS's vehicle was drivable following the accident. The police report further indicated that DS was not injured and did not complain of any pain at the scene. In keeping with the fact that DS was not seriously injured, DS did not visit any hospital emergency room following the accident. To the extent that DS experienced any health problems at all as the result

95

of the accident, they were of low severity, and did not include any pelvic injuries. Even so, following a purported initial examination of DS by Luca on October 2, 2018, Luca, Rosenberg, and South Shore falsely reported that DS experienced range of motion deficits in his pelvis, and recommended that DS receive pelvic MUA services, despite the fact that DS and not suffered any injuries to his hip or pelvis. Then, Rosenberg and South Shore purported to provide DS with medically unnecessary pelvic MUA services on November 14, 2018.

316.     These are only representative examples. In the claims identified in Exhibits "1" – "4", Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bromberg, Lefcort, Rosenberg, and Luca routinely provided Insureds with fraudulent and medically unnecessary pelvic MUA services, despite the fact that the insureds had not suffered any legitimate injury to their hips or pelvis.

317.     Axial Chiro, Action Chiro, Lefcort MUA, South Shore, Bromberg, Lefcort, Rosenberg, and Luca's use of CPT codes 27194 and 27198 to bill for their putative MUA services constituted a deliberate misrepresentation of the service that was provided, so as to maximize the amount of fraudulent billing that they could submit for each purported MUA procedure.

**E.     The Fraudulently-Obtained Arbitration Awards**

318.     In many of the claims identified Exhibits "1" – "5", once the Defendants submitted their billing to GEICO, GEICO would deny the Defendants' bills for some reason.

319.     Following these denials, the Defendants submitted many of the claims identified in Exhibits "1" – "5" to PIP collections arbitration.

**1.     New York's PIP Collections Arbitration System**

320.     Pursuant to N.Y. Ins. Law § 5106(b), insurers such as GEICO must provide claimants – or, as was the case as to the Defendants, claimants' assigns – the opportunity to arbitrate any dispute involving the insurer's liability to pay a PIP insurance claim.

321.     No-fault arbitrations are "special expedited" proceedings, where no oral arguments are heard, virtually no defenses are permitted, and discovery is limited or non-existent. See 11 N.Y.C.R.R. § 65-4.5.

322.     A stenographic record of the arbitration proceedings is not required. See 11 N.Y.C.R.R. § 65-4.5(b)(2).

323.     Multiple arbitration disputes can be consolidated, but only where practical and only if the claims arise out of the same accident. See 11 N.Y.C.R.R. § 65-4.5(b)(2)(c).

324.     Because of the expedited nature of the arbitral proceeds, arbitrators generally do not look beyond the discrete bill before them in a given hearing – to the limited extent that they would even allow any discovery at all.

325.     Because of the limitations on discovery, the expedited nature of the proceedings, the lack of oral argument, the lack of a stenographic record, and the piecemeal nature of the proceedings, insurance companies such as GEICO are essentially defenseless at no-fault arbitrations.

**2.       The Defendants' Fraudulent Arbitrations**

326.     When the Defendants commenced arbitrations against GEICO, they typically did so on a piecemeal basis, with each arbitration seeking payment on claims consisting of a single or limited number of dates of service and with regard to a single Insured.

327.     As such, in most instances, the amount in controversy in each individual arbitration was almost never more than a few thousand dollars.

328.     During the arbitral proceedings they commenced against GEICO, the Defendants knowingly and intentionally failed to disclose, concealed, or otherwise misrepresented facts

material to their eligibility to collect no-fault insurance benefits from GEICO and – by extension – their entitlement to arbitral awards in the first instance.

329.    Had the Defendants disclosed or truthfully represented these material facts during the arbitral processes, the Defendants would not have received no-fault insurance benefits from GEICO via arbitral awards.

330.    Moreover, all of the arbitration demands filed or caused to be filed by the Defendants represented that the Defendants were entitled to collect no-fault benefits from GEICO, when in fact they were not.

**a.      Arbitral Awards Fraudulently Obtained by Bromberg, Axial Chiro, and Action Chiro**

331.    In many of the claims identified in Exhibits "1" and "2", Bromberg, Axial Chiro, and Action Chiro commenced arbitrations against GEICO seeking to collect on bills that had been denied by GEICO.

332.    During the arbitrations commenced by Axial Chiro and Action Chiro against GEICO, Bromberg, Axial Chiro, and Action Chiro knowingly and intentionally failed to disclose, concealed, or otherwise misrepresented facts material to their eligibility to collect insurance benefits from GEICO and – by extension – their entitlement to arbitral awards in the first instance.

333.    For example, during the arbitral proceedings, Bromberg, Axial Chiro, and Action Chiro never disclosed that, between 2014 and 2015, Axial Chiro and Action Chiro unlawfully provided many of the billed-for services in New Jersey as foreign professional corporations.

334.    In fact, as set forth above, between 2014 and 2015, Axial Chiro and Action Chiro unlawfully operated as foreign professional corporations in New Jersey, and purported to provide many of the billed-for services in New Jersey.

335.     Axial Chiro and Action Chiro operated as foreign professional corporations in New Jersey between 2014 and 2015 despite the fact that Bromberg was aware that Axial Chiro and Action Chiro were required to incorporated as professional corporations in New Jersey in order for them to lawfully render services there.

336.     In keeping with the fact that Bromberg was aware that Axial Chiro and Action Chiro were required to be incorporated as professional corporations in New Jersey in order for them to lawfully render services there, Bromberg's testimony during his November 9, 2020 deposition in this action indicated that he began attempting to incorporate Axial Chiro and Action Chiro in New Jersey as early as September 2014.

337.     Therefore, Axial Chiro and Action Chiro were never eligible to collect no-fault benefits in connection with the services provided in New Jersey while Axial Chiro and Action Chiro operated in New Jersey as foreign professional corporations, and any arbitral award they received for any such services was fraudulently obtained. See 11 N.Y.C.R.R. § 65-3.16(a)(12).

338.     Even so, all of Bromberg, Axial Chiro, and Action Chiro's arbitration demands and filings in support thereof falsely represented that Axial Chiro and Action were eligible to collect no-fault benefits for the billed-for services.

339.     As the result of Bromberg, Axial Chiro, and Action Chiro's failure to disclose, concealment, and misrepresentation of facts material to their eligibility to collect insurance benefits from GEICO, Bromberg, Axial Chiro, and Action Chiro obtained arbitral awards of no-fault benefits to which Bromberg, Axial Chiro, and Action Chiro were not entitled in the first instance.

340.    Had Bromberg, Axial Chiro, and Action Chiro disclosed or truthfully represented these material facts during the arbitral processes, they would not have received no-fault insurance benefits from GEICO <u>via</u> the arbitral awards.

**b.      The Arbitral Awards Fraudulently Obtained by Lefcort MUA and Lefcort**

341.    In many of the claims identified in Exhibit "3", Lefcort and Lefcort MUA commenced arbitrations against GEICO seeking to collect on bills that had been denied by GEICO.

342.    During the arbitrations commenced by Lefcort MUA against GEICO, Lefcort and Lefcort MUA knowingly and intentionally failed to disclose, concealed, or otherwise misrepresented facts material to their eligibility to collect insurance benefits from GEICO and – by extension – their entitlement to arbitral awards in the first instance.

343.    For example, during the arbitral proceedings:

(i)     Lefcort and Lefcort MUA never disclosed that virtually all of the services billed through Lefcort MUA to GEICO were provided – to the extent they were provided at all – pursuant to unlawful self-referrals in violation of New York Public Health Law § 238-d. In fact, as set forth above, virtually all of the services billed through Lefcort MUA to GEICO were provided – to – to the extent they were provided at all – pursuant to unlawful self-referrals. Therefore, Lefcort and Lefcort MUA were never eligible to collect no-fault benefits in connection with the services provided pursuant to the unlawful self-referrals, and any arbitral award they received for any such services was fraudulently obtained.

(ii)    Lefcort and Lefcort MUA never disclosed that, between 2014 and the present, Lefcort MUA unlawfully provided many of the billed-for services in New Jersey as a foreign professional corporation. Therefore, Lefcort MUA was never eligible to collect no-fault benefits in connection with the services provided in New Jersey while Lefcort MUA operated in New Jersey as a foreign professional corporation, and any arbitral award it received for any such services was fraudulently obtained. <u>See</u> 11 N.Y.C.R.R. § 65-3.16(a)(12).

(iii)   Lefcort and Lefcort MUA never disclosed that virtually all of the services billed to GEICO under CPT code 99243 were never actually "consultations" so as to justify the use of CPT code 99243. Therefore, Lefcort MUA was never eligible to collect no-fault benefits in connection with the services billed under CPT code 99243, and any arbitral award it received for any such services was fraudulently obtained.

344. Even so, all of Lefcort and Lefcort MUA's arbitration demands and filings in support thereof falsely represented that Lefcort MUA was eligible to collect no-fault benefits for the billed-for services.

345. As the result of Lefcort and Lefcort MUA's failure to disclose, concealment, and misrepresentation of facts material to their eligibility to collect insurance benefits from GEICO, Lefcort and Lefcort MUA obtained arbitral awards of no-fault benefits to which Lefcort and Lefcort MUA were not entitled in the first instance.

346. Had Lefcort and Lefcort MUA disclosed or truthfully represented these material facts during the arbitral processes, they would not have received no-fault insurance benefits from GEICO via the arbitral awards.

c. **The Arbitral Awards Fraudulently Obtained by South Shore and Rosenberg**

347. In many of the claims identified in Exhibit "4", Rosenberg and South Shore commenced arbitrations against GEICO seeking to collect on bills that had been denied by GEICO.

348. During the arbitrations commenced by Rosenberg and South Shore against GEICO, Rosenberg and South Shore knowingly and intentionally failed to disclose, concealed, or otherwise misrepresented facts material to their eligibility to collect insurance benefits from GEICO and – by extension – their entitlement to arbitral awards in the first instance.

349. For example, during the arbitral proceedings:

(i) Rosenberg and South Shore never disclosed that virtually all of the services billed through South Shore to GEICO were performed – to the extent they were performed at all – by independent contractors. In fact, virtually all of the bills submitted by South Shore and Rosenberg to GEICO and then to the arbitrators misrepresented that the billed-for services had been performed by South Shore's employees, when in fact they had been performed by independent contractors. Therefore, Rosenberg and South Shore were never eligible to collect no-fault benefits in connection with the services performed by independent contractors, and any arbitral award they received for any such services was fraudulently obtained. See 11 N.Y.C.R.R. §65-3.11(a).

(ii)   Rosenberg and South Shore never disclosed that, between 2014 and the present, South Shore unlawfully provided many of the billed-for services in New Jersey as a foreign professional corporation. Therefore, South Shore was never eligible to collect no-fault benefits in connection with the services provided in New Jersey while South Shore operated in New Jersey as a foreign professional corporation, and any arbitral award it received for any such services was fraudulently obtained. See 11 N.Y.C.R.R. § 65-3.16(a)(12).

350.   Even so, all of Rosenberg and South Shore's arbitration demands and filings in support thereof falsely represented that South Shore was eligible to collect no-fault benefits for the billed-for services.

351.   As the result of Rosenberg and South Shore's failure to disclose, concealment, and misrepresentation of facts material to their eligibility to collect insurance benefits from GEICO, Rosenberg and South Shore obtained arbitral awards of no-fault benefits to which Rosenberg and South Shore were not entitled in the first instance.

352.   Had Rosenberg and South Shore disclosed or truthfully represented these material facts during the arbitral processes, they would not have received no-fault insurance benefits from GEICO via the arbitral awards.

**d.   The Arbitral Awards Fraudulently Obtained by Lefcort, Yoo, and Bayside**

353.   In many of the claims identified in Exhibit "5", Lefcort, Yoo, and Bayside commenced arbitrations against GEICO seeking to collect on bills that had been denied by GEICO.

354.   During the arbitrations commenced by Bayside against GEICO, Lefcort, Yoo, and Bayside knowingly and intentionally failed to disclose, concealed, or otherwise misrepresented facts material to their eligibility to collect insurance benefits from GEICO and – by extension – their entitlement to arbitral awards in the first instance.

355.   For example, during the arbitral proceedings, Lefcort, Yoo, and Bayside never disclosed that many of the services billed through Bayside to GEICO were provided – to the extent

they were provided at all – pursuant to unlawful self-referrals in violation of New York Public Health Law § 238-d.

356. In fact, as set forth above, many of the services billed through Bayside to GEICO were provided – to the extent they were provided at all – pursuant to unlawful self-referrals.

357. Therefore, Lefcort, Yoo, and Bayside were never eligible to collect no-fault benefits in connection with the services provided pursuant to the unlawful self-referrals, and any arbitral award they received for any such services was fraudulently obtained.

358. Even so, all of Lefcort, Yoo, and Bayside's arbitration demands and filings in support thereof falsely represented that South Shore was eligible to collect no-fault benefits for the billed-for services.

359. As the result of Lefcort, Yoo, and Bayside's failure to disclose, concealment, and misrepresentation of facts material to their eligibility to collect insurance benefits from GEICO, Rosenberg and South Shore obtained arbitral awards of no-fault benefits to which Rosenberg and South Shore were not entitled in the first instance.

360. Had Lefcort, Yoo, and Bayside disclosed or truthfully represented these material facts during the arbitral processes, they would not have received no-fault insurance benefits from GEICO via the arbitral awards.

## III. The Fraudulent Billing Submitted to GEICO

361. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms and treatment reports through Axial Chiro, Action Chiro, Lefcort MUA, South Shore, and Bayside to GEICO, containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

362.    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by

and on behalf of the Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted or caused to
        be submitted by the Defendants uniformly misrepresented to GEICO that the
        Defendants and Fraudulent Services were in compliance with all applicable
        statutory and regulatory requirements governing healthcare practice, and therefore
        were eligible to receive PIP reimbursement. In fact, the Defendants and Fraudulent
        Services were not in compliance with all applicable statutory and regulatory
        requirements governing healthcare practice, and therefore were not eligible for PIP
        reimbursement, because: (a) the Defendants purported to provide, and billed for,
        the medically unnecessary, unlawful, and in some cases illusory Fraudulent
        Services; (b) the Defendants routinely violated New York and New Jersey law by
        inflating, exaggerating, and misrepresenting their charges for the Fraudulent
        Services; (c) between at least November 18, 2014 and June 11, 2015, Bromberg
        unlawfully caused Axial Chiro to provide and bill for chiropractic services in New
        Jersey as a foreign professional corporation; (d) between at least December 4, 2014
        and June 11, 2015, Bromberg unlawfully caused Action Chiro to provide and bill
        for chiropractic services in New Jersey as a foreign professional corporation; (e)
        between at least July 22, 2015 and the present, Lefcort unlawfully caused Lefcort
        MUA to provide and bill for chiropractic services in New Jersey as a foreign
        professional corporation; (f) between at least May 7, 2016 and the present,
        Rosenberg unlawfully caused South Shore to provide and bill for chiropractic
        services in New Jersey as a foreign professional corporation; (g) many of the
        Fraudulent Services at South Shore were purportedly performed in New York by
        independent contractors, and therefore were not eligible for PIP reimbursement;
        and (h) Lefcort,  Bayside, and Lefcort MUA were engaged in an illegal referral
        scheme.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly
        misrepresented to GEICO that the Fraudulent Services were medically necessary.
        In fact, the Fraudulent Services were not medically necessary, and were performed
        as part of a pre-determined fraudulent treatment and billing protocol designed
        solely to financially enrich the Defendants, not to benefit the Insureds who
        supposedly were subjected to them.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted or caused to
        be submitted by the Defendants misrepresented and exaggerated the level of the
        Fraudulent Services, the nature of the Fraudulent Services that purportedly were
        provided, and the reimbursable amounts for the Fraudulent Services.

**IV.    GEICO's Justifiable Reliance**

363.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO. Even so, the Defendants knowingly misrepresented and concealed facts related to Axial Chiro, Action Chiro, Lefcort MUA, South Shore, and Bayside  in an effort to prevent discovery: (i) that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to it; (ii) that the Fraudulent Services frequently never were performed in the first instance; (iii) that Axial Chiro, Action Chiro, Lefcort MUA, and South Shore unlawfully operated in New Jersey as foreign professional corporations; (iv) that many of the Fraudulent Services provided through South Shore were performed – to the extent they were performed at all – by a series of independent contractors; and (v) that Lefcort, Yoo, Bayside, and Lefcort MUA knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services performed at Bayside and Lefcort MUA were performed, to the extent that they are performed at all, pursuant to illegal self-referral arrangements between Lefcort, Lefcort MUA, and Bayside.

364.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming arbitration and litigation against GEICO and other insurers if the charges were not promptly paid in full.

365.    GEICO is under statutory and contractual obligations to promptly and fairly process claims.  The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them.

366.     Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### **FIRST CAUSE OF ACTION**
**Against Axial Chiro, Action Chiro, South Shore, Lefcort MUA, and Bayside**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

367.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

368.     There is an actual case and controversy between GEICO and Axial Chiro, Action Chiro, South Shore, Lefcort MUA, and Bayside regarding an amount to be determined at trial, but at least: (i) $60,000.00 in pending no-fault insurance claims submitted by or on behalf of Axial Chiro; (ii) $5,000.00 in pending no-fault insurance claims submitted by or on behalf of Action Chiro; (iii) $150,000.00 in pending no-fault insurance claims submitted by or on behalf of Lefcort MUA; (iv) $175,000.00 in pending no-fault insurance claims submitted by or on behalf of South Shore; and (v) $1,600,000.00 in pending no-fault insurance claims submitted by or on behalf of Bayside to GEICO.

369.     Axial Chiro, Action Chiro, South Shore, Lefcort MUA, and Bayside have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

370.     Axial Chiro, Action Chiro, South Shore, Lefcort MUA, and Bayside have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for

the Fraudulent Services misrepresented and exaggerated the levels and types of services that purportedly were provided in order to inflate the charges submitted to GEICO.

371.    Axial Chiro, Action Chiro, South Shore, Lefcort MUA, and Bayside have no right to receive payment for any pending bills submitted to GEICO because they were not in compliance with all relevant laws and regulations governing healthcare practice and, as a result, were not eligible to receive no-fault reimbursement in the first instance.

372.    Axial Chiro, Action Chiro, South Shore, Lefcort MUA, and Bayside have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice and, therefore, were not eligible for no-fault reimbursement in the first instance.

373.    Axial Chiro, Action Chiro, South Shore, and Lefcort MUA have no right to receive payment for any pending bills submitted to GEICO because Axial Chiro, Action Chiro, South Shore, and Lefcort MUA unlawfully operated in New Jersey as foreign professional corporations.

374.    Bayside and Lefcort MUA have no right to receive payment for any pending bills submitted to GEICO because Bayside and Lefcort MUA were engaged in an unlawful referral scheme.

375.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Axial Chiro, Action Chiro, South Shore, Lefcort MUA, and Bayside have no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
**Against Bromberg**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

376.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

377. Axial Chiro is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

378. Bromberg knowingly has conducted and/or participated, directly or indirectly, in the conduct of Axial Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than five years seeking payments that Axial Chiro was not eligible to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many cases, the billed-for services were not performed at all; (v) Axial Chiro unlawfully operated in New Jersey as a foreign professional corporation; and (vi) the Fraudulent Services were not provided in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.  A large, representative sample, of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

379. Axial Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Bromberg operates Axial Chiro, insofar as Axial Chiro is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Axial Chiro to

function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt to collect on the fraudulent billing submitted through Axial Chiro to the present day.

380.    Axial Chiro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Axial Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

381.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $180,000.00 pursuant to the fraudulent bills submitted through Axial Chiro.

382.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### Against Bromberg, Coty, and Rosenberg
### (Violation of RICO, 18 U.S.C. § 1962(d))

383.    GEICO incorporates as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

384.    Axial Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

385.    Bromberg, Coty, and Rosenberg are employed by and/or associated with the Axial Chiro enterprise.

386.    Bromberg, Coty, and Rosenberg knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Axial Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than five years seeking payments that Axial Chiro was not eligible to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many cases, the billed-for services were not performed at all; (v) Axial Chiro unlawfully operated in New Jersey as a foreign professional corporation; (vi) Axial Chiro was not in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; and (vii) the Fraudulent Services were not provided in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice in New Jersey. A large, representative sample, of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".  Each such mailing was made in furtherance of the mail fraud scheme.

387.    Bromberg, Coty, and Rosenberg knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

388.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $180,000.00 pursuant to the fraudulent bills submitted through Axial Chiro.

389.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Axial Chiro, Bromberg, Rosenberg, and Coty**
**(Common Law Fraud)**

390.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

391.     Axial Chiro, Bromberg, Rosenberg, and Coty intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

392.     The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)      In every claim, the representation that Axial Chiro, Bromberg, Rosenberg, and Coty were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Axial Chiro, Bromberg, Rosenberg, and Coty were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Axial Chiro, Bromberg, Rosenberg, and Coty purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (b) Axial Chiro, Bromberg, Rosenberg, and Coty routinely inflated, exaggerated, and misrepresented the nature of the Fraudulent Services and their charges for the Fraudulent Services; and (c) Axial Chiro, Bromberg, Rosenberg, and Coty unlawfully operated Axial Chiro in New Jersey as a foreign professional corporation.

(ii)    In every claim, the representation that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Fraudulent Services were medically unnecessary and in some cases illusory; and (b) the Fraudulent Services were, in many cases, unlawfully performed through Axial Chiro in New Jersey, despite the fact that Axial Chiro was a foreign professional corporation.

(iii)    In every claim, the representation that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

393.    Axial Chiro, Bromberg, Rosenberg, and Coty intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Axial Chiro that were not compensable under the New York and New Jersey no-fault insurance laws.

394.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $180,000.00 pursuant to the fraudulent bills submitted through Axial Chiro.

395.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

396.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Axial Chiro, Bromberg, Coty, and Rosenberg**
**(Unjust Enrichment)**

397.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

398.    As set forth above, Axial Chiro, Bromberg, Coty, and Rosenberg have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

399.    When GEICO paid the bills and charges submitted by or on behalf of Axial Chiro for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Axial Chiro, Bromberg, Coty, and Rosenberg's improper, unlawful, and/or unjust acts.

400.    Axial Chiro, Bromberg, Coty, and Rosenberg have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Axial Chiro, Bromberg, Coty, and Rosenberg voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

401.    Axial Chiro, Bromberg, Coty, and Rosenberg's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

402.    By reason of the above, Axial Chiro, Bromberg, Coty, and Rosenberg have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $180,000.00.

**SIXTH CAUSE OF ACTION**
**Against Axial Chiro, Bromberg, Coty, and Rosenberg**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

403.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

404.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", Defendants Axial Chiro, Bromberg, Coty, and Rosenberg knowingly submitted or caused to be submitted NF-3 forms,

HCFA-1500 forms, and treatment reports through Axial Chiro to GEICO that were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted or caused to be submitted by Axial Chiro, Bromberg, Coty, and Rosenberg uniformly misrepresented to GEICO that Axial Chiro, Bromberg, Coty, and Rosenberg and Fraudulent Services were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Axial Chiro, Bromberg, Coty, and Rosenberg and Fraudulent Services were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible for PIP reimbursement, because: (a) Axial Chiro, Bromberg, Coty, and Rosenberg purported to provide, and billed for, the medically unnecessary, unlawful, and in some cases illusory Fraudulent Services; (b) Axial Chiro, Bromberg, Coty, and Rosenberg routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services; and (c) Axial Chiro, Bromberg, Coty, and Rosenberg unlawfully operated Axial Chiro in New Jersey, despite the fact that Axial Chiro was a foreign professional corporation.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted or caused to be submitted by Axial Chiro, Bromberg, Coty, and Rosenberg misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

405.    Axial Chiro, Bromberg, Coty, and Rosenberg's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33-A-7.    As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $40,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in

connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs

and counsel fees associated with the prosecution of this litigation.

## SEVENTH CAUSE OF ACTION
### Against Bromberg
### (Violation of RICO, 18 U.S.C. § 1962(c))

406.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 366 above.

407.    Action Chiro is an ongoing "enterprise" as that term is defined in 18 U.S.C. §

1961(4), that engages in activities that affected interstate commerce.

408.    Bromberg knowingly has conducted and/or participated, directly or indirectly, in the

conduct of  Action Chiro's affairs through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States

mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for

approximately four years seeking payments that Action Chiro was not eligible to receive under the

New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not

medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-

determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants;

(iii) the billing codes used for the services misrepresented and exaggerated the level of services

that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many

cases, the billed-for services were not performed at all; (v) Action Chiro unlawfully operated in

New Jersey as a foreign professional corporation; and (vi) the Fraudulent Services were not

provided in compliance with New York licensing laws and all applicable statutory and regulatory

requirements governing healthcare practice in New Jersey.  A large, representative sample, of the

fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern

of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

409.    Action Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Bromberg operates Action Chiro, insofar as Action Chiro is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Action Chiro to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt to collect on the fraudulent billing submitted through Action Chiro to the present day.

410.    Action Chiro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Action Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

411.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $60,000.00 pursuant to the fraudulent bills submitted through Action Chiro.

412.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against Bromberg and Rosenberg**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

413.     GEICO incorporates as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

414.     Action Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

415.     Bromberg and Rosenberg are employed by and/or associated with the Action Chiro enterprise.

416.     Bromberg and Rosenberg knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Action Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for approximately four years seeking payments that Action Chiro was not eligible to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many cases, the billed-for services were not performed at all; (v) Action Chiro unlawfully operated in New Jersey as a foreign professional corporation; (vi) Action Chiro was not in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; and (vii) the Fraudulent Services were not provided in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice in New Jersey. A large, representative sample, of the fraudulent bills and corresponding mailings submitted to

GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

417.    Bromberg and Rosenberg knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

418.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $60,000.00 pursuant to the fraudulent bills submitted through Action Chiro.

419.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Action Chiro, Bromberg, and Rosenberg**
**(Common Law Fraud)**

420.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

421.    Action Chiro, Bromberg, and Rosenberg intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

422.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Action Chiro, Bromberg, and Rosenberg were in compliance with all applicable statutory and regulatory requirements

governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Action Chiro, Bromberg, and Rosenberg were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Action Chiro, Bromberg, and Rosenberg purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (b) Action Chiro, Bromberg, and Rosenberg routinely inflated, exaggerated, and misrepresented the nature of the Fraudulent Services and their charges for the Fraudulent Services; and (c) Action Chiro, Bromberg, and Rosenberg unlawfully operated Action Chiro in New Jersey as a foreign professional corporation.

(ii)     In every claim, the representation that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Fraudulent Services were medically unnecessary and in some cases illusory; and (b) the Fraudulent Services were, in many cases, unlawfully performed through Action Chiro in New Jersey, despite the fact that Action Chiro was a foreign professional corporation.

(iii)    In every claim, the representation that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

423.    Action Chiro, Bromberg, and Rosenberg intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Action Chiro that were not compensable under the New York and New Jersey no-fault insurance laws.

424.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $60,000.00 pursuant to the fraudulent bills submitted through Action Chiro.

425.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

426.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
**Against Action Chiro, Bromberg, and Rosenberg**
**(Unjust Enrichment)**

427.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

428.     As set forth above, Action Chiro, Bromberg, and Rosenberg have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

429.     When GEICO paid the bills and charges submitted by or on behalf of Action Chiro for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Action Chiro, Bromberg, and Rosenberg's improper, unlawful, and/or unjust acts.

430.     Action Chiro, Bromberg, and Rosenberg have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Action Chiro, Bromberg, and Rosenberg voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

431.     Action Chiro, Bromberg, and Rosenberg's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

432.     By reason of the above, Action Chiro, Bromberg, and Rosenberg have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $60,000.00.

## ELEVENTH CAUSE OF ACTION
**Against Action Chiro, Bromberg, and Rosenberg**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

433.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

434.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", Defendants Action Chiro, Bromberg, and Rosenberg knowingly submitted or caused to be submitted NF-3 forms, HCFA-1500 forms, and treatment reports through Action Chiro to GEICO that were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted or caused to be submitted by Action Chiro, Bromberg, and Rosenberg uniformly misrepresented to GEICO that Action Chiro, Bromberg, and Rosenberg and Fraudulent Services were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Action Chiro, Bromberg, and Rosenberg and Fraudulent Services were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible for PIP reimbursement, because: (a) Action Chiro, Bromberg, and Rosenberg purported to provide, and billed for, the medically unnecessary, unlawful, and in some cases illusory Fraudulent Services; (b) Action Chiro, Bromberg, and Rosenberg routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services; and (c) Action Chiro, Bromberg, and Rosenberg unlawfully operated Action Chiro in New Jersey, despite the fact that Action Chiro was a foreign professional corporation.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted or caused to be submitted by Action Chiro, Bromberg, and Rosenberg misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

435.     Action Chiro, Bromberg, and Rosenberg's systematic violation of the New Jersey

Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act.  See N.J.S.A.

17:33-A-7.  As a result, GEICO is entitled to not only damages in the form of disgorgement of the

PIP benefits paid in an amount to be established at trial, but exceeding $50,000.00, but is also

entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the

investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees

associated with the prosecution of this litigation.

### TWELFTH CAUSE OF ACTION
**Against Lefcort**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

436.     GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 366 above.

437.     Lefcort MUA is an ongoing "enterprise" as that term is defined in 18 U.S.C. §

1961(4), that engages in activities that affected interstate commerce.

438.     Lefcort knowingly has conducted and/or participated, directly or indirectly, in the

conduct of  Lefcort MUA's affairs through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States

mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for

approximately four years seeking payments that Lefcort MUA was not eligible to receive under the

New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not

medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-

determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants;

(iii) the billing codes used for the services misrepresented and exaggerated the level of services

that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many

cases, the billed-for services were not performed at all; (v) Lefcort MUA unlawfully operated in New Jersey as a foreign professional corporation; (vi) Lefcort MUA was not in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; (vii) the Fraudulent Services were not provided in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; and (viii) Lefcort MUA was engaged in an illegal self-referral scheme. A large, representative sample, of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

439. Lefcort MUA's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lefcort operates Lefcort MUA, insofar as Lefcort MUA is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Lefcort MUA to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt to collect on the fraudulent billing submitted through Lefcort MUA to the present day.

440. Lefcort MUA is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Lefcort MUA in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

441.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $50,000.00 pursuant to the fraudulent bills submitted through Lefcort MUA.

442.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
**Against Lefcort and Rosenberg**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

443.    GEICO incorporates as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

444.    Lefcort MUA is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

445.    Lefcort and Rosenberg are employed by and/or associated with the Lefcort MUA enterprise.

446.    Lefcort and Rosenberg knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Lefcort MUA' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for approximately four years seeking payments that Lefcort MUA was not eligible to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services

misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many cases, the billed-for services were not performed at all; (v) Lefcort MUA unlawfully operated in New Jersey as a foreign professional corporation; (vi) Lefcort MUA was not in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; (vii) the Fraudulent Services were not provided in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; and (viii) Lefcort MUA was engaged in an illegal self-referral scheme.  A large, representative sample, of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".  Each such mailing was made in furtherance of the mail fraud scheme.

447.    Lefcort and Rosenberg knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

448.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $50,000.00 pursuant to the fraudulent bills submitted through Lefcort MUA.

449.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTEENTH  CAUSE OF ACTION**
**Against Lefcort MUA, Lefcort, and Rosenberg**
**(Common Law Fraud)**

450.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

451.     Lefcort MUA, Lefcort, and Rosenberg intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

452.     The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Lefcort MUA, Lefcort, and Rosenberg were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Lefcort MUA, Lefcort, and Rosenberg were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Lefcort MUA, Lefcort, and Rosenberg purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (b) Lefcort MUA, Lefcort, and Rosenberg routinely inflated, exaggerated, and misrepresented the nature of the Fraudulent Services and their charges for the Fraudulent Services; (c) Lefcort MUA, Lefcort, and Rosenberg unlawfully operated Lefcort MUA in New Jersey as a foreign professional corporation; and (d) Lefcort MUA and Lefcort were engaged in an illegal referral scheme.

(ii)     In every claim, the representation that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Fraudulent Services were medically unnecessary and in some cases illusory; (b) Lefcort MUA, Lefcort, and Rosenberg routinely inflated, exaggerated, and misrepresented the nature of the Fraudulent Services and their charges for the Fraudulent Services; (c) the Fraudulent Services were, in many cases, unlawfully performed through Lefcort MUA in New Jersey, despite the fact that Lefcort MUA was a foreign professional corporation; and (d) Lefcort MUA and Lefcort were engaged in an illegal referral scheme.

(i)     In every claim, the representation that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were

performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

453.     Lefcort MUA, Lefcort, and Rosenberg intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Lefcort MUA that were not compensable under the New York and New Jersey no-fault insurance laws.

454.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $50,000.00 pursuant to the fraudulent bills submitted through Lefcort MUA.

455.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

456.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Lefcort MUA, Lefcort, and Rosenberg
### (Unjust Enrichment)

457.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

458.     As set forth above, Lefcort MUA, Lefcort, and Rosenberg have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

459.     When GEICO paid the bills and charges submitted by or on behalf of Lefcort MUA for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Lefcort MUA, Lefcort, and Rosenberg's improper, unlawful, and/or unjust acts.

460.    Lefcort MUA, Lefcort, and Rosenberg have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Lefcort MUA, Lefcort, and Rosenberg voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

461.    Lefcort MUA, Lefcort, and Rosenberg's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

462.    By reason of the above, Lefcort MUA, Lefcort, and Rosenberg have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $50,000.00.

**SIXTEENTH CAUSE OF ACTION**
**Against Lefcort MUA, Lefcort, and Rosenberg**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

463.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

464.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "5", Defendants Lefcort MUA, Lefcort, and Rosenberg knowingly submitted or caused to be submitted NF-3 forms, HCFA-1500 forms, and treatment reports through Lefcort MUA to GEICO that were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted or caused to be submitted by Lefcort MUA, Lefcort, and Rosenberg uniformly misrepresented to GEICO that Lefcort MUA, Lefcort, and Rosenberg and Fraudulent Services were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Lefcort MUA, Lefcort, and Rosenberg and Fraudulent Services were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible for PIP reimbursement, because: (a) Lefcort MUA, Lefcort, and Rosenberg purported to provide, and billed for, the medically unnecessary and in some cases illusory

128

Fraudulent Services; (b) Lefcort MUA, Lefcort, and Rosenberg routinely inflated, exaggerated, and misrepresented the nature of the Fraudulent Services and their charges for the Fraudulent Services; and (c) Lefcort MUA, Lefcort, and Rosenberg unlawfully operated Lefcort MUA in New Jersey as a foreign professional corporation.

(ii)   The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted or caused to be submitted by Lefcort MUA, Lefcort, and Rosenberg misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

465.   Lefcort MUA, Lefcort, and Rosenberg's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act.  See N.J.S.A. 17:33-A-7.  As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $40,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

**SEVENTEENTH CAUSE OF ACTION**
**Against Rosenberg**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

466.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

467.   South Shore is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

468.     Rosenberg knowingly has conducted and/or participated, directly or indirectly, in the conduct of South Shore's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for approximately four years seeking payments that South Shore was not eligible to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many cases, the billed-for services were not performed at all; (v) South Shore unlawfully operated in New Jersey as a foreign professional corporation; (vi) South Shore was not in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; (vii) the billed-for-services were performed and billed through a series of independent contractors; and (viii) the Fraudulent Services were not provided in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.  A large, representative sample, of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

469.     South Shore's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Rosenberg operate South Shore, insofar as South Shore is not engaged in a

legitimate medical practice, and acts of mail fraud therefore are essential in order for South Shore to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt to collect on the fraudulent billing submitted through South Shore to the present day.

470.    South Shore is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by South Shore in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

471.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $16,000.00 pursuant to the fraudulent bills submitted through South Shore.

472.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### Against Rosenberg, Luca, and Irby
### (Violation of RICO, 18 U.S.C. § 1962(d))

473.    GEICO incorporates as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

474.    South Shore is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

475.    Rosenberg, Luca, and Irby are employed by and/or associated with the South Shore enterprise.

476.     Rosenberg, Luca, and Irby knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of South Shore' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for approximately four years seeking payments that South Shore was not eligible to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many cases, the billed-for services were not performed at all; (v) South Shore unlawfully operated in New Jersey as a foreign professional corporation; (vi) South Shore was not in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; (vii) the billed-for-services were performed and billed through a series of independent contractors; and (viii) the Fraudulent Services were not provided in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice in New Jersey. A large, representative sample, of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

477.    Rosenberg, Luca, and Irby knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

478.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $16,000.00 pursuant to the fraudulent bills submitted through South Shore.

479.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against South Shore, Rosenberg, Luca, and Irby
### (Common Law Fraud)

480.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

481.    South Shore, Rosenberg, Luca, and Irby intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

482.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that South Shore, Rosenberg, Luca, and Irby were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, South Shore, Rosenberg, Luca, and Irby were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) South Shore, Rosenberg, Luca, and Irby purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (b) South Shore,

Rosenberg, Luca, and Irby routinely inflated, exaggerated, and misrepresented the nature of the Fraudulent Services and their charges for the Fraudulent Services; (c) South Shore, Rosenberg, Luca, and Irby unlawfully operated South Shore in New Jersey as a foreign professional corporation; and (d) South Shore routinely purported to provide and bill for the Fraudulent Services through a series of independent contractors, including Irby and Luca.

(ii)     In every claim, the representation that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Fraudulent Services were medically unnecessary and in some cases illusory; (b) the Fraudulent Services were, in many cases, unlawfully performed through South Shore in New Jersey, despite the fact that South Shore was a foreign professional corporation; and (c) the Fraudulent Services were, in many cases, unlawfully performed through a series of independent contractors, including Irby and Luca.

(iii)    In every claim, the representation that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

483.     South Shore, Rosenberg, Luca, and Irby intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through South Shore that were not compensable under the New York and New Jersey no-fault insurance laws.

484.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $16,000.00 pursuant to the fraudulent bills submitted through South Shore.

485.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

486.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTIETH CAUSE OF ACTION**
**Against South Shore, Rosenberg, Luca, and Irby**
**(Unjust Enrichment)**

487.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

488.    As set forth above, South Shore, Rosenberg, Luca, and Irby have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

489.    When GEICO paid the bills and charges submitted by or on behalf of South Shore for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on South Shore, Rosenberg, Luca, and Irby's improper, unlawful, and/or unjust acts.

490.    South Shore, Rosenberg, Luca, and Irby have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that South Shore, Rosenberg, Luca, and Irby voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

491.    South Shore, Rosenberg, Luca, and Irby's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

492.    By reason of the above, South Shore, Rosenberg, Luca, and Irby have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $16,000.00.

**TWENTY-FIRST CAUSE OF ACTION**
**Against Lefcort and Yoo**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

493.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

494.   Bayside is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

495.   Lefcort and Yoo knowingly have conducted and/or participated, directly or indirectly, in the conduct of Bayside's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for approximately six years seeking payments that Bayside was not eligible to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many cases, the billed-for services were not performed at all; (v) Bayside was not in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice;; (vi) the Fraudulent Services were not provided in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice; and (vii) Bayside was engaged in an illegal self-referral scheme.  A large, representative sample, of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

496.     Bayside's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Lefcort and Yoo operate Bayside, insofar as Bayside is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Bayside to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt to collect on the fraudulent billing submitted through Bayside to the present day.

497.     Bayside is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Bayside in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

498.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,600,000.00 pursuant to the fraudulent bills submitted through Bayside.

499.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TWENTY-SECOND CAUSE OF ACTION
**Against Lefcort, Yoo, and Lefcort MUA**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

500.     GEICO incorporates as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

501.     Bayside is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

502.    Lefcort, Yoo, and Lefcort MUA are employed by and/or associated with the Bayside enterprise.

503.    Lefcort, Yoo, and Lefcort MUA knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Bayside' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for approximately six years seeking payments that Bayside was not eligible to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many cases, the billed-for services were not performed at all; (v) Bayside was not in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice; (vi) the Fraudulent Services were not provided in compliance with New York licensing laws and all applicable statutory and regulatory requirements governing healthcare practice; and (vii) Bayside was engaged in an illegal self-referral scheme.  A large, representative sample, of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".  Each such mailing was made in furtherance of the mail fraud scheme.

504.     Lefcort, Yoo, and Lefcort MUA knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

505.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,600,000.00 pursuant to the fraudulent bills submitted through Bayside.

506.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TWENTY-THIRD CAUSE OF ACTION
**Against Bayside, Lefcort, and Yoo**
**(Common Law Fraud)**

507.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

508.     Bayside, Lefcort, and Yoo intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

509.     The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Bayside, Lefcort, and Yoo were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Bayside, Lefcort, and Yoo were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Bayside, Lefcort, and Yoo purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (b) Bayside, Lefcort, and Yoo routinely inflated, exaggerated, and misrepresented the nature of the Fraudulent Services and their

charges for the Fraudulent Services; and (c) Bayside and Lefcort were engaged in an illegal referral scheme.

(iii)    In every claim, the representation that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Fraudulent Services were medically unnecessary and in some cases illusory; and (b) Bayside and Lefcort were engaged in an illegal referral scheme.

(iv)    In every claim, the representation that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

510.    Bayside, Lefcort, and Yoo intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Bayside that were not compensable under the New York and New Jersey no-fault insurance laws.

511.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,600,000.00 pursuant to the fraudulent bills submitted through Bayside.

512.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

513.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FOURTH CAUSE OF ACTION
### Against Lefcort MUA
### (Aiding and Abetting Fraud)

514.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

515.    Lefcort MUA knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Bayside, Lefcort, and Yoo.

516.    The acts of Lefcort MUA in furtherance of the fraudulent scheme included Lefcort MUA causing Insureds to be referred to Bayside in violation of New York law for the continued provision of the Fraudulent Services.

517.    The conduct of Lefcort MUA in furtherance of the fraudulent scheme was significant and material. The conduct of Lefcort MUA was a necessary part of and was critical to the success of the fraudulent scheme because, through the referrals caused by Lefcort MUA, Lefcort MUA provided Bayside, Lefcort, and Yoo with the opportunity to submit additional fraudulent billing to GEICO and other insurers.

518.    Lefcort MUA aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Bayside, Lefcort, and Yoo for medically unnecessary Fraudulent Services or illusory services that were not compensable under the No-Fault Laws, because they sought to continue profiting through the fraudulent scheme.

519.    The conduct of Lefcort MUA caused GEICO to pay more than at least $1,600,000.00 pursuant to the fraudulent bills that the Bayside, Lefcort, and Yoo submitted or caused to be submitted through Bayside.

520.    Lefcort MUA's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

521. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FIFTH CAUSE OF ACTION
**Against Bayside, Lefcort, and Yoo**
**(Unjust Enrichment)**

522. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

523. As set forth above, Bayside, Lefcort, and Yoo have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

524. When GEICO paid the bills and charges submitted by or on behalf of Bayside for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Bayside, Lefcort, and Yoo's improper, unlawful, and/or unjust acts.

525. Bayside, Lefcort, and Yoo have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Bayside, Lefcort, and Yoo voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

526. Bayside, Lefcort, and Yoo's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

527. By reason of the above, Bayside, Lefcort, and Yoo have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $1,600,000.00.

### TWENTY-SIXTH CAUSE OF ACTION
**Against Bromberg**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

528.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

529.     Axial Chiro and Action Chiro together constitute an association-in-fact "enterprise" (the "Axial/Action Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the Axial/Action Fraud Enterprise are and have been associated through time, joined in purposed and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Axial Chiro and Action Chiro ostensibly are different businesses – with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO. The Axial/Action Fraud Enterprise has been operated under seven separate names and tax identification numbers in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business.  Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Axial/Action Fraud Enterprise acting singly or without the aid of each other.

530.     The Axial/Action Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating

and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

531.     Bromberg has been employed by and/or associated with the Axial/Action Fraud Enterprise.

532.     Bromberg knowingly has conducted and/or participated, directly or indirectly, in the conduct of the Axial/Action Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Axial Chiro and Action Chiro were not eligible to receive under the No-Fault Law because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many cases, the billed-for services were not performed at all; (v) Action Chiro and Axial Chiro were not in compliance with New Jersey's applicable statutory and regulatory requirements governing healthcare practice; and (vi) the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" and "2".

533.     The Axial/Action Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Bromberg operated the Axial/Action Fraud Enterprise, insofar as the enterprise is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Axial Chiro and Action Chiro to the present day.

534.     The Axial/Action Fraud Enterprise is engaged in in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Axial/Action Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent billing.

535.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $240,000.00 pursuant to the fraudulent bills submitted through Axial Chiro and Action Chiro.

536.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## **JURY DEMAND**

537.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Axial Chiro, Action Chiro, South Shore, Lefcort MUA, and Bayside, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Axial Chiro, Action Chiro, South Shore, Lefcort MUA, and Bayside, have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Bromberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $180,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Bromberg, Coty, and Rosenberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $180,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Axial Chiro, Bromberg , Rosenberg, and Coty, compensatory damages in an amount to be determined at trial but in excess of $180,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against Axial Chiro, Bromberg, Coty, and Rosenberg, more than $180,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

F.     On the Sixth Cause of Action against Axial Chiro, Bromberg, Coty, and Rosenberg, damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at

trial, but exceeding $40,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

G.      On the Seventh Cause of Action against Bromberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $60,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Bromberg and Rosenberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $60,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Action Chiro, Bromberg, and Rosenberg, compensatory damages in an amount to be determined at trial but in excess of $60,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Action Chiro, Bromberg, and Rosenberg, more than $60,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Action Chiro, Bromberg, and Rosenberg, damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $50,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the

costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

L.      On the Twelfth of Action against Lefcort, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $50,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against Lefcort and Rosenberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $50,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Lefcort MUA, Lefcort, and Rosenberg, compensatory damages in an amount to be determined at trial but in excess of $50,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Lefcort MUA, Lefcort, and Rosenberg, more than $50,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Lefcort MUA, Lefcort, and Rosenberg, damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $40,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

Q.      On the Seventeenth Cause of Action against Rosenberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $16,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against Rosenberg, Luca, and Irby, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $16,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth of Action against South Shore, Rosenberg, Luca, and Irby, compensatory damages in an amount to be determined at trial but in excess of $16,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against South Shore, Rosenberg, Luca, and Irby, more than $16,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper; and

U.      On the Twenty-First Cause of Action against Lefcort and Yoo, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.      On the Twenty-Second Cause of Action against Lefcort and Yoo, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.      On the Twenty-Third Cause of Action against Bayside, Lefcort, and Yoo, compensatory damages in an amount to be determined at trial but in excess of $1,600,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

X.      On the Twenty-Fourth of Action against Lefcort MUA, compensatory damages in an amount to be determined at trial but in excess of $1,600,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.      On the Twenty-Fifth Cause of Action against Bayside, Lefcort, and Yoo, more than $1,600,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper; and

Z.      On Twenty-Sixth Second Cause of Action against Bromberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $240,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: July 8, 2021

RIVKIN RADLER LLP

By: _____

Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
Steven T. Henesy (SH 6357)
Yonatan Bernstein (YB 6425)
926 RXR Plaza
Uniondale, New York  11556
(516) 357-3000
*Counsel for Plaintiffs Government
Employees Insurance Co., GEICO
Indemnity Co, GEICO General Insurance
Company and GEICO Casualty Co.*

5104280.v3